United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE:FINISAR CORPORATION SECURITIES LITIGATION | Case No.: 5:11-CV-01252-EJD<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>**[Re: Docket No. 70]** |

Presently before the court in this securities fraud class action is Defendants Finisar Corporation, Eitan Gertel, Jerry Rawls, and Kurt Adzema's (collectively, "Defendants") Motion to Dismiss Lead Plaintiff Oklahoma Firefighters Pension and Retirement System's ("Plaintiff") First Amended Complaint ("FAC"). Dkt. No. 70. The court found this matter suitable for decision without oral argument pursuant to Civil Local Rule 7-1(b) and vacated the hearing on June 25, 2013. Dkt. No. 76. The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Having fully reviewed the parties' briefing, and for the following reasons, the court GRANTS Defendants' Motion.

## I. BACKGROUND

### a. Factual Background

The following factual background is taken from Plaintiff's FAC and is presumed to be true for purposes of this motion. See FAC, Dkt. No. 69. Plaintiff brings this federal securities fraud action on behalf of itself and a class of all persons and entities who purchased or otherwise acquired the common stock of Finisar between September 8, 2010 and March 8, 2011 (the "Class Period"). Defendant is a technology company that develops and sells fiber optic subsystems and components that enable high-speed voice, video and data communications for telecommunications, networking, storage, wireless and cable television applications. The individual defendants each served as directors of Finisar during the Class Period: Mr. Gertel was the Chief Executive Officer, Mr. Rawls was the Chairman of the Board, and Mr. Adzema was the Chief Financial Officer.

Prior to the Class Period, Finisar experienced six consecutive fiscal quarters of revenue growth, purportedly driven by sales of its key wavelength selective switches ("WSS") and reconfigurable optical add/drop multiplexers ("ROADM") linecard telecom products. Plaintiff alleges that Defendants misled investors as to the nature of that growth by denying that Finisar's revenue increase was the result of a short-term, unsustainable inventory build-up by customers rather than the result of increased demand for Finisar products. Moreover, Plaintiff contends that Defendants knew at some point during the Class Period that customers' fears of over-supply constraints had not materialized but failed to disclose that information, and also failed to disclose that customers would be reducing their orders from Finisar as a result.

Plaintiff points to the following allegedly misleading statements Defendants made about Finisar's performance:

- On September 8, 2010 PiperJaffray analyst Troy Jensen issued a report on Finisar titled "Takeaways from Recent Management Meeting" which purportedly repeated statements made by Mr. Gertel at an investor dinner. Particularly, Mr. Jensen reported that "[t]he negative concerns with respect to Finisar and the optical component sector is a belief that customers have been double ordering over the past

2

Case No.: 5:11-CV-01252-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

several quarters and, if true, this could dramatically slow demand if customers return to normal patterns. While it is hard to quantify the amount of optical components sitting in OEM's inventories, Finisar (and JDS Uniphase and Oclaro) have been adamant that inventory levels have not increased materially." Moreover, the report stated that "We [the PiperJaffray analysts] believe concerns regarding double ordering and inventory levels being [sic] overblown and have created a compelling valuation for FNSR shares." FAC ¶ 36.

- On December 2, 2010 during a Credit Suisse Technology Conference Call, a Credit Suisse analyst highlighted that Finisar had "significantly outgrown [its] end markets for the last six quarters" and raised the fear that that "this is going to revert." Mr. Gertel responded saying:

    > So if you look at the market, you see the fundamentals for growth are there. People need more higher bit rate products, more sophisticated products to address the cost reduction that the network needs and the demand continues.
    >
    > As far as we know we haven't seen any inventory issues with our product with our customers. Our product—our business is 60/40, basically 40% is LAN/SAN business, 60% is telecom. On the LAN/SAN side, by far the majority of our sales is a vendor-managed inventory. So we have visibility to what people have. There is no reason for them to have inventory because we own the inventory. So we're pretty safe with that. And on the telecom side, look, there can be one or two guys who try to build their own inventory, but by far the majority of the customers expediting products and doesn't look to us, not visible to us at all, all these quarters if they are building any inventory.

    Id. at ¶ 38.

- On January 11, 2011 Mr. Rawls stated during a call with analysts, investors, and media representatives that:

  > This [the ROADMs, the wavelength selective switch or the WSS] is the fastest growing product on the planet for optic. It is the drug that phone companies don't seem to be able to get enough off [sic], it is—gives them the ability to switch light instead of electrons and gives them operational efficiency, that is they can spend CapEx and save OpEx.
  >
  > So it is—the demand has been incredibly strong and we have been at capacity and on allocation now for—oh, I don't know, the last five quarters, maybe six quarters in this product. It's a very exciting space.
  >
  > [F]or most—some of our customers, we get very specific rolling production forecasts that go out as far as 12 months as to what—that are updated biweekly. So we understand their business, at least what they expect for their business. And others, we get forecasts that say, this is what we need for capacity, this is what we expect to sell. Because we are such an important supplier and all of our customers depend on us so heavily, they have to share with us what it is that they expect to happen in their business to make sure that we are ready for it. I mean, we are not only the number one supplier for Cisco, Alcatel, Huawei, but also IBM, EMC, you name it. And all of these guys in their business need us to be able to respond or they're going to be revenue-limited.

  Id. at ¶¶ 42-43.

- On February 10, 2011, during another call with analysts, investors, and media representatives, Mr. Rawls stated that Finisar, "today," was in a "very strong demand environment." Id. at ¶ 46.

Plaintiff alleges that, despite the statements listed above, Finisar learned through the course of annual negotiations with customers that Finisar was experiencing a serious slowdown in business, particularly from customers in China. According to Plaintiff, these negotiations were substantially

4

Case No.: 5:11-CV-01252-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

completed by December 2010. Defendants also knew after its customer negotiations were completed that Finisar was experiencing increased pricing pressures due to intense competition and that Finisar was forced to steeply discount pricing in order to retain certain customers.

Despite learning of these conditions as early as November 2010, Finisar did not share this information with its investors or the public until March 8, 2011. On that date, Finisar issued a press release indicating that, during the fourth quarter of fiscal year 2011 (February 1, 2011, through April 30, 2011), Finisar revenues would be impacted by certain developments, including: (1) the annual price negotiations, (2) a shutdown at certain customers for Chinese New Year, (3) an inventory adjustment by some customers who had been double ordering and building inventory, particularly for products that had been on allocation such as WSS and ROADM line cards, and (4) a slowdown in business in China overall. Id. at ¶ 48.

Mr. Rawls gave a conference call that same day to discuss Finisar's expected results. During the call, Mr. Rawls explained the inventory adjustment saying:

> [M]any, many of the people that follow our company have speculated for several quarters about double ordering inventory builds on the part of our customers and we continually responded that we asked our customers and they say, "No. We're buying for production and we're not buying for inventory." Well we have clearly learned here in the last month or so from several of them that all of a sudden surprise, surprise they have some pretty good size inventories of wavelength selective switches. And the question is we don't really have great visibility into their inventory levels other than what they tell us and I, you know, they're not—we're not getting complete information I don't think.

Id. at ¶ 49. Mr. Rawls also stated that Finisar had seen "reduced order rates" for "a couple of months." Id. at ¶ 52. Mr. Gertel admitted that Finisar had seen the slowdown in a more pronounced way since the beginning of February. Id. at ¶ 53.

On this news, Finisar's stock price, which had nearly tripled during the Class Period, erased nearly all of those gains in one day, falling from its previous close of $40.04 to $24.61 at

the close of March 9, 2011. Id. at ¶¶ 7, 79, 86. The financial news media reported on Finisar's March disclosure and the fallen stock price.

Plaintiff further alleges that during the more than three months in which Defendants knew of the inventory build-up and slowdown in the Chinese market prior to disclosing the same on March 8, 2011, they capitalized on the rapidly rising stock price. Finisar conducted a substantial stock offering garnering over $118 million in gross proceeds. Id. at ¶ 72. At the same time, individual defendants Mr. Rawls, Mr. Gertel and Mr. Adzema sold over 264,000 shares of their personally held Finisar stock for proceeds of over $6.8 million. Id. at ¶ 73.

### b. Procedural History

On March 15, 2011, Plaintiff Martin Derchi-Russo filed a class action complaint in this court against Defendants for violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). Dkt. No. 1; 15 U.S.C. § 78j(b). Two additional plaintiffs filed separate but similar actions in the ensuing weeks. See Dkt. No. 12. On May 4, 2011, this court ordered that the three cases be related. Dkt. No. 17. Several months later, on October 27, 2011, this court issued an order consolidating all related actions, appointing Oklahoma Firefighters Pension and Retirement System as Lead Plaintiff, and approving the same's legal counsel as Lead Counsel. Dkt. No. 48. Lead Plaintiff filed the Amended Consolidated Class Action Complaint on January 20, 2012. Dkt. No. 53. Defendants filed a motion to dismiss (Dkt. No. 56), which the court granted on January 16, 2013 (Dkt. No. 68). The FAC followed (Dkt. No. 69), and Defendants moved to dismiss it on February 20, 2013 (Dkt. No. 70). The court now turns to the substance of that motion.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim in the complaint with sufficient specificity to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations omitted). A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

6

Case No.: 5:11-CV-01252-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

Dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is "proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." Shroyer v. New Cingular Wireless Servs., Inc., 606 F.3d 658, 664 (9th Cir. 2010) (quoting Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001)). In considering whether the complaint is sufficient to state a claim, the court must accept as true all of the factual allegations contained in the complaint. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570).

Because Plaintiff's FAC exclusively raises federal securities laws causes of action, it is also subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the pleading standards articulated in the Private Securities Litigation Reform Act of 1995 ("PSLRA"). See 15 U.S.C. § 78u-4(b)(1) (applying the PSLRA provisions to "any private action arising under this chapter [the Exchange Act]" alleging false or misleading statements). Under these rules, a securities fraud plaintiff must "state with particularity" the elements of its claim. See Fed. R. Civ. Proc. 9(b) (requiring the plaintiff to "state with particularity the circumstances constituting fraud or mistake"); Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009) (finding the PSLRA requires the plaintiff to plead falsity and scienter with particularity).

With respect to falsity, the plaintiff must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). To the extent an allegation is based on information and belief, "the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In doing so, the plaintiff shall "reveal 'the sources of [his] information.'" In re Daou Sys., Inc. Sec. Litig., 411 F.3d 1006, 1015 (9th Cir. 2005) (quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 975 (9th Cir. 1999)). With respect to scienter, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the

7
Case No.: 5:11-CV-01252-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

required state of mind." 15 U.S.C. § 78u-4(b)(2). That is, the plaintiff must plead with particularity the facts evidencing "the defendant's intention 'to deceive, manipulate, or defraud.'" Tellabs Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n. 12 (1976)). To satisfy the rigorous pleading standards of the PSLRA, the complaint's scienter allegations must give rise not simply to a plausible inference of scienter, but rather to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. at 314.

### III. DISCUSSION

To state a claim under Section 10(b) of the Exchange Act and its accompanying rule promulgated by the Securities and Exchange Commission ("SEC"), Rule 10b-5, 17 C.F.R. § 240.10b-5, a plaintiff must allege (1) a material misrepresentation or omission made by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. Janus Capital Grp. v. First Derivate Traders, --- U.S. ---; 131 S. Ct. 2296, 2301 n.3 (2011). Defendants argue that Plaintiff has failed to adequately alleged the first (false or misleading statement), second (scienter), and sixth (loss causation) prongs of its 10(b) claim.

### a. False or Misleading Statement by Defendants

#### i. Mr. Gertel's Statement as Reported by the September 8, 2010 Analyst Report

Plaintiff alleges that on September 7, 2010, ACI Research issued a report and recommendation on Finisar that relayed, in pertinent part, that analysts "are now detecting inventory buildup in Finisar's ROADM business, particularly in their merchant market WSS [wavelength selective switches] business." FAC ¶ 35. The very next day, which marks the start of the Class Period, an analyst from PiperJaffray issued a report based largely on information he had gathered during a dinner he hosted with Mr. Gertel. Id. at ¶ 36. According to the report, "Finisar (and JDS Uniphase and Oclaro)," as of that date, "have been adamant that inventory levels have

8

Case No.: 5:11-CV-01252-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FIRST AMENDED
COMPLAINT

not increased materially." Id. Plaintiff argues that, because Mr. Gertel hosted this dinner and because Finisar is mentioned in this statement in the report, the court should attribute the "adamant" denial of inventory build-up to Mr. Gertel. The court disagrees.

Plaintiff's argument appears to be in direct conflict with the Supreme Court's recent decision in Janus Capital. In that case, the Court considered whether certain allegedly misleading statements contained in several fund prospectuses could be attributed to the funds' creator and investment adviser. See 131 S. Ct. 2296. The Court first articulated a rule for determining if a speaker is a "maker" of a statement, holding that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." 131 S. Ct. at 2302. It then went on to note that, despite the close relationship between the funds and their adviser, they were maintained as legally separate entities. Thus, the Court found that statements made by the funds could not be attributed to the adviser, even if the adviser assisted in preparing the prospectuses. 131 S. Ct. at 2304-05.

The statement at issue in this case is even further removed from its alleged maker than the ones at issue in Janus Capital. There, the alleged "maker" was a corporate entity closely related to the true speaker and had been heavily involved in preparing the statement. Here, the "adamant" denial statement is contained in an independent analyst's report. While that report appears to be based at least in part on statements made by Mr. Gertel at a recent dinner, Plaintiff supplies no allegations suggesting that Mr. Gertel or anyone else at Finisar had editorial control over the author's use of it or the preparation of the ultimate report. Moreover, the statement is clearly attributed to at least three separate speakers: Finisar, JDS Uniphase, and Oclaro. See FAC ¶ 36. The collective nature of this statement makes it impossible for the court to determine whether the author was reporting on each individual company's specific "adamant" denial, or rather the cumulative impression he received from the three companies throughout the evening. Accordingly, the court finds that the September 8, 2010 statement cannot be attributed to Mr. Gertel or Finisar.

9
Case No.: 5:11-CV-01252-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

### ii. Mr. Gertel's Statements During the December 2, 2010 Investor Call

Plaintiff next alleges that Mr. Gertel's December 2, 2010 statements that the "fundamentals for growth" were present in the market, that Finisar had not seen inventory issues with its customers, and that it did not have visibility into inventory issues with its telecom customers were false and misleading. The court previously found that these statements, when read in full, were insufficient to show falsity because the only visibility Mr. Gertel appeared to admit to was that of the inventory of Finisar's LAN/SAN products, which are not at issue in this case. Dkt. No. 68 7-8. Plaintiff now alleges that Finisar's annual price negotiations with its telecom customers typically cover topics such as production needs and capacity and that during these negotiations in 2010 customers "disclosed—and had every incentive to disclose—their inventory levels and decreased demand for Finisar products as they burned-off excess inventory." FAC ¶¶ 8, 41, 62, 66-67. Moreover, according to Plaintiff, these negotiations occurred "at the end of 2010" and were substantially completed by the time of Mr. Gertel's statement. Id. at ¶¶ 8, 9, 41, 61.

These allegations plausibly suggest that Finisar at least discussed inventory levels with its telecom customers prior to December 2, 2010. However, they do not go so far as to suggest that Finisar had any true visibility into its customers' inventory levels as of that time. Most notably, these allegations do not support an inference that Finisar's customers had actually revealed an excess of inventory during these discussions, and thus that Mr. Gertel's statement suggesting that Finisar's growth was in-line with end market sales and that Finisar had "visibility" into telecom inventory can be inferred to be false or misleading.

Elsewhere in the FAC, Plaintiff includes curative statements issued by Finisar regarding its fiscal fourth quarter 2011 revenues that directly contradict the inference it asks the court to make here. In a March 8, 2011 press release, Finisar listed both the annual price negotiations and "the adjustment of inventory levels at some telecom customers" among the factors influencing its revised revenue estimates. Finisar's setting forth the negotiations and the inventory adjustment as separate causes of the decrease in its revenue contradicts Plaintiff's argument that Defendants had accurate visibility into its customers' inventories during the annual negotiations. Id. at ¶ 48. Even

10
Case No.: 5:11-CV-01252-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

more strongly detracting from this argument is Plaintiff's inclusion of Mr. Rawls' March 8, 2011 statement to investors that "we don't really have great visibility into [customers'] inventory levels other than what they tell us and I, you know, they're not—we're not getting complete information I don't think." Id. at ¶ 49. Without more to support an inference that customers revealed an inventory build-up to Defendants by December, the court finds that Plaintiff has not alleged that Mr. Gertel's December 2, 2010 statement was false or misleading when made to the satisfaction of Rule 9(b) and the PLSRA.

### iii. Mr. Rawls' Statements During the January 11, 2011 and February 10, 2011 Investor Calls

Finally, Plaintiff contends that Mr. Rawls' January 11, 2011 statement that WSS is "the fastest growing product on the planet for optic" and "the drug that phone companies don't seem to be able to get enough of," along with his statement that demand had been "incredibly strong," and on February 10, 2011 that "today" Finisar finds itself "in a very strong demand environment" for ROADM and WSS products misled investors to believe that demand for WSS and other telecom products remained strong at the time of the respective calls. FAC ¶¶ 42, 46. Plaintiff makes clear that it only alleges these cited portions of the January and February 2011 statements to be false or misleading. Dkt. No. 73 at 9. The court previously found that Plaintiff did not adequately allege falsity as to these statements because Plaintiff had not included allegations suggesting that customers were actually building inventory at the time of the call or, even if customers were building inventory, Plaintiff did not allege that the statements about demand were false, only that the source of the demand was omitted. Dkt. No. 68 at 8-9.

Plaintiff maintains that it has changed its theory as to these statements from that of omission to that of an affirmative misstatement, now arguing that the statements were false when made because, at the time Mr. Rawls was trumpeting the "incredibly strong" demand environment for WSS and ROADM to investors, demand for the telecom products was actually falling as a result of customers' inventory build-up. In arguing that its allegations are sufficient to state falsity, Plaintiff points to Finisar's own later statements suggesting that Defendants had already seen

11
Case No.: 5:11-CV-01252-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

reduced order rates by the time the January and February statements were made.  Particularly, during the March 8, 2011 call on Finisar's revised revenue estimates, Mr. Rawls stated that he had seen the impact of reduced order rates for "a couple of months" due to "an industry-wide phenomenon" that was "not limited to just one customer in China." FAC ¶ 45.  This statement plausibly suggests that Finisar's orders had been reduced since at least January.  Also on March 8, 2011, Mr. Gertel explained that Defendants had seen this "more pronounced" slowdown in China "starting at the beginning of February in a more serious way."  This statement appears to directly contradict Mr. Rawls' February 10 statement that "today" Finisar is in a "strong demand environment."

Despite Plaintiff's plausible allegations that demand had started to curtail by January 2011, the court does not find that Plaintiff has plausibly alleged that Mr. Rawls' January statements were false.  Taking these statements in context, Mr. Rawls appears to have been discussing Finisar's past performance:

> This [the ROADMs, the wavelength selective switch or the WSS] is the fastest growing product on the planet for optic.  It is the drug that phone companies don't seem to be able to get enough off [sic], it is—gives them the ability to switch light instead of electrons and gives them operational efficiency, that is they can spend CapEx and save OpEx. So it is—the demand has been incredibly strong and we have been at capacity and on allocation now for—oh, I don't know, the last five quarters, maybe six quarters in this product.  It's a very exciting space.

Id. at ¶ 42. On its face, Mr. Rawls' statement pertains to the prior "five quarters, maybe six quarters."  The present tense in the introductory portion of these statements appears only to be used for the purpose of setting up an analogy to describe what the demand "has been" like over these past quarters.

Similarly, Mr. Rawls' February statement also appears, in context, to be referring to prior quarters:

> And if you think about the headlines for the company, most of it what you've seen I think over the last few quarters has been wavelength selective switches, switching light, not electrons, the ROADM capabilities and telecom equipment, and it has been very exciting as that business has grown 20%, 30% per quarter, quarter after quarter…so anyway, today we find ourselves in a very strong demand environment. Revenues have been growing fast.

Id. at ¶ 46. Given Plaintiff's own admissions that Defendants' "double-digit, sequential growth" in the six consecutive quarters leading into the Class Period was "driven primarily" by WSS and ROADM sales, the court cannot find that these statements describing demand in those recent quarters as "strong" were false. Id. at ¶ 33.

Even isolating the narrow portion of Mr. Rawls' February statement that Plaintiff asserts as the misrepresentation, i.e. the statement that "today" Finisar finds itself "in a very strong demand environment," the court still cannot find that Plaintiff has adequately alleged falsity. This statement, taken alone, does suggest at least a pivot in the conversation towards present day conditions. However, without more, the word "strong" used to describe a company's demand is insufficient to serve as the basis of a securities fraud cause of action. See In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F. Supp. 2d 1059, 1076-77 (N.D. Cal. 2001) (noting that courts have held that phrases such as "strong," "robust," and "well-positioned," when used to describe demand, results, or strategy are not actionable as material misrepresentations); see also In re Calpine Corp., 288 F. Supp. 2d 1054, 1088 (N.D. Cal. 2003) (holding that words such as "strong" and "solid" could not form a basis for Section 10(b) claims). Accordingly, the court finds that Plaintiff has failed to adequately allege falsity of the January and February statements.

Because Plaintiff has for the second time failed to adequately allege any material misrepresentation on the part of Defendants, the court DISMISSES its Section 10(b) claim WITHOUT LEAVE TO AMEND. For the same reasons, the court DISMISSES Plaintiff's Section 20(a) claim WITHOUT LEAVE TO AMEND. See Zucco Partners, 552 F.3d at 990 ("Section 20(a) claims may be dismissed summarily…if a plaintiff fails to adequately plead a primary violation of section 10(b).").

13
Case No.: 5:11-CV-01252-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion to Dismiss. The clerk shall CLOSE this file upon entry of judgment.

**IT IS SO ORDERED**

Dated: September 30, 2013

                                                         _____
                                                         EDWARD J. DAVILA
                                                         United States District Judge

Case No.: 5:11-CV-01252-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT