1
2
3
4
5
6
7
8

ABRAHAM, FRUCHTER
   & TWERSKY, LLP
IAN D. BERG   (Bar No. 263586)
TAKEO A. KELLAR   (Bar No. 234470)
11622 El Camino Real, Suite 100
San Diego, CA 92130
Tel:     (858) 764-2580
Fax:     (858) 764-2582
*iberg@aftlaw.com*
*tkellar@aftlaw.com*

*Counsel for Lead Plaintiff Oklahoma*
*Firefighters Pension and Retirement System*
*and Lead Counsel for the Class*

9

UNITED STATES DISTRICT COURT

10

NORTHERN DISTRICT OF CALIFORNIA

11

SAN JOSE DIVISION

12
13
14
15
16
17

In re FINISAR CORPORATION
SECURITIES LITIGATION

Case No. 5:11-CV-01252-EJD

CLASS ACTION

SECOND AMENDED
CONSOLIDATED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

I.    NATURE OF THE ACTION .................................................................1

II.   JURISDICTION AND VENUE ............................................................5

III.  PARTIES ..............................................................................................6

IV.   SUBSTANTIVE ALLEGATIONS AND DEFENDANTS'
      MATERIAL MISREPRESENTATIONS AND
      OMISSIONS .........................................................................................7

      A.    Background ...............................................................................7

      B.    Defendants Knew, Or Were Reckless In Not
            Knowing, That An Inventory Build-up Was Driving
            Growth Because They Had Access To Key
            Customer Information ..............................................................9

      C.    Finisar First Acknowledged The Inventory Build-up
            And Slowdown In China On March 8, 2011 ..........................13

      D.    Defendants Misled Investors By Making Materially
            False And Misleading Statements And Omissions
            Concerning Finisar's Growth And Demand For Its
            Products During The Class Period ..........................................16

V.    ADDITIONAL FACTS SUPPORTIVE OF FALSITY
      AND SCIENTER ................................................................................20

VI.   LOSS CAUSATION ..........................................................................22

VII.  PRESUMPTION OF RELIANCE .......................................................23

VIII. NO SAFE HARBOR ..........................................................................24

IX.   CLASS ACTION ALLEGATIONS ....................................................24

X.    CLAIMS FOR RELIEF .....................................................................26

      COUNT I For Violation Of Section 10(b) Of The Exchange
      Act And  Rule 10b-5 Promulgated Thereunder
      Against Defendants Finisar And Gertel .................................26

      COUNT II For Violation Of Section 20(a) Of The
      Exchange Act Against Defendants Rawls And
      Gertel.....................................................................................28

XI.   PRAYER FOR RELIEF .....................................................................29

XII.  JURY DEMAND ...............................................................................30

Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Lead Plaintiff" or "Plaintiff") makes the following allegations in this Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") upon information and belief based upon all of the facts set forth herein which were obtained through an investigation made by and through Lead Counsel.  Lead Counsel's investigation has included, among other things, a review and analysis of public filings by Defendants (defined herein) with the United States Securities and Exchange Commission (the "SEC"), press releases and other public statements issued by Defendants, and the other sources, including confidential witnesses, set forth herein.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      This is a federal securities action on behalf of a Class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired the common stock of Finisar Corporation ("Finisar" or the "Company") between December 2, 2010 and March 8, 2011, inclusive, (the "Class Period"), and who were damaged thereby.

2.      Finisar is a technology company that develops and sells fiber optic subsystems and components that enable high-speed voice, video and data communications for telecommunications, networking, storage, wireless, and cable TV applications.  Finisar sells its optical products to manufacturers of storage systems, networking equipment, and telecommunication equipment, or their contract manufacturers, through a direct sales force and distribution channels in the United States and internationally, including in Malaysia and the People's Republic of China.

3.      During the Class Period, Defendants issued materially false and misleading statements regarding the Company's business and financial results, and the sustainability of its financial results.  Prior to the Class Period, Finisar experienced six consecutive fiscal quarters of revenue growth.  Analysts suspected that this growth was driven by customers building-up inventory rather than purchasing Finisar products for immediate use in production.  Prior to the Class Period, Finisar remained silent regarding such suspicions.  At the commencement of the

Class Period, however, Defendants intentionally or recklessly misled investors to believe that the Company's recent growth was not the result of an inventory build-up, but rather the result of an organic increase in demand for Finisar products to be used for immediate production by its customers.  In truth, Defendants knew, or were reckless in not knowing, that Finisar's growth was the result of its customers increasing their inventory for *future* production, in light of the industry-wide fear that component supply might be limited over the next few fiscal quarters.

4.     Throughout the Class Period, which covers essentially one fiscal quarter, Defendants knew that industry fears over supply restraints and allocations had subsided and that its customers would no longer be ordering "extra" product from Finisar to boost their inventory. In addition, Defendants knew, or should have known, but failed to disclose that the Company's customers would actually be ordering **less** product in the next (and future) quarter(s) because (i) they were holding extra inventory after the build-up in previous quarters; and, (ii) due to financial conditions in China, where most of its customers for its key WSS (wavelength selective switches) and ROADM (reconfigurable optical add/drop multiplexers) linecard products are located.

5.     The truth of what Defendants knew, or should have known, regarding Finisar's growth and prospects for the fourth fiscal quarter 2011 (February 1, 2011 through April 30, 2011) was first revealed to investors through a curative disclosure on March 8, 2011, when the Company announced that its revenues for the upcoming quarter would be far below analyst estimates and in stark contrast to what Defendants had intimated throughout the Class Period. Specifically, the Company disclosed that its results for the next quarter would be impacted by: (i) the full three months of annual price negotiations with telecom customers; (ii) certain customers being shut down for an extended period in February to celebrate the Chinese New Year; (iii) the adjustment of inventory levels at some telecom customers; and (iv) an overall economic slowdown in China and a slowdown in Chinese business.

6.     On this news, shares of the Company's stock, which had more than doubled since the Company reported its second quarter results at the start of the Class Period on December 2, 2010, fell $15.43 per share, to close on March 9, 2011 at $24.61 per share, marking

a one-day decline of nearly 39%, on unusually heavy trading volume.

7.     The information disclosed to investors on March 8, 2011, however, was known, or should have been known, to Defendants by the time that the Class Period commenced on December 2, 2010.  Each year, Finisar engages in contract negotiations with its customers for the supply of its products, including WSS and ROADM linecards.  These negotiations typically take place over the course of weeks or months prior to December, with the new prices taking effect on January 1, annually.  During these negotiations, Finisar and its customers discuss production needs and set prices in accord with competition and the overall health of the industry and local economies.

8.     Over the course of these negotiations for the calendar year 2011, Defendants learned of, or should have learned of, and concealed from investors throughout the Class Period, that Finisar's revenue surge over the past six quarters was not due solely to organic growth from real end-market demand, but rather was due to a substantial inventory build-up by the Company's customers.

9.     Prior to the Class Period, due to fear surrounding supply chain constraints in the optical component industry, Finisar's customers were ordering additional products, referred to as "double-ordering," in order to cover any potential shortages of supply in the near future.  Accordingly, Defendants knew, or were reckless in not knowing, that its unprecedented growth could not be sustained over time, as supply constraints loosened.  When those supply restraint fears never materialized, Finisar's customers were left with an oversupply of inventory and thus would need to decrease the amount of products they ordered from Finisar in order to reduce their inventory levels.

10.     In addition, through the course of Finisar's yearly negotiations, Defendants learned that Finisar was experiencing a serious slowdown in business from China.  Chinese equipment manufacturers contributed significantly to the Company's recent growth streak, particularly with regards to ROADM sales growth, and slowing in demand from Chinese companies would necessarily have a detrimental effect on the Company's ability to continue growing at unprecedented rates.

11.     Finally, Defendants knew prior to December 2, 2010, a date by which its 2011 negotiations were complete, that Finisar was experiencing increasing pricing pressures due to intense competition in the industry and, as a result, the Company was forced to discount pricing in order to retain certain of its customers.

12.     Accordingly, by December 2, 2010, when the Class Period commences, Defendants knew, or were reckless in not knowing, that Finisar's streak of consecutive quarters of tremendous growth would inevitably end in the fourth fiscal quarter.  Rather than disclose this truth, however, Defendants misled investors regarding the Company's prospects so they could cash in on insider stock sales and so the Company could conduct a substantial stock offering at artificially inflated prices before the truth was revealed.

13.     As indicated by the chart below, the price per share of Finisar common stock closed at $19.77 per share on December 1, 2010, which is the day before the first alleged false and misleading statements and omissions that begin the Class Period (December 2, 2010 – March 8, 2011).  Over the next quarter, while Defendants were misleading investors, the price per share of Finisar stock more than doubled, reaching a high of $43.23 per share on February 14, 2011:



14. During this time, Defendant Eitan Gertel, Finisar's Chief Executive Officer ("CEO"), sold 201,913 shares of his personally held Finisar stock for proceeds of over $5.17 million, with over 99.5% of those sales occurring within two weeks of his false statement. These sales were out of the ordinary for Defendant Gertel and not consistent with his previous sales patterns.

15. In addition, while misleading investors about Finisar's purportedly surging revenues and strong demand for its products, and while denying a customer inventory build-up, Defendants conducted a substantial stock offering that closed on December 27, 2010, garnering over $117.9 million in net proceeds to the Company (the "Offering").

16. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Lead Plaintiff and other Class Members suffered damages.

## II.  **JURISDICTION AND VENUE**

17. This action arises under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

18. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

19. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and Section 1391(b) of the Judicial Code, 28 U.S.C. § 1391(b).  At all relevant times, Finisar maintained its corporate headquarters and conducted business in this District.  In addition, many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

20. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications and the facilities of a national securities exchange.

### III. **PARTIES**

#### A. **Lead Plaintiff**

21. Lead Plaintiff Oklahoma Firefighters Pension and Retirement System purchased Finisar common stock during the Class Period and suffered damages as a result. Lead Plaintiff's PSLRA Certification has previously been filed with the Court and is incorporated herein by reference.

#### B. **Defendants**

22. Defendant Finisar is a Delaware corporation with its principal executive offices located at 1389 Moffett Park Drive, Sunnyvale, California, 94089.

23. Defendant Eitan Gertel ("Gertel") served as Chief Executive Officer ("CEO") and a director of Finisar from August 2008 to September 2015. During the Class Period, Defendant Gertel reaped over $5.17 million in insider trading proceeds by selling 201,913 shares of his Finisar stock at artificially inflated prices.

24. Defendant Jerry S. Rawls ("Rawls") has served as Chairman of the Board of Finisar since 2006, and was appointed CEO in September 2015. Previously, Rawls served as President, CEO, co-CEO and a member of the Board from 1989 to 2008.

25. As set forth herein, by virtue of their positions with the Company, Defendants Gertel and Rawls (the "Individual Defendants") had access to adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

26. Defendants Gertel and Rawls, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements and financial condition, as alleged herein. Defendants Gertel and Rawls were

involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

27.     As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ and governed by the provisions of the federal securities laws, Defendants Gertel and Rawls each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.  Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

28.     Defendants Gertel and Rawls are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Finisar common stock during the Class Period by disseminating materially false and misleading statements and/or concealing material adverse facts known to them about Finisar.  The scheme: (a) deceived the investing public regarding Finisar's prospects and business; (b) artificially inflated the price of Finisar common stock; (c) allowed insiders, including Defendant Gertel, to sell millions worth of their Finisar stock; and (d) caused Lead Plaintiff and other members of the Class to purchase or acquire Finisar common stock at artificially inflated prices.

## IV.     SUBSTANTIVE ALLEGATIONS AND DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS

### A.     Background

29.     Finisar is a leading provider of optical subsystems and components that are used to interconnect equipment in short-distance LANs (local area networks) and SANs (storage area networks), and longer distance MANs (metropolitan area networks), FTTx (fiber to the home

networks), CATV (cable television networks), and WANs (wide area networks).  In essence, the Company provides components that help move information, in greater quantities and at greater speeds.

30.     Among other network and telecom products, Finisar provides products known as wavelength selective switches, or "WSS," that are used for dynamically switching network traffic from one optical wavelength to another across multiple wavelengths without first converting to an electrical signal.   These products are sometimes combined with other components and sold as linecards, also known as reconfigurable optical add/drop multiplexers, or "ROADMs."

31.     Demand for Finisar's products is largely driven by the continually growing need for additional bandwidth created by the ongoing proliferation of data and video traffic that must be handled by both wireline and wireless networks.

32.     ROADM and WSS sales represented a significant portion of the Company's total revenues, and a greater proportion of its growth prospects, with ROADM and WSS accounting for $72 million in revenues in fiscal year 2010 and $150.8 million in fiscal year 2011.   In meetings with analysts, Finisar presented slides in December 2010, stating that Finisar held 33% of the WSS/ROADM market share.

33.     Driven primarily by ROADM and WSS sales, Finisar experienced six consecutive quarter of double-digit, sequential growth prior to the start of the Class Period:



34.     In terms of customers, Finisar sells its optical products to manufacturers of storage systems, networking equipment and telecommunication equipment, including Alcatel-Lucent, Brocade, Cisco Systems, EMC, Emulex, Ericsson, Hewlett-Packard Company, IBM, Juniper, Qlogic, Siemens and Tellabs, and to their contract manufacturers.  With respect to Chinese customers, Finisar's key telecom equipment customers included Huawei Corp. ("Huawei"), ZTE Corporation ("ZTE") and FiberHome Technologies Group ("FiberHome"). These customers, in turn, sell their systems to businesses and to wireline and wireless telecommunications service providers and cable TV operators.

35.     On December 1, 2010, during a conference call with analysts and investors attended by Defendants Gertel and Rawls, Finisar's Chief Financial Officer ("CFO") Kurt Adzema stated "[i]n terms of customer concentration, we had three 10%-or-greater customers, and our top three customers contributed 41% of total revenue, compared to 38.1% last quarter. Our top ten customers represented 64% of total revenues, compared to 61.7% last quarter.  While the increase in revenues was driven by a broad range of products, product mix remained favorable, ***driven [by] particularly strong growth in the sale of WSS and ROADM linecards***."[1]

**B.     Defendants Knew, Or Were Reckless In Not Knowing, That An Inventory Build-up Was Driving Growth Because They Had Access To Key Customer Information**

36.     Prior to the Class Period, analysts asked whether Finisar's recent record-setting growth was the result of an inventory build-up by customers.  During this time, Finisar did not affirm nor deny an inventory build-up.  Accordingly, Finisar's stock price remained relatively consistent over the course of the six-quarters of record-growth.

37.     Throughout the Class Period, however, Defendants misled investors into believing that its recent growth was organic and due to an increased demand for components to be used in production.  As a result, Finisar's stock price increased significantly throughout the Class Period.  In truth, Defendants knew, or were reckless in not knowing, that Finisar's growth

---

[1] Unless otherwise indicated, all emphasis is added.

1    was, in substantial part, due to a build-up in customer inventory levels amidst the industry-wide

2    fear of short or restricted supply and allocations.

3        38.    When this truth was later revealed, Defendants claimed that they had no

4    knowledge of the inventory build-up, or that customers were otherwise purchasing Finisar's

5    products for anything other than immediate production.  It is evident from Defendants' own

6    statements, however, that customer inventory build-up was a key issue to the Company and one

7    that Finisar and its top executive officers, including the Individual Defendants, would have been,

8    or should have been, aware of through the course of the Company's core operations.  Inventory

9    build-up was a particularly important issue pertaining to Finisar's Chinese customers, as China

10   and the Chinese equipment manufacturing industry had begun to slide into an economic slow-

11   down prior to the Class Period.  These Chinese customers were a particularly important part of

12   Finisar's growth over the prior six quarters.

13       39.    Inventory build-up was a key topic asked about and discussed by industry analysts

14   prior to and throughout the Class Period.  Prior to and throughout the Class Period, analysts

15   repeatedly questioned whether Finisar's recent growth and increased sales were attributable to

16   inventory build-up rather than real end-market demand.  For example, in a report dated

17   September 7, 2010, analysts at ACI Research questioned whether the telecom industry was

18   "suffering from an inventory bubble" and reported that it was "detecting inventory buildup in

19   Finisar's ROADM business, particularly in their merchant market WSS business."  Defendants,

20   however, denied detecting any inventory build-up by its customers.

21       40.    In fact, on January 5, 2011, the Juda Group, a financial analyst firm, released a

22   report detailing a "series of investor meetings with Finisar management on January 4, 2011,"

23   during which they were led to believe that "[g]rowth appears to be driven by real end market

24   demand rather than inventory build."  The Juda Group further reported:

25           Management tone at the meetings was positive and validates our recent checks
            indicating business trends in the telecom optical component market remain strong
26           with Finisar . . . outperforming peers.  We believe ROADM, 40G client side
            optics and 100G cfp modules will continue to drive growth for Finisar and we
27           expect the telecom segment of the business to grow faster than LAN/SAN in
            C2011.  We believe that Finisar continues to receive expedites for products on
28           allocation, such as ROADMs, indicating orders are driven off real end market

demand rather than inventory build, and we expect capacity to catch up with demand for the most part in [the first quarter of the calendar year 2011, *i.e.*, Finisar's fiscal fourth quarter 2011].

41.     As Finisar and its executives consistently told analysts and investors before and during the Class Period, Finisar "understands" their customers supply needs and had "visibility" as to product demand.  For instance, prior to the Class Period, on March 4, 2010, at the Morgan Stanley Technology, Media & Telecom Conference, Defendant Rawls stated that with respect to ROADM orders, because of the production lead time of 14 to 16 weeks, the Company had "visibility" on firm non-cancelable ROADM orders "more than a quarter" ahead.

42.     On December 2, 2010, during the Credit Suisse Technology Conference call with analysts and investors, Defendant Gertel affirmed that ***Finisar had "visibility as to what people have" and "[a]s far as we know we haven't seen any inventory issues with our product with our customers."***  Defendant Gertel stated also that "on the telecom side, look, there can be one or two guys who try to build their own inventory, but by far the majority of the customers expediting products and *doesn't look to us, not visible to us at all, all these quarters if they are building any inventory.*"

43.     On January 11, 2011, when speaking with analysts and investors during the Needham & Company Growth Conference call, Defendant Rawls admitted that Finisar and its executives closely tracked – or at least had the ability to closely track – inventory at their customers and "understand" their customers' needs because Finisar is such an important supplier to its customers.  Defendants Rawls explained:

> [F]or most – some of our customers, *we get very specific rolling production forecasts that go out as far as 12 months as to what – that are updated biweekly*. So *we understand their business*, at least what they expect for their business. And others, we get forecasts that say, this is what we need for capacity, this is what we expect to sell. *Because we are such an important supplier and all of our customers depend on us so heavily, they have to share with us what it is that they expect to happen in their business to make sure that we are ready for it*. I mean, we are not only the number one supplier for Cisco, Alcatel, Huawei, but also IBM, EMC, you name it. And all of these guys in their business need us to be able to respond or they're going to be revenue-limited, so.

44.     Even after the Class Period, Defendant Gertel admitted on June 15, 2011, during the Company's fourth quarter earnings conference call, that "*we know what a customer tells us*

*and what's going on with our customers. We're pretty well, you know, integrated.  As much as we know we're pretty well knowledgeable about what the customer uses, you know specifically on ROADMs*." The same was true prior to, and throughout, the Class Period.

45.     Inventory levels were clearly an issue of concern for the Company and were discussed during Finisar's annual demand and pricing negotiations with its customers, which, as Defendant Gertel later admitted on March 8, 2011, were "concluded before the end of 2010 and implemented January 1 [2011]."

46.     Lead Counsel, with the assistance of a private investigative firm located in China, conducted an investigation to affirm that inventory levels and the economic slow-down in China were discussed during negotiations with Finisar in 2010, and that, accordingly, Defendants knew, or were reckless in not knowing, at that time that growth would decline over the following quarters as customers were no longer concerned over supply constraints and needed to burn-off existing excess inventory.

47.     With the help of the Chinese private investigators, Lead Counsel identified approximately 30 holding companies, subsidiaries and branches in China that are affiliated with three major telecom conglomerates that use ROADM and WSS type products.  Lead Counsel (personally and through its investigators) contacted approximately 100 employees at those firms who were identified as potentially having information regarding inventory levels, the effects of the Chinese economic position on the industry, and contract negotiations with suppliers.  These companies and employees were identified through information available online, phone calls made to the general numbers of these firms, and contact with a few former employees thereof.

48.     Lead Counsel was repeatedly informed that information of this type, particularly information regarding specific suppliers, was considered highly confidential, and that any employee discussing specific relationships or business transactions without the approval of counsel would be subject to severe punishment.  Accordingly, Lead Counsel directed its inquiries to the various legal departments of these entities, but received no response. Nonetheless, a few current employees of Finisar's customers have affirmed generally that suppliers such as Finisar would very likely be aware of product inventory levels because they

1    were typically discussed during annual contract negotiations or interim adjustments made due to

2    market charges.

3        49.    For instance, Confidential Witness 1 ("CW1"), who works at a subsidiary of

4    FiberHome, Accelink Technologies Co., Ltd. ("Accelink"), was personally involved in making

5    purchases from Finisar.  CW1 stated that customers, including Accelink, generally tell Finisar its

6    volume of demands in advance, sometimes four weeks or more in advance, before making the

7    actual purchase order.  Moreover, during the annual pricing negotiations, CW1 discussed with

8    Finisar the projected volume of orders for the upcoming year, as well as the current year's

9    volumes.  These accounts are consistent with Defendant Rawls statement that Finisar "get[s]

10   very specific rolling production forecasts," and Defendant Gertel's statements that Finisar had

11   "visibility" as to what their customers had, and were "integrated" with their customers.

12       50.    As to industry practices in ordering products in China, Confidential Witness 2

13   ("CW2"), an employee in the supply department at Wuxi Zhongxing Optoelectronics

14   Technology Co. Ltd., a subsidiary of ZTE, discussed the "industry practice" in China for

15   ordering products of the type at issue in China and affirmed that typically, during yearly contract

16   negotiations and within the "general procurement process," purchasers do discuss (i) the volumes

17   ordered for the previous year, (ii) how much inventory remains, and (iii) how much to expect to

18   be ordered for the next year.

19       51.    In addition, Lead Counsel's investigators attempted to contact former employees

20   in the United States.  Confidential Witness 3 ("CW3"), the former Director of Demand Planning

21   at Finisar from May 2007 through July 2011, managed Finisar's worldwide demand planning

22   and inventory group.  CW3 stated that he had been interviewed as part of Finisar's internal

23   investigation in response to the current litigation, and that he is "unable" to discuss the topics at

24   issue in this Complaint without clearance from Finisar's legal department.

25       **C.    Finisar First Acknowledged The Inventory
              Build-up And Slowdown In China On March 8, 2011**

26

27       52.    On March 8, 2011, the market learned for the first time that Defendants had

28   already known, or were reckless in not knowing, by the beginning of the Class Period: that

Finisar's revenue surge over the previous six quarters was not due to organic growth from real end-market demand, but rather due, in substantial part, to an inventory build-up by Finisar's customers.  Further, Defendants knew when the Class Period commenced that Finisar was experiencing a serious slowdown in business from China, which would have detrimental effect on Finisar's ability to continue growing at unprecedented rates.

53.     Indeed, the truth about Finisar was understood by the market when Finisar issued a press release after the market closed on March 8, 2011, revealing that the Company's fiscal fourth quarter revenues would be much lower than previous estimates and revealing that the previous inventory build-up by Finisar's customers was the main reason.  The release stated:

> During the fourth quarter ending April 30, 2011, the Company will be impacted by the full three months of the annual price negotiations with telecom customers that typically take effect on January 1, the 10-day long shutdown at certain customers for Chinese New Year in February, the adjustment of inventory levels at some telecom customers, particularly for products which had previously been on allocation and long lead times, including WSS and ROADM line cards, and a slowdown in business in China overall.  Primarily as a result of these factors, the Company indicated that it currently expects revenues for the fourth quarter to be in the range of $235 to $250 million.

54.     During the March 8, 2011 conference call, Defendant Rawls acknowledged that throughout the Class Period, analysts and investors repeatedly asked Finisar about inventory build-ups at its customers and Finisar repeatedly stated that this was not an issue.  Despite all of Defendants' affirmations that Finisar's executives had access to information about client inventory and product needs, Defendants claimed on March 8, 2011 that they did not have visibility and that they were surprised to learn that its customers were buying extra components to build-up inventory.  And yet, at the same time, Defendant Rawls admitted that Defendants knew earlier than disclosed on March 8, 2011, that customers had been increasing inventory and not using Finisar products for production.  Specifically, Defendant Rawls stated:

> [M]any, many of the people that follow our company have speculated for several quarters about double ordering inventory builds on the part of our customers and we continually responded that we asked our customers and they say, "No. We're buying for production and we're not buying for inventory." Well we have clearly learned here ***in the last month*** or so from several of them that all of a sudden surprise, surprise they have some pretty good size inventories of wavelength selective switches. And the question is ***we don't really have great visibility into their inventory levels*** other than what they tell us and I, you know, they're not – we're not getting complete information I don't think.

55.     During the March 8, 2011 conference call, Defendant Rawls admitted also that Defendants had access to information that indicated earlier than disclosed that the Company's revenue would be impacted by the economic slowdown in China.  On the call, Credit Suisse analyst William Stein asked "when did you start to see that slow [in China]?"  In response, Defendant Rawls stated "You know, I don't know how to explain it other than ***we've now seen it*** ***for oh, I don't know, the impacts*** <u>***a couple of months***</u> ***in terms of, you know, reduced order*** ***rates***."  Defendants Rawls further noted that issues at Finisar were "not limited to just one customer in China as well."

56.     Defendant Gertel also admitted the Finisar's data indicated the slowdown prior to the disclosure on March 8, 2011, stating "I mean we've seen it [the slowdown in China] I guess more pronounced starting at the ***beginning of February*** in a more serious way . . . . And the slowdown in China coupled with the ten days that they were shutoff for the Chinese New Year is – had a meaningful effect on how we are predicting the – our Q4 revenues."

57.     Immediately following Defendants' statements on March 8, 2011, the news media and analysts reported that the Company's weak fiscal fourth quarter guidance was the result of a demand-reduction resulting from the burn-off of the previously denied inventory build-up by Finisar's customers:

- WJB Capital Group, Inc., an analyst firm, reported that "guidance was very disappointing" due to "ROADM inventory corrections in China" and that ***"[t]he*** ***primary culprit was the ROADM product . . . as demand from Chinese OEMs*** ***declined significantly***."

- Credit Suisse reported that Finisar "delivered far weaker than expected [fourth quarter] guidance owing to an ***unexpected demand reduction*** among its Chinese telecom equipment customers"; and

- Reuters reported that "Network equipment maker Finisar Corp forecast a dismal fourth quarter, blaming a surprise ***inventory pile-up*** at telecom equipment makers in China, and its share plunged 38 percent in extended trading."

58.     Later, on March 14, 2011, following meetings with Finisar's management, Credit Suisse affirmed in an analyst report that "[t]he current inventory correction involves Huawei (mostly ROADMs) and ZTE (mostly 40G transceivers)" – two Chinese customers.  Credit Suisse further revealed "[s]pecific takeaways from our meetings with [Finisar] management over the last week include [that] ROADM demand from Huawei was strong through January and ***turned negative in February***" and that Finisar "was also impacted by weak 40G transceiver demand from ZTE which was specific to a slowdown in a 40G backbone deployment by China Telecom."

**D.      Defendants Misled Investors By Making Materially False And Misleading Statements And Omissions Concerning Finisar's Growth And Demand For Its Products During The Class Period**

59.     The Class Period begins on December 2, 2010.  The previous day, on December 1, 2010, Finisar issued a press release entitled "Finisar Corporation Announces Record Revenues and Profitability" announcing the Company's fiscal second quarter (August 2, 2010 to October 31, 2010).  In addition to announcing quarterly revenues of $240.9 million and net income of $33.8 million (or $0.39 per diluted share), up $33.1 million, or 15.9%, from $207.9 million in the preceding quarter, the press release quoted the Company's Co-CEOs Defendants Rawls and Gertel, as follows:

> "In our just completed second quarter, we reached our previously announced target for non-GAAP operating margin of 17.0%, upwardly revised just last quarter, substantially earlier than we had predicted. Achieving this level of operating margin was driven by our strong revenue growth combined with minimal increases in operating expenses," said Jerry Rawls, Finisar's executive Chairman of the Board. "We achieved new company records for quarterly revenues, operating income and net income."

> "Furthermore, the market environment continued to be very strong for Finisar, driven by increased demand for a broad range of LAN/SAN and metro/telecom products," said Eitan Gertel, Finisar's Chief Executive Officer. "The company continued to gain market share, including in the WSS/ROADM line card segment where revenues grew 27.3% over the previous quarter. We expect revenues for WSS/ROADM line cards to grow another 20% to 30% sequentially in our fiscal third quarter."

60.     After releasing its financial results on December 1, 2010, Defendants hosted a conference call with analysts, media representatives, and investors.  The Company's Co-CEOs

Rawls and Gertel, and its CFO Adzema all participated in the call.   During the call, CFO Adzema and Defendant Rawls stated the following:

> [MR. ADZEMA:]  Revenues of 240.9 million were up 33.1 million, or 15.9%, from 207.9 million in the preceding quarter.  Breaking down that increase by product group, the sale of 10-gigabit-and-faster products increased 13.3 million, or 14.1%.  The sale of less-than-10-gigabit products increased 12.1 million, or 15.4%. The sale of ROADM-related products, including wavelength selective switches, or WSSs, increased 8.3 million, or 27.3%.
>
> And finally, the sale of analog and cable television products decreased 0.7 million, or 15.6%.  The sequential increase of 14.1% in revenues for high-speed applications was driven by demand for both short-distance LAN/SAN and longer-distance Metro/Telecom applications.
>
> *     *     *
>
> In terms of customer concentration, we had three 10%-or-greater customers, and our top three customers contributed 41% of total revenue, compared to 38.1% last quarter.  Our top ten customers represented 64% of total revenues, compared to 61.7% last quarter.  While the increase in revenues was driven by a broad range of products, product mix remained favorable, driven particularly strong growth in the sale of WSS and ROADM linecards.
>
> *     *     *
>
> [ANALYST TROY JENSEN WITH PIPER JAFFRAY:]  Jerry, you mentioned ***pricing negotiations*** kind of impacting the gross margin slightly here. Any sense on how it's trending versus prior years?  Are we seeing a normal erosion, or better or worse than?
>
> [DEFENDANT RAWLS:] Well, our view of is that price erosion this year is less than last year, so that's good.  But I would say it's pretty normal compared to what our historical expectations are.  We've always expected the prices went down 10% or 15%, and we're in that range.

61.    Finisar's earnings announcements and subsequent exchange with analysts, including Troy Jensen of Piper Jaffray, demonstrate that Finisar and its top executives had conducted their annual price negotiations with clients, and had access to information that provided insight as to what impact those price negotiations would have on Finisar's financial results.

62.    On December 2, 2010, Defendant Gertel participated in the Credit Suisse Technology Conference call with analysts, media representatives, and investors.  During the call, Credit Suisse analyst William Stein questioned Finisar's financial results issued the day before and in previous quarters, directly questioning how the Company's growth was outpacing the end markets for its products. Defendant Gertel responded with a false or misleading statement about

customer inventory and the possibility that Finisar's growth was the result of an inventory build-up as had been suspected by analysts.  Specifically, Mr. Stein asked:

> You've grown pretty dramatically over the last six quarters in particular. Investors look at that and say, you're a component supplier to networking and telecom customers and storage customers, *you've significantly outgrown your end markets for the last six quarters*.  And that's sending a signal to some investors that this kind of defines peak and *this is going to revert.*  Can you help us understand how it's possible for the company to not only sustain that but continue *to grow faster than the end markets?*

In response, Defendant Gertel stated:

> So *if you look at the market, you see the fundamentals for growth are there.* People need more higher bit rate products, more sophisticated products to address the cost reduction that the network needs and the demand continues.
>
> *As far as we know we haven't seen any inventory issues with our product with our customers.*  Our product – our business is 60/40, basically 40% is LAN/SAN business, 60% is telecom.  On the LAN/SAN side, by far the majority of our sales is a vendor-managed inventory. *So we have visibility to what people have*.  There is no reason for them to have inventory because we own the inventory.  So we're pretty safe with that.
>
> *And on the telecom side,* look, there can be one or two guys who try to build their own inventory, but by far *the majority of the customers* expediting products and *doesn't look to us, not visible to us at all*, all these quarters if they are building *any inventory*.

63.     On December 2, 2010, the price per share of the Company's common stock increased $3.29 per share, or 16.64%, to close at $23.06 per share.  The next day, the price per share of the Company's common stock increased another $0.95 per share, or 4.12%, to close at $24.01 per share.  Indeed, the Company's stock price continued to rise throughout the Class Period, now that Finsiar had denied that there was an inventory build-up.

64.     Defendant Gertel's statement on December 2, 2010, that "fundamentals for growth are there," that Defendants "haven't seen any inventory issues" with Finisar's products, and that "on the telecom side, there can be one or two guys who try to build their own inventory, but by far the majority of the customers . . . doesn't look to us, not visible to us at all, all these quarters, if they are building inventory" misled investors to believe that Finisar's growth was in-line with growth in the "end-markets," based on "fundamentals for growth;" and that growth would not revert due to an inventory correction after an inventory build-up by customers. Indeed, growth that resulted from an inventory build-up would not constitute or be equivalent in

the minds of investors to growth that resulted from "fundamentals for growth."  Thus, by stating that "fundamentals for growth" were present, Defendants misled investors to believe that Finisar's growth *was not* outpacing end-market growth, and that there was no differential between Finisar's growth and end-market growth. In truth, as would be later revealed, Credit Suisse analysts were correct to question whether there was in fact an inventory build-up based on the observed differential between Finisar's growth and end-market growth.

65.     In addition, Defendant Gertel's statement on December 2, 2010 misled investors to believe that there was no risk of an inventory build-up, and that it was not possible for more than "one or two" customers to build their inventory over six quarters without the inventory build-up being visible to Finisar.  In truth, however, analysts were correct that Finisar was only able to outsell the end-markets for its components as a result of an industry-wide inventory build-up, including by several of Finisar's largest customers, such as Chinese customers Huawei and ZTE.

66.     Moreover, Defendant Gertel's statement that Defendants "haven't seen any inventory issues" with the Company's products was false because, at the time of the statement, Defendants had completed a substantial portion of its calendar year-end negotiation with customers, during which customers disclosed – and had every incentive to disclose – their inventory levels and decreased demand for Finisar products as they burned-off excess inventory. In addition, Finisar and its top executives had access to information that would have indicated an inventory build-up if that information was reviewed by those executives.  As stated by Defendant Rawls on January 11, 2011, Finisar received "very specific rolling production forecasts" that go out as far as 12 months, and that these reports are "updated bi-weekly,' and that other customers supply reports that say what they "need for capacity." As a result, and as stated by Defendant Rawls, Finisar and the Defendants "understand . . . what [customers] expect for their businesses."   Accordingly, Defendant Gertel knew, or was reckless in not knowing, based on those forecasts, that Finisar's customers were ordering beyond their production needs (*i.e.*, to build inventory).

67.     Soon after Finisar's stock price was artificially inflated by these false assurances that Finisar's growth was not merely the result of an unsustainable inventory build-up, on December 27, 2010, Defendants completed an equity offering of Finisar common stock, selling 4,140,000 shares at $28.54 per share for proceeds of over $118,155,600.

68.     When the truth, and what Defendants knew all along throughout the Class Period, was revealed on March 8, 2011, the price per share of Finisar stock plummeted $15.43 per share, marking a one-day decline of nearly 39%, on unusually heavy trading volume, as the market finally understood the nature of the Company's previous growth and that such growth was not organic or sustainable absent inventory supply shortages.  Notably, Finisar's stock price has never again reached those Class Period high levels.

## V.     ADDITIONAL FACTS SUPPORTIVE OF FALSITY AND SCIENTER

69.     As alleged herein, Defendants acted with scienter in that they knew and/or disregarded with deliberate recklessness that the public documents and statements, issued or disseminated in the name of the Company, were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Finisar, their control over, and/or receipt and/or modification of Finisar's allegedly materially misleading misstatements and omissions, and their associations with the Company which made them privy to confidential proprietary information concerning Finisar, participated in the fraudulent scheme alleged herein.

70.     Defendants knew and/or disregarded with deliberate recklessness the falsity and misleading nature of the information that they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this Complaint could not have been perpetrated over the Class Period without the knowledge and complicity of the personnel at the highest level of the Company, including each of the Individual Defendants.

71.     In addition to the foregoing and other facts alleged herein, the following facts provide compelling evidence that each of the Defendants acted with the intent to deceive Finisar investors.

72.     On or about December 27, 2010, when Finisar stock was trading at artificially inflated prices, Defendants completed an equity offering.   In connection with the Offering, Defendants sold 4,140,000 shares of Finisar common stock to investors at an artificially inflated price of $28.54 per share, thus reaping proceeds of over $118,155,600.

73.     Further, during the Class Period, with the Company's securities trading at artificially inflated prices, Defendant Gertel sold 201,913 shares of his personally held or controlled Finisar stock for gross proceeds of over $5.17 million. Moreover, the timing of Defendant Gertel's insider sales in relation to the timing of his false statement, and, ultimately, the curative disclosure on March 8, 2011, are indicative of scienter.

74.     Defendant Gertel's insider sales during the Class Period:

| Date of Trade | Number of Shares | Price Per Share | Gross Proceeds |
|---|---|---|---|
| 12/7/10 | 50,000 | $ 23.8578 | $ 1,192,890.00 |
| 12/8/10 | 1,020 | $ 23.99 | $ 24,469.80 |
| 12/9/10 | 25,000 | $ 24.50 | $ 612,500.00 |
| 12/10/10 | 25,000 | $ 25.50 | $ 637,500.00 |
| 12/13/10 | 25,000 | $ 26.00 | $ 650,000.00 |
| 12/15/10 | 25,000 | $ 27.50 | $ 687,500.00 |
| 12/15/10 | 25,000 | $ 27.00 | $ 675,000.00 |
| 12/15/10 | 25,000 | $ 26.50 | $ 662,500.00 |
| 3/1/11 | 638 | $ 39.68 | $ 25,315.84 |
| 3/8/11 | 255 | $ 40.04 | $ 10,210.20 |
| Totals: | 201,913 | | $ 5,177,885.84 |

75.     Defendant Gertel's stock sales during the Class Period were substantially more than in any previous year. For example, in the year prior to the Class Period (12/2/09-12/1/10), Defendant Gertel only sold 5,163 shares for gross proceeds of $71,269.53. Moreover, Defendant Gertel's stock sales were substantially more than any other Finisar executive during that time, or any other time, including Co-CEO Defendant Rawls who sold stock for proceeds of only $170,564.17 during the Class Period and $85,140.16 during the year before the Class Period.

1

## VI.    LOSS CAUSATION

2      76.      Defendants' wrongful conduct, as alleged herein, directly and proximately caused

3 the economic loss suffered by Lead Plaintiff and the Class. The price of Finisar common stock

4 significantly declined when the misrepresentation made to the market, and/or the information

5 alleged herein to have been concealed from the market, and/or the effects thereof, were revealed,

6 causing investors' losses.   As a result of their purchases of Finisar securities during the Class

7 Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages,

8 under the federal securities laws.

9      77.      After the December 2, 2010 statement, the price per share of the Company's

10 common stock increased 4.12%, to close at $24.01 per share on December 3, 2010.  As the

11 Company and its executives continued to talk about Finisar's business prospects during the Class

12 Period – while failing to correct the misleading statement made on December 2, 2010, the price

13 or share of Finisar stock continued to rise.  Indeed, by February 14, 2011, the price per share of

14 Finisar common stock reached its Class Period high of $43.23 per share.

15      78.      The truth about Finisar, as set forth above, was revealed to the market on

16 March 8, 2011, after the market closed, when Finisar issued a press release revealing that the

17 Company's fourth quarter revenues would only be in the range of $235 to $250 million – lower

18 than analysts' estimates due to the previously undisclosed inventory build-up at some of the

19 Company's telecom customers and a slowdown in business in China.   Indeed, prior to the

20 corrective disclosure, analysts were anticipating a profit of 48 cents a share on revenues of

21 $268.6 million for the fourth quarter, according to Thomson Reuters I/B/E/S.

22      79.      Specifically, the March 8, 2011 press release disclosed that:

23 During the fourth quarter ending April 30, 2011, ***the Company will be impacted***
***by the full three months of the annual price negotiations with telecom***
24 ***customers*** that typically take effect on January 1, ***the 10-day long shutdown at***
***certain customers for Chinese New Year in February, the adjustment of***
25 ***inventory levels at some telecom customers***, particularly for products which had
previously been on allocation and long lead times, including WSS and ROADM
26 line cards, and ***a slowdown in business in China overall.  Primarily as a result of***
***these factors, the Company indicated that it currently expects revenues for the***
27 ***fourth quarter to be in the range of $235 to $250 million.***

28

80.     Following the Company's disclosure, analysts and news media reported that the weak guidance for Finisar's fiscal fourth quarter was primarily due to the previously undisclosed inventory build-up at Finisar's telecom customers, even though Defendants explicitly denied that an inventory build-up had taken place.

81.     In reaction to the Company's March 8, 2011 disclosure, Finisar's stock **collapsed $15.43 per share** to close at $24.61 per share on March 9, 2010, a one-day decline of nearly 39% on unusually heavy trading volume, thereby causing investors to suffer significant losses.  As stated herein, Finisar's stock price has never again reached those Class Period high levels.

## VII.     PRESUMPTION OF RELIANCE

82.     The market for Finisar's common stock was, at all times, an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities.  Throughout the Class Period:

(a)     The Company's common stock met the requirements for public listing and was listed and actively traded on the NASDAQ, a highly efficient market;

(b)     As a regulated issuer, Finisar filed periodic reports with the SEC and the NASDAQ;

(c)     Finisar regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)     Numerous securities analysts, including Credit Suisse, The Juda Group, Miller Tabak, LLC, Morgan Stanley, Stifel Nicolaus, WJB Capital Group, Inc., and Piper Jaffray, followed and published research reports regarding the Company that were publicly available to investors;

(e)     Finisar's common stock was actively traded throughout the Class Period, with substantial trading volume and institutional investor participation; and

1    (f)   The market price of the Company's securities reacted promptly to the

2  dissemination of public information regarding the Company.

3    83.   Accordingly, Lead Plaintiff and other members of the Class did rely and are

4  entitled to have relied upon the integrity of the market price for the Company's securities and to

5  a presumption of reliance on Defendants' materially false and misleading statements and

6  omissions during the Class Period.

7  **VIII.   NO SAFE HARBOR**

8    84.   The statutory safe harbor provided for forward-looking statements under certain

9  circumstances does not apply to any of the allegedly false or misleading statements pleaded in

10  this Complaint.  The statements alleged to be false or misleading herein all relate to facts and

11  conditions existing at the time the statements were made.  No statutory safe harbor applies to any

12  of Defendants' materially false or misleading statements.

13    85.   Many of the specific statements pleaded herein were not identified as "forward-

14  looking statements" when made.  Additionally, to the extent applicable, Finisar's verbal "safe

15  harbor" warnings accompanying its oral forward-looking statements issued during the Class

16  Period were ineffective to shield those statements from liability.  To the extent there were any

17  forward-looking statements, there were no meaningful cautionary statements identifying

18  important factors that could cause actual results to differ materially from those in the purportedly

19  forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply

20  to any forward-looking statements pleaded herein, Defendants are liable for those false forward-

21  looking statements because at the time each of those forward-looking statements was made, the

22  particular speaker knew that the particular forward-looking statement was false and/or the

23  forward-looking statement was authorized and/or approved by an executive officer of Finisar

24  who knew that those statements were false when made.

25  **IX.   CLASS ACTION ALLEGATIONS**

26    86.   Lead Plaintiff brings this action on its own behalf and as a class action pursuant to

27  Rules 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who

28  purchased or otherwise acquired the Company's common stock during the Class Period, and who

were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

87.     The members of the Class are so numerous that joinder of all members is impracticable.  Finisar shares were actively traded on the NASDAQ stock market throughout the Class Period.  According to the Company's Form 10-Q filed with the SEC on December 8, 2010, Finisar had over 77.1 million shares of stock outstanding as of November 30, 2010.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Finisar or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

88.     Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

89.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests that are contrary to or in conflict with those of the Class members that Lead Plaintiff seeks to represent.

90.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether documents, including the Company's SEC filings, press releases and public statements made by Defendants during the Class Period contained misstatements of

material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)     whether Defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents filed with the SEC, press releases and public statements;

(d)     whether the price of Finisar's common stock during the Class Period was artificially inflated; and

(e)     the extent of damages sustained by Class members and the appropriate measure of damages.

91.     A class action is superior to all other available methods of fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for members of the Class to individually redress the wrongs done to them.  Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## X.   CLAIMS FOR RELIEF

**COUNT I**
**For Violation Of Section 10(b) Of The Exchange Act And**
**Rule 10b-5 Promulgated Thereunder Against Defendants Finisar And Gertel**

92.     Lead Plaintiff repeats and realleges each of the allegations contained above as if fully set forth herein.

93.     This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Defendants Finisar and Gertel.

94.     During the Class Period, Defendants Finisar and Gertel carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (2) cause Lead Plaintiff and other members of the Class to purchase and/or sell Finisar's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants Finisar and Gertel individually and together, took the actions set forth herein.

95.     Defendants Finisar and Gertel, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Finisar as specified herein.  Defendants Finisar and Gertel, individually and in concert, employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Finisar's value, performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Finisar and its business operations and financial condition, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Finisar common stock during the Class Period.

96.     Defendants Finisar and Gertel had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though they had access to such facts and such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Finisar's financial condition from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by Defendants' false and misleading statements during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

97.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for Finisar's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Finisar's publicly-traded common stock were artificially inflated or distorted, and relying

1   directly or indirectly on the false and misleading statements made by Defendants, or upon the

2   integrity of the market in which the Company's securities trade, and/or on the absence of

3   material adverse information that was known to, or recklessly disregarded by, Defendants but not

4   disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the

5   other members of the Class acquired Finisar's common stock during the Class Period at

6   artificially high prices and were damaged thereby.

7          98.    At the time of said misrepresentations and omissions, Lead Plaintiff and other

8   members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead

9   Plaintiff and the other members of the Class and the marketplace known the truth regarding

10  Finisar's financial results and condition, which were not disclosed by Defendants, Lead Plaintiff

11  and other members of the Class would not have purchased or otherwise acquired Finisar

12  common stock, or, if they had acquired such common stock during the Class Period, they would

13  not have done so at the artificially inflated prices or distorted prices at which they paid.

14         99.    By virtue of the foregoing, Defendants Finisar and Gertel have violated Section

15  10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

16         100.   As a direct and proximate result of the wrongful conduct of Defendants Finisar

17  and Gertel, Lead Plaintiff and the other members of the Class suffered damages in connection

18  with their respective purchases and sales of the Company's common stock during the Class

19  Period.

20                                  **COUNT II**
                       **For Violation Of Section 20(a) Of The**
21            **Exchange Act Against Defendants Rawls And Gertel**

22         101.   Plaintiff repeats and realleges each of the allegations set forth in the foregoing

23  paragraphs as if fully set forth herein.

24         102.   Defendants Rawls and Gertel acted as controlling persons of Finisar within the

25  meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

26  positions, their ownership and contractual rights, participation in and awareness of the

27  Company's operations and intimate knowledge of aspects of the Company's revenues and

28  earnings and dissemination of information to the investing public, Defendants Rawls and Gertel

had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading. Defendants Rawls and Gertel were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

103. In particular, Defendants Rawls and Gertel had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

104. As set forth above, Defendants Finisar and Gertel each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Defendants Rawls and Gertel are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein.

105. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for the relief and judgment as follows:

A. Determining this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Lead Plaintiff as Class Representative and Lead Counsel as Class Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiff and against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

**XII.    <u>JURY DEMAND</u>**

Lead Plaintiff demands a trial by jury.

Dated: July 15, 2016                          Respectfully submitted,

ABRAHAM, FRUCHTER &
   TWERSKY, LLP

<u>        /s/ Ian D. Berg        </u>
IAN D. BERG

IAN D. BERG   (Bar No. 263586)
TAKEO A. KELLAR   (Bar No. 234470)
11622 El Camino Real, Suite 100
San Diego, CA 92130
Tel:     (858) 764-2580
Fax:     (858) 764-2582
*iberg@aftlaw.com*
*tkellar@aftlaw.com*

- and -

MITCHELL M.Z. TWERSKY
ATARA HIRSCH
One Penn Plaza, Suite 2805
New York, NY 10119
Tel:     (212) 279-5050
Fax:     (212) 279-3655
*mtwersky@aftlaw.com*
*ahirsch@aftlaw.com*

*Counsel for Lead Plaintiff Oklahoma
Firefighters Pension and Retirement System
and Lead Counsel for the Class*