United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re FINISAR CORPORATION SECURITIES LITIGATION | Case No. 5:11-cv-01252-EJD<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS**<br><br>Re: Dkt. No. 94 |

Lead Plaintiff, the Oklahoma Firefighters Pension & Retirement System ("Plaintiff"), brings this putative securities fraud class action against Defendants Finisar Corporation ("Finisar"), Eitan Gertel, and Jerry S. Rawls (collectively, "Defendants"),[1] alleging that Defendants issued a single false or misleading statement on December 2, 2010, denying an inventory build-up of Finisar's key telecom products by the Company's customers.

Presently before the court is Defendants' Motion to Dismiss the Second Amended Complaint. Dkt. No. 94 ("MTD"). After careful consideration of the parties' papers and for the reasons explained below, Defendants' Motion will be DENIED.

I. BACKGROUND

Following a remand from the Ninth Circuit, this is now the third motion to dismiss filed in this action. Accordingly, the factual allegations in this case are well-established. See Order

---

[1] The court observes that Kurt Adzema, Finisar's Chief Financial Officer and a previously named defendant in this case (FAC ¶ 24, Dkt. No. 69), is not named as a party to this action in the Second Amended Complaint ("SAC"). See SAC ¶¶ 22-28. While no formal dismissal was filed, the court construes the revision made to the operative pleading to mean that Plaintiff is no longer asserting any claims against Mr. Adzema. Accordingly Mr. Adzema is hereby terminated as a defendant.

1

Case No.: 5:11-cv-01252-EJD
ORDER DENYING MOTION TO DISMISS

Granting Defs.' Mot. to Dismiss ("Prior Order"), Dkt. No. 77. The following is a brief overview of the factual and procedural background relevant to the instant motion, and is taken primarily from Plaintiff's Second Amended Consolidated Class Action Complaint ("SAC").

### A. Factual Background

Plaintiff brings this action on behalf of itself and a class of all persons and entities who purchased or otherwise acquired the common stock of Finisar between December 2, 2010 and March 8, 2011 (the "Class Period"). SAC ¶ 1.

Finisar is a technology company that "develops and sells fiber optic subsystems and components that enable high-speed voice, video and data communications for telecommunications, networking, storage, wireless and cable television applications." Id. ¶ 2. Gertel served as Chief Executive Officer ("CEO") and a director of Finisar from August 2008 to September 2015. Id. ¶ 23. Plaintiff alleges that during the Class Period, Gertel made over $5.17 million by selling 201,913 shares of his Finisar stock at artificially inflated prices. Id. ¶¶ 23, 74-75. Rawls has served as Chairman of the Board of Finisar since 2006, and was appointed CEO in September 2015. Id. ¶ 24.

Prior to the Class Period, Finisar experienced six consecutive fiscal quarters of revenue growth, which Plaintiff alleges was driven primarily by sales of its wavelength selective switches ("WSS") and reconfigurable optical add/drop multiplexers ("ROADM") linecard telecom products. Id. ¶¶ 30-33. During this phase of growth, but prior to the Class Period, Plaintiff alleges that analysts in the industry "suspected that this growth was driven by customers building-up inventory rather than purchasing Finisar products for immediate use in production." Id. ¶ 3. Plaintiff contends that Finisar did not affirm nor deny the inventory build-up suspicions during this time, and as a result, "Finisar's stock price remained relatively consistent over the course of the six-quarters of record-growth." Id. ¶ 36.

However, on December 2, 2010, Plaintiff alleges that Finisar's then-CEO, Gertel, "participated in the Credit Suisse Technology Conference call with analysts, media representatives, and investors." Id. ¶ 62. During this call, Plaintiff claims that an analyst from

2

Case No.: 5:11-cv-01252-EJD
ORDER DENYING MOTION TO DISMISS

Credit Suisse named William Stein highlighted that Finisar had "significantly outgrown [its] end markets for the last six quarters" and raised the fear that that the company's growth "is going to revert." Id. Mr. Stein then asked, "Can you help us understand how it's possible for the company to not only sustain that [growth] but continue to grow faster than the end markets?" Id. In response, Gertel provided the following explanation:

> So if you look at the market, you see the fundamentals for growth are there. People need more higher bit rate products, more sophisticated products to address the cost reduction that the network needs and the demand continues.
>
> As far as we know we haven't seen any inventory issues with our product with our customers. Our product—our business is 60/40, basically 40% is LAN/SAN business, 60% is telecom. On the LAN/SAN side, by far the majority of our sales is a vendor-managed inventory. So we have visibility to what people have. There is no reason for them to have inventory because we own the inventory. So we're pretty safe with that.
>
> And on the telecom side, look, there can be one or two guys who try to build their own inventory, but by far the majority of the customers expediting products and doesn't look to us, not visible to us at all, all these quarters if they are building any inventory.

Id.

The same day Gertel made this statement, Finisar's common stock increased $3.29 per share (or 16.64%), going from $19.77 per share on December 1, 2010, to close at $23.06 per share on December 2, 2010. Id. ¶¶ 13, 63. The following day, on December 3, 2010, the price per share increased another $0.95 (or 4.12%). Id. ¶ 63. Plaintiff alleges that Finisar's stock price continued to rise in this manner throughout the Class Period, reaching a Class Period high of $43.23 per share on February 14, 2011. Id. ¶¶ 63, ¶ 77.

But on March 8, 2011, Finisar issued a press release indicating that its fourth quarter revenues would be lower than projected due in part to "the previously undisclosed inventory build-up at some of the Company's telecom customers and a slowdown in business in China." Id. ¶ 78. The press release read, in relevant part:

> During the fourth quarter ending April 30, 2011, the Company will be impacted by the full three months of the annual price negotiations with telecom customers that typically take effect on January 1, the

3
Case No.: 5:11-cv-01252-EJD
ORDER DENYING MOTION TO DISMISS

> 10-day long shutdown at certain customers for Chinese New Year in February, the adjustment of inventory levels at some telecom customers, particularly for products which had previously been on allocation and long lead times, including WSS and ROADM line cards, and a slowdown in business in China overall. Primarily as a result of these factors, the Company indicated that it currently expects revenues for the fourth quarter to be in the range of $235 to $250 million.

Id. ¶ 53, 79. The press release was issued after the market closed on March 8, 2011. Id. Rawls also held a conference call the same day to discuss the expected results, and explained the inventory adjustment in this way:

> [M]any, many of the people that follow our company have speculated for several quarters about double ordering inventory builds on the part of our customers and we continually responded that we asked our customers and they say, "No. We're buying for production and we're not buying for inventory." Well we have clearly learned here in the last month or so from several of them that all of a sudden surprise, surprise they have some pretty good size inventories of wavelength selective switches. And the question is we don't really have great visibility into their inventory levels other than what they tell us and I, you know, they're not—we're not getting complete information I don't think.

Id. ¶ 54

In reaction to the March 8 press release, Finisar's stock price dropped by $15.43 per share, falling from $40.04 per share on March 8, 2010 to close at $24.61 on March 9, 2010, "marking a one-day decline of nearly 39%." Id. ¶¶ 6, 68, 81. Plaintiff asserts that Finisar's stock price has never fully recovered from this decline. Id.

Plaintiff contends that Gertel's December 2 statement misled investors as to the nature of Finisar's growth by denying that its revenue increase was the result of a short-term, unsustainable inventory build-up by customers rather than the result of increased demand for Finisar products. Plaintiff claims that the statement misrepresented Finisar's growth as being "in line with" and "not outpacing" the end-market growth, and incorrectly suggested that its "growth would not revert due to an inventory correction after an inventory build-up by customers." Id. ¶ 64.

Plaintiff alleges that both before and during the Class Period, Finisar would have "necessarily learned about customer inventory and demand during its annual demand and pricing negotiations with customers." Opp. at 5 (citing SAC ¶¶ 5, 45-50). According to Plaintiff, these

4

Case No.: 5:11-cv-01252-EJD
ORDER DENYING MOTION TO DISMISS

negotiations occurred over the course of a three-month period that "concluded before the end of 2010," the results of which were implemented by January 1, 2011. SAC ¶¶ 7, 45, 53, 79. Plaintiff further alleges that an investigation conducted by Lead Counsel, with the assistance of a private investigative firm located in China, "affirm[ed] that inventory levels and the economic slow-down in China were discussed during negotiations with Finisar in 2010." Id. ¶ 46. Indeed, the SAC identifies confidential witnesses who, according to Plaintiff, were "personally involved in making purchases from Finisar" and confirmed that current volumes and the next year's projected demand volumes were discussed during annual negotiations at that time. Id. ¶¶ 49-51. From this Plaintiff concludes that Defendants either knew, or were reckless in not knowing, that an inventory build-up existed, and that Finisar's growth would decline in the upcoming quarters as customers became less concerned about supply constraints and needed to "burn-off existing excess inventory." Id.

Finally, Plaintiff contends that Defendants' knowledge of the inventory build-up is further supported by their behavior during the class period. Specifically, Plaintiff asserts that Defendants capitalized on the rapidly rising stock price by conducting a substantial stock offering that garnered over $118 million in gross proceeds. Id. ¶ 72. Additionally, Gertel himself "sold 201,913 shares of his personally held or controlled Finisar stock for gross proceeds of over $5.17 million," which Plaintiff claims was "substantially more than in any previous year." Id. ¶¶ 73-75

### B. Procedural Background

On March 15, 2011, plaintiff Martin Derchi-Russo filed a class action complaint in this court against Defendants for violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). Dkt. No. 1; 15 U.S.C. § 78j(b). Two additional plaintiffs filed separate but similar actions in the ensuing weeks. See Dkt. No. 12. On May 4, 2011, this court ordered that the three cases be related. Dkt. No. 17. Several months later, on October 27, 2011, this court issued an order consolidating all related actions, appointing Oklahoma Firefighters Pension and Retirement System as Lead Plaintiff, and approving the same's legal counsel as Lead Counsel. Dkt. No. 48. Plaintiff filed the Amended Consolidated Class Action Complaint on January 20, 2012. Dkt. No. 53. Defendants filed a motion to dismiss (Dkt. No. 56), which the

court granted with leave to amend on January 16, 2013 (Dkt. No. 68). Plaintiff filed its First Amended Complaint ("FAC") (Dkt. No. 69) on February 6, 2013, and Defendants moved to dismiss it on February 20, 2013 (Dkt. No. 70). On September 30, 2013, the court again granted Defendants' motion to dismiss the FAC on the grounds that it failed to adequately plead falsity, this time without leave to amend. Dkt. No. 77. Plaintiff timely appealed the dismissal to the Ninth Circuit Court of Appeals. Dkt. No. 81.

On appeal, the Ninth Circuit agreed that three of the four statements at issue in the FAC were "not actionable,"[2] but reversed as to the December 2, 2010 Statement, finding that Plaintiff had "adequately plead falsity." See Ninth Cir. Am. Mem. ("Ninth Cir. Order"), Dkt. No. 86 at 2-3, n.1. It explained,

> The First Amended Complaint identifies specific statements in which defendants denied their knowledge of an inventory build-up or otherwise down-played concerns of a looming inventory bubble. And it identifies why those statements were misleading by alleging that inventory levels would have been disclosed to defendants during the annual contract negotiations. As a result, the district court erred in dismissing the First Amended Complaint for failure to plead falsity

Id. at 3.

Accordingly, the Ninth Circuit remanded the case to this court "to consider in the first instance whether the complaint states a claim under the remaining elements of a private federal securities fraud action." Id. The Ninth Circuit further instructed that on remand, this court "should allow leave to amend as to scienter in light of [its] recent discussion of deliberate recklessness" in Reese v. Malone, 747 F.3d 557, 568-69 (9th Cir. 2014). Id. at 3-4. In accordance with the Ninth Circuit's instruction, this court issued a new briefing schedule and Plaintiff filed its SAC on July 15, 2016. Dkt. No. 93. Defendants then filed the Motion to Dismiss that is presently

---

[2] Specifically, the Ninth Circuit held:

> The September 8, 2010 report indicating that defendants and two other companies "have been adamant that inventory levels have not increased materially" is not actionable because the statement was made before defendants could have learned of the inventory increase through the contract negotiations. Moreover, Rawls's January 11, 2011 and February 10, 2011 statements about the strength of demand are not actionable, as they amount to corporate puffery.

6
Case No.: 5:11-cv-01252-EJD
ORDER DENYING MOTION TO DISMISS

before the court. Dkt. No. 94.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the … claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations omitted). A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Dismissal of a claim under Rule 12(b)(6) may be based on a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008); Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988). Moreover, the factual allegations "must be enough to raise a right to relief above the speculative level" such that the claim "is plausible on its face." Twombly, 550 U.S. at 556-57.

Claims that sound in fraud are subject to a heightened pleading standard. Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); Swartz v. KPMG LLP, 476 F.3d 756, 765 (9th Cir. 2007) ("Rule 9(b) imposes heightened pleading requirements where the object of the conspiracy is fraudulent"). The allegations must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged. Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985). To that end, the allegations must contain "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Swartz, 476 F.3d at 764l; see Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir.2003) (citation omitted) (explaining that averments of fraud must be accompanied by the "who, what, when, where, and how" of the misconduct charged). Additionally, "the plaintiff must plead facts explaining why the statement was false when it was made." Smith v. Allstate Ins. Co., 160 F.Supp.2d 1150, 1152 (S.D.Cal. 2001) (citation omitted); see also In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1549 (9th Cir.1994) (en banc) (superseded by statute on other grounds). In other words, fraud or claims asserting fraudulent conduct must

generally contain more specific facts than is necessary to support other causes of action.

At the motion to dismiss stage, the court must read and construe the complaint in the light most favorable to the non-moving party. Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337–38 (9th Cir. 1996). The court must accept as true all "well-pleaded factual allegations." Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009). However, "courts are not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555. "In all cases, evaluating a complaint's plausibility is a context-specific endeavor that requires courts to draw on ... judicial experience and common sense." Levitt v. Yelp! Inc., 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011)).

When deciding whether to grant a motion to dismiss, the court generally "may not consider any material beyond the pleadings." Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990). However, the court may consider material submitted as part of the complaint or relied upon in the complaint, and may also consider material subject to judicial notice. See Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001). In the event that a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" DeSoto v. Yellow Freight Sys., Inc., 957 F.2d 655, 658 (9th Cir. 1992) (quoting Schreiber Distrib. Co. v. Serv–Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986)).

### III. DISCUSSION

#### A. Defendants' Motion to Dismiss

Section 10(b) of the Exchange Act provides that it shall be unlawful "to use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations." 15 U.S.C. § 78(b). SEC Rule 10b-5 implements this provision by making it unlawful for any person "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5(b). To adequately state such a claim, a plaintiff must allege facts sufficient to establish: "(1) a

material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37-38 (2011) (quoting Stoneridge Inv. Partners LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008)).

Having found that Plaintiff adequately alleged falsity as to the December 2 statement, the Ninth Circuit remanded the case for this court to determine if Plaintiff adequately alleged the remaining elements of its claim. Ninth Cir. Order at 2-3. Defendants challenge the sufficiency of Plaintiff's allegations only as to "scienter" and "loss causation." MTD. at 1, 2. Each will be addressed in turn.

### i. Scienter

Defendants' primary argument in favor of dismissal is that the SAC fails to adequately plead scienter. See MTD at 8-20; Reply at 3-14. Defendants assert that on December 1, 2010, Finisar released its Third Quarter Forecast, immediately followed by a press release and conference call with analysts and investors, all of which indicated that the company did ***not*** believe the "unprecedented" double-digit revenue growth to continue. MTD at 3-4; Reply at 3. Defendants argue that the release of this information the day before the December 2 statement significantly undermines any suggestion that Gertel intended to mislead investors into thinking that double-digit growth rates would continue into the Fourth Quarter. Id. Defendants argue that scienter is further undermined by the fact that the December 2 statement was still "qualified and equivocal," despite Gertel actually having a reasonable basis to be optimistic about Finisar's growth prospects. MTD at 13-14. Specifically, Defendants point out that Gertel used phrases like "as far as we know" to qualify his answers, and acknowledged the possibility that certain people could be trying to build their inventory by stating "it doesn't look to us, not visible to us at all" that inventory building was occurring. Id.; Reply at 5.

Plaintiff argues that the SAC adequately pleads scienter under the Ninth Circuit's "deliberate recklessness" standard explained in Reese v. Malone, and is otherwise supported by a

9
Case No.: 5:11-cv-01252-EJD
ORDER DENYING MOTION TO DISMISS

holistic view of the facts and circumstances of this case. Based on a review of the controlling law in this circuit, the court agrees that Plaintiff has plead facts sufficient to give rise to a strong inference of scienter.

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976). To sufficiently plead scienter, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). "A strong inference of scienter 'must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" Reese, 747 F.3d at 569 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007). In the Ninth Circuit, a plaintiff may satisfy this burden if all of the facts alleged, taken collectively, give rise to the strong inference that "the defendant made false or misleading statements either *intentionally* or with *deliberate recklessness*." Id. (quoting Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 991 (9th Cir. 2009)) (emphasis in original). "[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." Id. (citing In re Oracle Corp. Sec. Litig., 627 F.3d 376, 390 (9th Cir. 2010). At the motion to dismiss stage, a plaintiff is not required to prove that a defendant "*actually knew*" the material facts or information at issue; the Ninth Circuit holds that "[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b–5." In re VeriFone Holdings, Inc. Sec. Litig., 704 F.3d 694, 708 (9th Cir. 2012).

When evaluating whether a complaint adequately pleads scienter, the Supreme Court instructs that courts "must review all the allegations holistically." Matrixx, 563 U.S. at 48. And as the Ninth Circuit explains, the relevant inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Reese, 747 F.3d at 569 (emphasis in original).

Here, Plaintiff contends Finisar would have been given information about customer

10
Case No.: 5:11-cv-01252-EJD
ORDER DENYING MOTION TO DISMISS

inventory and demand during its annual pricing negotiations with customers. See SAC ¶¶ 5, 45-50. In support of this, Plaintiff asserts that two confidential witnesses corroborate that inventory would have been discussed during the annual negotiations with respect to the 2011 contracts. Id. ¶¶ 49-51. Plaintiff alleges that one of the confidential witness ("CW1"), who was personally involved in making purchases from Finisar, confirmed that "current volumes and the next year's projected demand volumes were discussed during annual negotiations at that time." Id. ¶ 49. Another confidential witness ("CW2") provided information about "industry practice" in China, and affirmed that purchasers typically discussed "volumes ordered for the previous year, how much inventory remains, and how much to expect to be ordered for the next year." Id. ¶ 50.

Based on this information, Plaintiff argues "[t]he that inventory information learned during these negotiations…would have alerted Defendants that the inventory build-up existed and was coming to an end; and, with that end, there would be an inventory correction resulting in reduced order rates while customers burned off excess inventory." Opp. at 5-6. Plaintiff reasons that as the co-CEO of Finisar, Gertel had access to information concerning the results of the price negotiations regardless of whether or not he attended the specific meetings. Plaintiff concludes that "customer inventory build-up was a key issue to the Company and one that Finisar and its top executive officers, including the Individual Defendants, would have been, or should have been, aware of through the course of the Company's core operations." SAC ¶ 38. Notwithstanding their access to the relevant information, Plaintiff alleges that Defendants "remained silent" regarding the possibility of an inventory build-up until the start of the Class Period on December 2, 2010. Id. ¶¶ 3, 37-38.

The court agrees that these facts give rise to a strong inference of scienter. In holding that Plaintiff had adequately alleged falsity, the Ninth Circuit relied on Plaintiff's allegations that information regarding inventory levels would have been disclosed to Defendants prior to and during the Class Period. See Ninth Cir. Order at 3. The court explained that "[t]he First Amended Complaint identifies a specific statement in which Finisar's CEO denied having knowledge of an inventory build-up and down-played concerns of a looming inventory bubble[,]…[a]nd it

11
Case No.: 5:11-cv-01252-EJD
ORDER DENYING MOTION TO DISMISS

identifies why that statement was misleading by alleging *that inventory levels would have been disclosed to defendants* during the annual contract negotiations." Id. (emphasis added). The same is true of scienter.

Indeed, Plaintiff alleges that material inventory-related information was disclosed to and/or discussed by Defendants during annual client negotiations. Plaintiff asserts that multiple confidential witnesses with knowledge of such negotiations corroborate this claim. Plaintiff alleges that even if Gertel and Rawls were not directly involved in these negotiations, they were either aware or should have been aware of this materially relevant business information. And if for some reason they were not, Plaintiff argues that as the leaders of the company, both Gertel and Rawls had access to it and could have sought it out. Plaintiff further alleges that industry analysts had been speculating about the possibility of an inventory build-up for months, providing further incentive for Defendants to seek out or pay attention to such information. Moreover, given this substantial interest, Plaintiff asserts that Defendants knew or should have known that information related inventory levels was highly relevant, and any statement made by Finisar or its representatives on the topic would be of significant interest and importance to the market. Plaintiff further alleges that soon after the December 2 statement was made and the company's stock prices had risen significantly, Finisar conducted a large stock offering, resulting in proceeds of over $118,155,600. Finally, Plaintiff alleges that Gertel personally sold an unusually large portion of his own shares during the class period, resulting in significant over $5 million in profits.

Taken collectively, the court finds that the foregoing allegations give rise to a strong inference that Defendants made the December 2 statement with the knowledge that it was false or misleading, or that they were deliberately reckless to the possibility of the same. Reese, 747 F.3d at 569. Accordingly, Defendants Motion to Dismiss is denied to the extent it is based on scienter.

### ii. Loss Causation

Defendants' second argument in favor of dismissal is that Plaintiff fails to adequately allege loss causation.

In order to state a securities fraud claim, a plaintiff must also allege that there was "loss

12
Case No.: 5:11-cv-01252-EJD
ORDER DENYING MOTION TO DISMISS

causation." Dura Pharm. v. Broudo, 544 U.S. 336, 342 (2005); 15 U.S.C. § 78u–4(b)(4). To establish loss causation, "the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff." In re Daou Sys., Inc., 411 F.3d 1006, 1025 (9th Cir. 2005); accord In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055–56 (9th Cir. 2008). "The misrepresentation need not be the sole reason for the decline in value of the securities, but it must be a 'substantial cause.'" Gilead, 536 F.3d at 1055–56. "A plaintiff can plead loss causation by alleging that the share price fell significantly after the truth became known, or by alleging that the content of the omissions caused his or her loss." WPP Lux. Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d 1039, 1053 (9th Cir. 2011) (citing Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1062 (9th Cir.2008) and Livid Holdings, Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 949 (9th Cir.2005)).

Here, Defendants appear to challenge loss causation based on an overly narrow reading of the March 8, 2011 press release. Defendants contend that the "sole alleged reason for economic loss" in this case was that the March 8 press release revealed that Finisar's "'revenues would be much lower than previous estimates' and caused the stock price to decline." See MTD at 22 (citing SAC ¶ 78). Defendants argue they had not made any "previous estimate" for the Fourth Quarter, and therefore the economic loss was not caused by the information disclosed in the March 8 press release. Id. In their Reply, Defendants again seek to distinguish the content of the March press release from the December statement, arguing that "[t]he March 2011 disclosures did not state to the market that inventories had been overbuilt as of December 2, 2010 or that Defendants had deceived them on that day. Rather, the disclosures referred to inventory build-up in February 2011." Reply at 15. However, Defendants' arguments ignore the substance of Plaintiff's allegations regarding the inventory build-up, and are generally unpersuasive.

Plaintiff alleges that Defendants' December 2 statement misled investors by intentionally downplaying or dismissing concerns about the possibility of inventory build-ups, and thus painting an inaccurate picture of Finisar's grown potential. SAC ¶¶ 3, 63, 77. This in turn boosted market confidence in Finisar and resulted in stock prices rising to artificially inflated levels between

13
Case No.: 5:11-cv-01252-EJD
ORDER DENYING MOTION TO DISMISS

December 2010 and March 2011.[3] Id. However, on March 8, the press release issued by Defendants not only revealed that revenues would be lower than anticipated, but disclosed that this was in part due to "the adjustment of inventory levels at some telecom customers" and "a slowdown in business in China overall." SAC ¶ 53, 79. In the conference call held the same day, Rawls similarly acknowledged that the speculation and concerns regarding inventory build-up that Gertel had downplayed in the December 2 statement were in fact legitimate, and that Finisar customers actually had "some pretty good size inventories of wavelength selective switches." Id. ¶ 54. As a result of this information coming to light, Plaintiff alleges that Finisar's stock price dropped by $15.43 (nearly 39%) from $40.04 to $24.61, and shareholders suffered economic harm as a result. Id. ¶¶ 79-81.

These allegations sufficiently allege a causal connection between the December 2 statement and the injury suffered by shareholders. As Plaintiff correctly points out, "a corrective disclosure need not be a 'mirror-image' disclosure – a direct admission that a previous statement is untrue;" it must simply "relate to the same subject matter as the alleged misrepresentation." In re Harman Int'l Indus., Inc. Sec. Litig., 791 F.3d 90, 109 (D.C. Cir. 2015), (quoting Mass. Ret. Sys. v. CVS Caremark Corp., 716 F.3d 229, 240 (1st Cir. 2013)). Here, Defendants' disclosure of below anticipated revenue that is, in part, the result of an inventory build-up is sufficiently "relate[d] to the same subject matter" as Defendants' statement denying the existence of such a build-up. Accordingly, Plaintiff has adequately plead loss causation, and Defendants Motion to Dismiss on that basis is also denied.

**B.     The PSLRA Discovery Stay**

Pursuant to the PSLRA, all discovery and other proceedings in this action were stayed pending resolution of the Motion to Dismiss. See 15 U.S.C. §78u-4(b)(3)(B). Plaintiff filed a Motion for Modification of the PSLRA Stay of Discovery (Dkt. No. 106), which was set for a

---

[3] Specifically, Plaintiff alleges that just prior to the Class Period, Finisar stock was trading at $19.77 per share, but following Defendants' December 2 statement denying an inventory build-up, Finisar's stock increased 16.64% the following day, and continued to rise to a Class Period high of $43.23 per share. SAC ¶¶ 13, 63, 77.

14
Case No.: 5:11-cv-01252-EJD
ORDER DENYING MOTION TO DISMISS

hearing on April 27, 2017.  In light of this Order denying Defendants' Motion to Dismiss, the automatic stay imposed by the PSLRA is hereby lifted, and Plaintiff's Motion for Modification of the Stay is DENIED AS MOOT.

**IV.  ORDER**

Based on the foregoing, the court finds, concludes, and orders as follows:

1. Defendants' Motion to Dismiss (Dkt. No 94) is DENIED.

2. Plaintiff's Motion for Modification of the PSLRA Stay of Discovery (Dkt. No. 106), is DENIED AS MOOT.

3. The court hereby schedules this case for a Case Management Conference at **10:00 a.m. on June 1, 2017**.  The parties shall file an updated Joint Case Management Conference Statement on or before May 25, 2017.

**IT IS SO ORDERED.**

Dated: May 1, 2017

_____
EDWARD J. DAVILA
United States District Judge

15
Case No.: 5:11-cv-01252-EJD
ORDER DENYING MOTION TO DISMISS