1   SHIRLI FABBRI WEISS (Bar No. 079225)
    shirli.weiss@dlapiper.com
2   DAVID PRIEBE (Bar No. 148679)
    david.priebe@dlapiper.com
3   DLA PIPER LLP (US)
    2000 University Avenue
4   East Palo Alto, CA 94303-2248
    Tel:  (650) 833-2000
5   Fax:  (650) 833-2001

6   Attorneys for Defendants FINISAR
    CORPORATION, JERRY S. RAWLS, and
7   EITAN GERTEL

8

9

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12   In re FINISAR CORPORATION          Case No. CV 11-1252 EJD HRL
     SECURITIES LITIGATION
13                                      Class Action

14                                      DEFENDANTS' OPPOSITION TO MOTION
                                        FOR CLASS CERTIFICATION
15
                                        Date:         No hearing scheduled
16                                      Time:         No hearing scheduled
                                        Courtroom:    No hearing scheduled
17                                      Judge:        Hon. Edward J. Davila

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.   STATEMENT OF FACTS ..................................................................................... 4

    A.    Finisar:  Prior to the Putative Class Period and Through December 1, 2010 ........ 4

    B.    December 2, 2010:  What Plaintiff Alleges Vs. What Its Expert Admits.............. 5

    C.    December 2, 2010:  What Actually Occurred ...................................................... 7

III.  ISSUES TO BE DECIDED ................................................................................. 10

IV.   ARGUMENT ....................................................................................................... 10

    A.    As A Matter Of Law, The Class Cannot Include Persons Who Purchased Before Mr. Gertel Made The Statement At Issue .................................................. 11

    B.    Price Impact Does Not Exist Because There Was No Price Increase After The Challenged Statement ...................................................................................... 13

    C.    Plaintiff Admits That Price Impact Does Not Exist Based On A Price Maintenance Theory ............................................................................................... 14

V.    CONCLUSION .................................................................................................... 22

1

# TABLE OF AUTHORITIES

2

## <u>CASES</u>

3

4

*Amgen, Inc. v. Connecticut Retirement Plans & Trust Funds*,
568 U.S. ___, 133 S. Ct. 1184 (2013) .................................................................................. 1

5

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ....................................................................................................... passim

6

7

*City of Livonia Emps.' Ret. Sys. v. Wyeth*,
284 F.R.D. 173 (S.D.N.Y. 2012) ...................................................................................... 16

8

9

*Comcast v. Behrend*,
569 U.S. 27 (2013) ............................................................................................................. 13

10

*Erica P. John Fund, Inc. v. Halliburton Co.*,
134 S.Ct. 2398 (2014) ........................................................................... 1, 10, 15, 17, 19

11

12

*Hatamian v. Advanced Micro Devices, Inc.*,
No. 14-cv-00226 YGR, 2016 WL 1042502 (N.D. Cal. Mar. 16, 2016) .............. 15, 16, 17

13

14

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
No. 11-429 (DWF/FLN), 2014 WL 4746195 (D. Minn. Aug. 6, 2014), *reversed*,
818 F.3d 775 (8th Cir. 2016) ............................................................................................. 12

15

16

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
818 F.3d 775 (8th Cir. 2016) ................................................................................ 3, 18, 19, 20

17

18

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
No. 11-429 (DWF/FLN), 2017 WL 2728399 (D. Minn. June 23, 2017) .......... 3, 19, 20, 21

19

*In re Intuitive Surgical Sec. Litig.*,
No. 5:13-cv-01920-EJD, 2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) ......... 2, 10, 11, 14

20

21

*In re Pfizer Inc. Sec. Litig.*,
936 F. Supp. 2d 252 (S.D.N.Y. 2013) .............................................................................. 16

22

## <u>RULES</u>

23

Federal Rule of Civil Procedure 23(b)(3) .......................................................................... 1

24

Federal Rule of Civil Procedure 23(c)(2)(B) .................................................................... 13

25

26

27

28

OPPOSITION TO CLASS CERTIFICATION
Case No. CV 11-1252 EJD HRL

1   Defendants Finisar Corporation ("Finisar"), Jerry S. Rawls, and Eitan Gertel

2   ("Defendants") oppose Plaintiff's Motion For Class Certification ("Motion").

3   **I.      INTRODUCTION AND SUMMARY OF ARGUMENT**

4   Plaintiff's Motion is flawed at the outset because it indisputably requests certification of

5   an overbroad Class that seeks to include persons who traded millions of shares before the

6   challenged statement was made.  The Court has limited this case to a single oral statement

7   allegedly made at a conference hosted by a third party (Credit Suisse) on December 2, 2010.  On

8   that day, Finisar's CEO, Mr. Gertel, allegedly made a false statement about Finisar's visibility

9   into Finisar's telecom customers' inventories.  As demonstrated below and admitted by Plaintiff's

10  expert, Mr. Gertel did not speak at the start of the trading day on December 2:  he spoke hours

11  after the market had opened and millions of shares had been traded.  Plaintiff makes no attempt to

12  account for this fact, but rather its proposed Order includes all persons who purchased on

13  December 2, and hence persons who purchased before Mr. Gertel's statement was made.  As a

14  matter of law and logic, those trades cannot not have been made in reliance on a statement that

15  had not yet been made, and a statement that had not yet been made cannot have had an impact on

16  Finisar's stock price before it was made.  *See* Section IV(A), *infra*.

17  The Motion's flaws, however, extend past the proposed Class' temporal overbreadth, and

18  the Court should deny it in its entirety.  Plaintiff seeks to satisfy the predominance requirement of

19  Rule 23(b)(3) on the element of reliance solely by invoking the presumption of *Basic Inc. v.*

20  *Levinson*, 485 U.S. 224 (1988).[1]  Under *Erica P. John Fund, Inc. v. Halliburton Co*., 134 S.Ct.

21  2398 (2014) ("*Halliburton II*"), defendants may rebut the *Basic* presumption by showing that the

22  challenged statement did not have a statistically significant impact on the stock price.  There is no

23  price impact here, and therefore the *Basic* presumption is unavailable to satisfy this Rule 23(b)(3)

24  requirement.

25  Plaintiff distorts the significance of the challenged December 2 statement by alleging that

26  Finisar's stock price increased by $3.29 per share that day as measured by the difference between

27  _____

28  [1]  All references to a "Rule" are to the Federal Rules of Civil Procedure.

- 1-

1  the $19.77 per share closing price on the previous day (December 1) and the $23.06 closing price

2  on the day of the Credit Suisse conference (December 2).  This allegation may have allowed

3  Plaintiff to survive a motion to dismiss, but it cannot support class certification because it

4  conflicts with the evidence that now can be presented at this juncture—evidence that shows the

5  allegation is demonstrably false.  As explained by Defendants' expert witness, Dr. Alexander

6  Aganin, in his expert report, the evidence shows that:  (1) the stock price already had increased on

7  December 2 by at least $3.00 per share from the December 1 closing price before Mr. Gertel

8  made the challenged statement later in the day on December 2; and (2) any increase after that

9  point was not statistically significant when the price is adjusted for general market and industry

10  trading.  (Indeed, the price at the time of the statement may have been higher than it closed on the

11  end of the December 2 trading day.)

12      Nothing in Plaintiff's expert report addresses these critical facts.  To the contrary,

13  Plaintiff's expert, Dr. Michael L. Hartzmark, wrongly combines the market's reaction to

14  unchallenged statements made on December 1 with the challenged statements made after mid-day

15  on December 2 so that Plaintiff can continue to argue that the challenged statement was

16  responsible for a statistically significant price increase on December 2.  However, when the

17  market reaction following the challenged statement is assessed, it is clear that the challenged

18  statement had no statistically significant impact on the stock price on December 2.  As further

19  evidence of the non-impact of the challenged statement, after having no statistically significant

20  impact on December 2, Plaintiff's expert admits the stock price did ***not*** react in a statistically

21  significant manner the next day (December 3).  As the Court recognized in *In re Intuitive Surgical*

22  *Securities Litigation*, if Finisar stock traded in an efficient market, any effect of Mr. Gertel's

23  statement would have been incorporated into the stock price well before the end of the next day.

24  Thus, the statement did not cause Finisar's stock price to increase by any statistically significant

25  amount and there is no price impact on that basis.  *See* Section IV(B), *infra*.

26      Nor can the March 9, 2011 decline in Finisar's stock price be attributed to the December 2

27  challenged statement.  In certain circumstances, when an alleged misrepresentation does not

28  cause a stock's price to increase, some courts, including this Court (but not the Ninth Circuit,

OPPOSITION TO CLASS CERTIFICATION
Case No. CV 11-1252 EJD HRL

which as of this writing has not addressed the issue) recognize price impact under an alternative theory of "price maintenance."  Under this theory, even if an alleged misrepresentation has no statistically significant price impact when made, it may have had an impact if it maintained a *pre-existing* stock price that was already inflated.  A "corrective disclosure" allegation is used by plaintiffs to try to show that the pre-challenged statement artificial inflation maintained by the alleged misrepresentation was eliminated and the price fell.  Plaintiff's admissions, however, foreclose a price maintenance theory.  Here, as an integral part of its case, Plaintiff alleges that prior to December 2, and up to the moment Mr. Gertel spoke, Finisar's stock price was not inflated—indeed, Plaintiff asserts that it did not even fully reflect Finisar's six quarters of strong growth—because the market was uncertain whether growth was related to customers' inventory build-up.  Plaintiff thus concedes there was no pre-existing inflated price that Mr. Gertel's statement could have "maintained;" then, as explained above, once Mr. Gertel spoke, his statement did not have a price impact because it did not increase the stock price.  Under very similar circumstances, *IBEW Local 98 Pension Fund v. Best Buy Co*., 818 F.3d 775 (8th Cir. 2016) and a follow-on District Court decision in that case held that the *Basic* presumption of reliance did not apply and therefore denied class certification.  *See* Section IV(C), *infra*.

Because Plaintiff admits there was no pre-existing inflated price for Mr. Gertel's statement to maintain, it is irrelevant to this Motion that the stock price declined the day after March 8, 2011, after Finisar issued its first-ever forecast for the Fourth Quarter 2011 that was lower than what analysts had forecasted based on their own research.  This is because, for there to be a price impact, the challenged statement must either artificially inflate the stock price or artificially maintain an inflated stock price.  The challenged statement here demonstrably and admittedly did neither.  There is no reason to infer that when a stock price declines following the disclosure of new adverse information, it also *must be the case* that some earlier piece of information had inflated the stock price or had maintained the stock price at an artificially inflated level.  One would expect a stock price to decline in an efficient market whenever an issuer announces adverse information, which is how the operative Second Amended Complaint ("SAC") characterizes the March 8 forecast.

1    Accordingly, the Court should deny Plaintiff's motion to certify a class of purchasers of

2    Finisar's common stock who traded from December 2, 2010 to March 8, 2011 because:  (1)

3    Plaintiff purports to include persons trading millions of shares who could not have traded in

4    reliance on the challenged December 2, 2010 statement; (2) the statement had no statistically

5    significant price impact in terms of causing the stock price to increase when made (which it did

6    not); and (3) the challenged statement did not maintain pre-existing stock price inflation.

7    **II.**      **STATEMENT OF FACTS**

8           **A.**      **Finisar:  Prior to the Putative Class Period and Through December 1, 2010**

9           Finisar is the world's leading manufacturer of components used by companies to

10   manufacture equipment deployed to build fiber optic communication networks.  The operative

11   complaint is the SAC filed July 15, 2016.  Plaintiff alleges, and its expert Dr. Michael Hartzmark

12   opines, that Finisar common stock is traded in an efficient market.  *See* Motion at 15-22; Expert

13   Report of Michael L. Hartzmark, Ph.D. ("Hartzmark Report").  For purposes of this Motion,

14   Defendants do not challenge this assertion.

15          The proposed Class Period commences on December 2, 2010.  At the end of the previous

16   trading day (December 1), Finisar's stock price had closed at $19.77 per share.  After the market

17   closed on December 1, Finisar issued a press release announcing its final unaudited results for its

18   Second Quarter of Fiscal Year 2011 and its forecast for its Third Quarter of Fiscal Year 2011.

19   Finisar management held a conference call later on December 1.  *Accord*, Hartzmark Report at 44

20   (admitting that press release and conference call occurred after market close on December 1).

21   Plaintiff's initial complaint alleged that Finisar made false and misleading statements in the

22   December 1 press release and conference call.  Consolidated Complaint (filed Jan. 20, 2012),

23   docket #53, ¶¶59-61.  On January 16, 2013, the District Court granted Defendants' motion to

24   dismiss that complaint with leave to amend.  Docket #68.  On February 13, 2013, Plaintiff filed a

25   First Amended Complaint ("FAC"), which dropped its challenge to the December 1, 2010

26   statements.  Docket #69.  The SAC does not challenge the December 1 statements either.

27          The $240.9 million in revenue reported on December 1 represented Finisar's sixth

28   consecutive quarter of double-digit growth.  As a lynchpin of its case, Plaintiff alleges that as of

-4-                                                OPPOSITION TO CLASS CERTIFICATION
                                                   Case No. CV 11-1252 EJD HRL

this point in time, there was uncertainty in the market about why that growth had occurred, and that this uncertainty had depressed Finisar's stock price.  According to Plaintiff, "market analysts repeatedly questioned whether, and to what extent, Finisar's extraordinary growth and increased sales were attributable to an inventory build-up by customers rather than real end-market demand."  Motion at 4:5-7.  "In the face of analyst speculation and questions, Defendants remained silent regarding the possibility of an inventory build-up" up to the time of the challenged statement.  *Id*. at 4:15-16, *citing* SAC ¶38.  "Accordingly, Finisar's stock price remained relatively constant prior to the Class Period, and it ***did not rise in proportion*** to the Company's record-setting growth."  *Id.* at 4:17-18, *citing* SAC ¶¶13, 33, 35-36 (emphasis added).  Thus, Plaintiff alleges and admits that Finisar's stock was not artificially inflated before Mr. Gertel spoke.

### B.   December 2, 2010:  What Plaintiff Alleges Vs. What Its Expert Admits

Following this Court's and the Ninth Circuit's rulings in this case, the only remaining allegedly false or misleading statement in this case was allegedly made on December 2, 2010.  According to the SAC, at a Credit Suisse Technology Conference on that day, analyst William Stein said:

> You've grown pretty dramatically over the last six quarters in particular.  Investors look at that and say, you're a component supplier to networking and telecom customers and storage customers, you've significantly outgrown your end markets for the last six quarters.  And that's sending a signal to some investors that this kind of defines peak and this is going to revert.  Can you help us understand how it's possible for the company to not only sustain that but continue to grow faster than the end markets?

Mr. Gertel allegedly replied, noting:  "And on the telcom side, look, there can be one or two guys who try to build their own inventory, but by far the majority of the customers expediting product and doesn't look to us, not visible to us at all, all these quarters if they are building any inventory."  SAC ¶¶42, 62.  The Ninth Circuit identified this as the statement for which the FAC had pleaded falsity, and the statement was re-alleged in the SAC.  Order dated Mar. 25, 2016, filed as docket #86, at 3 ("The First Amended Complaint identifies a specific statement in which Finisar's CEO denied having knowledge of an inventory build-up and down-played concerns of a looming inventory bubble.  And it identifies why that statement was misleading by alleging that

1   inventory levels would have been disclosed to defendants during the annual contract

2   negotiations.").

3          Plaintiff makes bold claims about the significance of Mr. Gertel's statement.  In the SAC,

4   in order to try to plead that Mr. Gertel's statement was material, Plaintiff pointed to the $3.29 per

5   share increase between the $19.77 closing price on December 1 and the $23.06 per share closing

6   price on December 2, the day of the Credit Suisse conference, and attributed this price increase to

7   the challenged statement.  SAC ¶¶13, 63.  The Court recognized the significance of this allegation

8   by citing the $3.29 increase allegedly resulting from this statement in denying Defendants'

9   motion to dismiss.  Order dated May 1, 2017 (docket #115) at 3:16-18.

10         Plaintiff continues to make this allegation in the current post-pleading, facts-matter stage

11  of the case.  In the instant Motion, as noted above, Plaintiff alleges that Defendants "had

12  remained silent regarding the possibility of an inventory build-up up until the start of the Class

13  Period on December 2, 2010"—*i.e.*, until Mr. Gertel's statement—and that as a result, there was

14  uncertainty as to the reasons for Finisar's strong growth and the stock price had not reflected that

15  growth.  Plaintiff then asserts that Mr. Gertel's statement that Finisar lacked visibility and that it

16  did not appear to Finisar that there was inventory build-up, because customers were expediting

17  product, *removed this uncertainty* by in effect stating there had not been inventory build-up.

18  Plaintiff contends that this demurral had a price impact—it caused the stock price to increase:

19  "As a result of Gertel's statement denying an inventory build-up, Finisar's common stock ***shot up***

20  from $19.77 per share on December 1, 2010…"  Motion at 5:6-7 (emphasis added).

21         The statement is false.  Plaintiff's own expert's testimony undermines Plaintiff's

22  contention and Defendants' expert confirms that in fact there was no price impact from the

23  statement.  First, Dr. Hartzmark states that after the market closed on December 1, Finisar issued

24  a type of information investors usually regard as significant:  the earnings and forecast press

25  release and conference call referenced in Section II(A) above.  Hartzmark Report at 44.  Dr.

26  Hartzmark claims this December 1 information was material and was included in the body of

27  information that moved the stock price by what he opines is a statistically significant amount on

28  December 2, as measured by the $3.29 closing price-to-closing price difference between

- 6 -

December 1 and December 2.  *Id.* at 45 & n.120.  He includes a number of references to public reports commenting on the strong second quarter results on the morning of December 2 (*e.g.*, "Finisar shares jump to new year-high after strong 2d-quarter results," Associated Press Newswires - Factiva, 12/02/2010 11:39 AM)."[2]  Second, Dr. Hartzmark admits that after the December 1 information was issued, and by the time the market opened on December 2, Finisar's stock price already had increased from the $19.77 per share closing price on December 1 to $21.12 per share.  *Id.* at 45 & n.139.  Third, Dr. Hartzmark admits that Mr. Gertel spoke at some unspecified point in time on December 2 *after* the market had opened.  *Id.* at 44-45 (Credit Suisse conference appearance occurred "while the market was open on December 2, 2010").[3]  Dr. Hartzmark, however, makes no attempt to separate the market's reaction to the unchallenged December 1, 2010 statement from the reaction to the challenged December 2, 2010 statement.  Rather, Dr. Hartzmark combines the effect of the disclosures on the two dates, and notes, irrelevantly, "[t]here was a rapid price response to Finisar's disclosures [made] on December 1 and 2, 2010.  There was a positive abnormal return on December 2, 2010 that is highly statistically significant…."  Hartzmark Report at 45.  Thus, Dr. Hartzmark points to a statistically significant price movement by comparing the price at the close of market on December 2 with the close of market on December 1, without accounting for the fact that the unchallenged December 1 statement had a significant positive effect on the price of the stock before Mr. Gertel spoke, that Mr. Gertel spoke after the beginning of the trading day on December 2, and that Mr. Gertel's alleged statements did not have a significant positive impact on the stock price.

## C.    December 2, 2010:  What Actually Occurred

Plaintiff's bold allegations about the effect of Mr. Gertel's statement on Finisar's stock price have no basis.  Dr. Hartzmark's report does not support them and the Expert Report of Alexander Aganin, Ph.D. ("Aganin Report"), which is attached as Exhibit 1 to the Declaration of David Priebe, refutes them.  As the Aganin Report shows, Finisar's stock price increased after the

---

[2]  Hartzmark Report, Appendix C, p. 3 of 33
[3]  Dr. Hartzmark's Appendix C, which purports to track certain events related to Finisar, has an entry on page 3 for a "Credit Suisse Conference Aerospace and Defense Conference" at "2010-12-02 12:30:00."

OPPOSITION TO CLASS CERTIFICATION
Case No. CV 11-1252 EJD HRL

1   aftermarket dissemination of the December 1, 2010 press release and conference call to open at

2   $21.12 per share, which was $1.35 above the closing price of December 1, 2010.  Mr. Gertel's

3   appearance at the Credit Suisse conference was scheduled to begin at 9:30 AM Pacific time \

4   12:30 PM Eastern time—*i.e.*, three hours after the trading day had begun.  Dr. Aganin obtained an

5   audio recording and transcript of Mr. Gertel's appearance, and noted when a transcript of the

6   conference appeared on Bloomberg (18:08:38 GMT, or 1:08:38 PM Eastern time).  Dr. Aganin

7   timed the length of time between the start of the recording and the statement at issue, and between

8   the statement at issue and the end of the recording.  Aganin Report ¶¶18-19 & n.17.  According to

9   this analysis, Mr. Gertel made the statement about telecom customers' inventories, as challenged

10  in the SAC, at some point in time between 12:51:15 PM and 1:04:29 PM.  At the earliest point in

11  that range (12:51:15), the stock price was $22.81.  *Id.* ¶34.  Prior to that statement, earlier in the

12  trading day on December 2, there had been more than 20 thousand trades and more than 4.8

13  million Finisar shares traded.  *Id*. ¶20.

14        Assuming an efficient market and that the information entered the efficient market for

15  purposes of this Motion, it still took some time for Mr. Gertel's statement to be incorporated into

16  the stock price, but authorities including this Court have cited the time of incorporation in an

17  efficient market to be within a time span of between a few hours to two days.  The parties agree

18  that the stock price closed on December 2 at $23.06.  To assess the price impact, if any, of Mr.

19  Gertel's statement separate from the December 1 statements, Dr. Aganin conducted an event

20  study measuring the period on December 2 after which Mr. Gertel made his statement.  His

21  analysis shows the statement had no statistically significant impact.  Aganin Report ¶¶29-36.[4]

22        Plaintiff's expert admits that the stock price movement on the next day (December 3,

23  2010) was "statistically insignificant."  Hartzmark Report at 45.  Defendants agree.  Aganin

24

25  _____

[4] Using the same methods, Dr. Aganin also assessed when an earlier part of Mr. Gertel's remarks
26  at the Credit Suisse conference that is alleged in the SAC but was not identified as false by the
Ninth Circuit was made.  ("So if you look at the market, you see the fundamentals for growth are
27  there. People need more higher bit rate products, more sophisticated products to address the cost
reduction that the network needs and the demand continues.").  It was made 42 seconds earlier, at
28  some point between 12:50:33 PM and 1:03:47 PM.  The results of Dr. Aganin's analysis do not
change if this earlier time is used.  Aganin Report ¶37 nn.41, 43.

OPPOSITION TO CLASS CERTIFICATION
                                         Case No. CV 11-1252 EJD HRL

Report ¶37.  Dr. Hartzmark points to no price impact that reflects that Mr. Gertel's December 2 statement dispelled concern or risk that telecom customers' inventories were being built up.  And while Plaintiff asserts that analysts had raised the issue of inventory build-up, it cannot reasonably be argued at this stage that analysts' concerns were dispelled.  For example, on December 15, 2010, the same analyst (Mr. Stein) who had asked the question to which Mr. Gertel responded at the Credit Suisse conference issued a report identifying "inventory restocking at customers" as a factor in accounting for Finisar's growth:

> We believe inventory cycles play a meaningful part in the separation in growth between FNSR and its customers.  For example, in the 2008-09 downturn, we believe a significant portion of the 33% organic revenue decline from to 3Q08 to 1Q09 represented inventory workdown by FNSR's customers.  Likewise, we believe a meaningful part of the 123% revenue growth off the trough of 1Q09 was owing to an inventory restocking at customers.  Because leadtimes are still stretched, we believe customer restocking is unlikely to reverse in the near-term.

Declaration of Margaret Austin Exhibit 1.  ACI Research expressed continuing concerns after the December 2 challenged statement as reflected in a report dated January 31, 2011:

> **We continue to believe that the entire optical components industry is experiencing a ballooning inventory bubble**. …
>
> **We are now detecting a major inventory buildup in Finisar's ROADM business.** This will result in significant disruption in coming quarters, as shortage mentality fades from the telecom industry.
>
> **We reiterate our Sell recommendation on Finisar.**  In the semiconductor industry, every single management team said that there was no excess inventory until it rebounded back at them.

Austin Declaration Exhibit 2 (emphasis in original).[5]

---

[5]  Defendants request judicial notice of these reports for the limited purpose of showing what the authors said to the market.  Dr. Hartzmark includes both of these reports in his Appendix C, "Finisar News Chronology with Daily Statistics."  Appendix C at 8 (12/15/2010 Wed entry) ("**Credit Suisse** (Analyst Report – Manual Entry, 12/15/2010)); Appendix C at 17 (1/31/2011 Mon entry) ("**ACI Research** (Analyst Report – Manual Entry, 01/15/2011)); *see also* Hartzmark Report ¶35 (including Credit Suisse and ACI Research in analysts offering research coverage of Finisar).  Dr. Hartzmark also attached both documents to his report.

OPPOSITION TO CLASS CERTIFICATION
Case No. CV 11-1252 EJD HRL

1    **III.**    <u>**ISSUES TO BE DECIDED**</u>

2    1.    Can the Court certify a Class that includes persons who traded millions of shares of

3    Finisar stock on December 2, 2010 before the allegedly false and misleading statement

4    was made?

5    2.    Does the evidence show the allegedly false and misleading statement had no impact on the

6    price of Finisar common stock and hence that the presumption of reliance under *Basic Inc.*

7    *v. Levinson*, 485 U.S. 224 (1988), does not apply, thereby precluding class certification?

8    **IV.**    <u>**ARGUMENT**</u>

9    Defendants recognize that the Supreme Court has limited the issues relevant to a class

10  certification motion, as distinguished from the fact adjudication stage where Plaintiff must prove

11  each of the elements of falsity, scienter, loss causation and damages.  Nevertheless, the Motion

12  should be denied.  First, it should be denied because the start of the proposed Class Period

13  includes persons who traded millions of shares before Mr. Gertel's statement was made.  *See*

14  Section IV(A), *infra*.  Second, it should be denied for the remainder of the proposed Class Period

15  because Mr. Gertel's statement did not have an impact on Finisar's stock price either by

16  increasing it or by maintaining a pre-existing inflated price.  Plaintiff contends that class-wide

17  issues predominate over individualized issues on the element of reliance because Class members

18  are entitled to a presumption of reliance under *Basic*.  Motion at 3, 14-15.  As noted, under

19  *Halliburton II*, even if plaintiff makes a prima facie showing that a security traded in any efficient

20  market, a defendant may rebut the *Basic* presumption by showing that the challenged statement

21  did not have a statistically significant impact on the stock price.  *In re Intuitive Surgical Sec.*

22  *Litig.*, 2016 WL 7425926, *13 (N.D. Cal. Dec. 22, 2016).

23    The evidence here shows the lack of a price impact.  Plaintiff alleges the following:

24  (1)    Prior to December 2, the market was uncertain as to the factors underlying Finisar's strong

25  revenue growth, and hence the stock price did not rise in proportion to the Company's

26  record-setting revenue growth; Finisar had not addressed the issue of customer inventory.

27  (2)    The stock price increased in a statistically significant amount on December 2 because and

28  when Defendants dispelled uncertainty by saying that Finisar had not observed telecom

1    inventory build-up to date; and

2   (3)      The day after the market learned of the Fourth Quarter 2011 forecast (March 9, 2011), one

3           contributing factor of which was inventory build-up, the stock price declined and thus

4           removed the price-inflating effect of the December 2 statement.

5    The evidence shows that allegation (2) is false:  Mr. Gertel's December 2 statement did

6 not have any impact on the price of Finisar stock as measured by a stock price increase after the

7 statement was made.  *See* Section IV(B), *infra*.  And, because allegation (2) is false, Plaintiff's

8 admission in allegation (1) that the stock price was not inflated means that allegation (3) cannot

9 apply.  According to Plaintiff, the stock price as of the time of the challenged statement was ***not***

10 inflated before the challenged statement.  Thus, regardless of what happened on March 8 or 9,

11 2011, it could not have removed any inflation in the stock price as of December 2 pre-existing at

12 the time of the challenged statement that had been maintained by Mr. Gertel's statement on that

13 day, because, as plaintiff admits, there was no pre-statement inflation to maintain in the first

14 place.  *A fortiori*, the statement itself had no price impact.  *See* Section IV(C), *infra*.

15

16         **A.    As A Matter Of Law, The Class Cannot Include Persons Who Purchased Before Mr. Gertel Made The Statement At Issue**

17    Plaintiff's proposed Order would certify a class of all persons who purchased Finisar

18 common stock from December 2, 2010 through March 8, 2011, inclusive.  [Proposed] Order

19 Granting Motion For Class Certification (docket #131-1) at 1:19-21.  As so defined, the Class

20 would include persons who purchased earlier in the day on December 2 <u>before</u> Mr. Gertel made

21 the challenged statement.  The Motion does not distinguish between those pre-statement

22 purchasers and persons who purchased later in the day—undoubtedly because Plaintiff wants the

23 Court to treat December 2 as a singular and undifferentiated event, a day in which Plaintiff has

24 asserted without basis that the stock price increased by $3.29 per share due solely to Mr. Gertel's

25 statement.

26    However, persons who purchased before Mr. Gertel's statement was made cannot have

27 relied on that statement, even under the *Basic* presumption of reliance.  *Intuitive Surgical*, 2016

28 WL 7425926 at *10 (to invoke *Basic*, plaintiff must show "the relevant transaction took place

- 11-

1   between the time the misrepresentations were made and the time the truth was revealed."). *Basic*

2   cannot apply because, as a matter of law and logic, there can be no price impact from a statement

3   that has not yet been made. *Amgen, Inc. v. Connecticut Retirement Plans & Trust Funds*, 568

4   U.S. __, 133 S. Ct. 1184, 1198 (2013) ("A security's market price cannot be affected by a

5   misrepresentation not yet made…."). The issue is particularly significant here because, as Dr.

6   Aganin's report shows, over four million shares traded before Mr. Gertel spoke.

7          Hence, the Court cannot enter Plaintiff's proposed Order because it would include persons

8   who purchased on December 2 before Mr. Gertel's challenged statement at the Credit Suisse

9   conference. *IBEW Local 98 Pension Fund v. Best Buy Co.*, 2014 WL 4746195 (D. Minn. Aug. 6,

10  2014), addressed a similar situation. In that opinion, a District Court's initial certification ruling

11  declined to certify the class described in plaintiff's proposed order but rather modified and

12  restricted the class definition so as to include only persons who traded after defendants made the

13  challenged statements on conference call—10 a.m. on September 14, 2010—rather than at the

14  start of the trading day as plaintiffs had proposed (when the company had issued a press release).

15  In *Best Buy*, defendants pointed out "that the proposed class includes those who purchased Best

16  Buy shares before the time at which the actionable statements were made," and submitted "that

17  none of those who purchased shares after the opening of the market and before the statements

18  were made could have relied on those statements." *Id*. at *9. The court replied: "The Court

19  agrees that those who purchased Best Buy stock on September [1]4, 2010, prior to the false

20  statements, should be excluded from the class definition." The court thus certified a class of

21  those who purchased stock starting at 10:00 a.m ET, not the start of the trading day. *Id*.[6] Later,

22  as explained below, certification was reversed in its entirety by the Eighth Circuit. *See* Section

23  IV(C), *infra*.

24         It is no response to contend that the proposed Order avoids this defect by limiting the

25  Class to persons who were damaged by Mr. Gertel's statement. Damages is but one element of a

26  securities claim. Persons who purchased before Mr. Gertel made the statement cannot in any

27  _____

28  [6] The *Best Buy* defendants did not seek to further pin down the time of the challenged statements
    as Defendants do here. *See* Section II(C), *supra*.

1   event show reliance and have no business in any purported Class.  Indeed, sending a notice of

2   pendency of a class action as required by Rule 23(c)(2)(B) to persons whose only purchases were

3   on the morning of December 2 would misleadingly suggest to those persons that they might have

4   a claim, when they do not.  Moreover, if Plaintiff argues that some persons who purchased in the

5   proposed Class Period were not damaged when others were, this suggests there is no method of

6   calculating damages that encompasses all Class members and all claims, which is a prerequisite

7   for class certification.  *Comcast v. Behrend*, 569 U.S. 27 (2013).

8
     **B.      Price Impact Does Not Exist Because There Was No Price Increase After The**
9            **Challenged Statement**

10          The previous section demonstrates that the Motion must be denied to the extent it would

11  start the proposed Class Period on December 2 before the challenged statements were made.  The

12  Motion should be denied for the remainder of the proposed Class Period because Mr. Gertel's

13  statement did not have an impact on Finisar's stock price.

14          One way in which a misrepresentation may have a price impact is if the stock price

15  increases in a statistically significant amount after the statement is made.  This is what Plaintiff

16  alleged in the SAC in order to convince the Court at the pleading stage that Mr. Gertel's

17  statement about telecom customers' inventories was material:  Plaintiff alleged that the December

18  2 statement was the first time Defendants had addressed the market's purported uncertainty about

19  growth and that as a result of the statement, the stock price increased by $3.29 on the day the

20  statement was made as compared with the $19.77 closing price on the prior day (December 1).  In

21  this Motion, Plaintiff continues to assert that Mr. Gertel's statement caused the stock price to

22  increase from a starting point of $19.77 as measured by the December 1 close, and its expert cites

23  the $3.29 per share closing-to-closing price increase in his report for the proposition that there

24  was a statistically significant price increase on the day of the Credit Suisse conference (December

25  2).  *See* Section II(B), *supra*.

26          In fact, the evidence shows there was no price impact from the challenged statement based

27  on the stock price increase movement after Mr. Gertel made the challenged statement.  Dr.

28  Hartzmark admits that $1.35 of the purported $3.29 increase occurred before the market opened

on December 2, a time period before Mr. Gertel spoke.  *See* Section II(B), *supra*.  Dr. Hartzmark also opines that information that is not challenged by Plaintiff as false or misleading (the December 1 press release and conference call) was material information absorbed by the market on December 2.  *Id*.  Dr. Hartzmark does not provide any evidence about the stock price at the time Mr. Gertel made the challenged statement, and his event study glosses over and does not attempt to segregate the effect of the December 1 information that was in the market on December 2 from the effect (if any) of Mr. Gertel's statement.  Thus, there is no evidence that Mr. Gertel's statement had a price impact by virtue of it causing the stock price to increase in a statistically significant amount.  *See Intuitive Surgical*, 2016 WL 7425926 at *15 (rejecting event study that did not provide a reliable methodology for distinguishing the effect of two pieces of information disclosed the same day).

In contrast, the December 2 intra-day evidence and analysis submitted by Defendants shows that Mr. Gertel's statement did not affect the stock price in any statistically significant manner.  *See* Section II(C), *supra*.  Dr. Hartzmark admits that the stock price did not move in a statistically significant amount on the next day (December 3), when under his efficient market opinion the market would have absorbed Mr. Gertel's statement and reflected that information in the stock price by that date.  *Id*.  Thus, the evidence shows that the challenged statement did not have an impact on Finisar's stock price at the time it was made.

### C.    Plaintiff Admits That Price Impact Does Not Exist Based On A Price Maintenance Theory

Defendants acknowledge that the absence of a statistically significant increase in Finisar's stock price at the time of the challenged statement may not end the price impact inquiry.  Some courts, including the Court in *Intuitive Surgical*, have stated that a stock price decline following a disclosure of adverse information can provide evidence that an earlier, challenged statement had a price impact, even where (as here) the challenged statement had not resulted in a statistically significant increase in the stock price when it was made.

The Ninth Circuit has not spoken on this proposition, and it is open to debate as it is counter to a finding that a stock trades in an efficient market and quickly reflects all publicly

1    available information, including alleged misrepresentations. The Supreme Court, in *Halliburton*

2    *II*, 134 S Ct. at 2414, held that a defendant may rebut the presumption of reliance by showing no

3    price impact.  However, the Court did not hold that if a market was efficient and an alleged

4    "corrective disclosure" affected the stock price, it necessarily follows that the earlier alleged

5    misrepresentation had a price impact.  Rather the Supreme Court acknowledged that a defendant

6    could defeat class certification even when plaintiff shows an efficient market in the stock at issue.

7    The Supreme Court considered the following hypothetical:

8
        Suppose a defendant at the certification stage submits an event study looking at the impact
9       on the price of its stock from six discrete events, in an effort to refute the plaintiffs' claim
        of general market efficiency. All agree the defendant may do this. Suppose one of the six
10      events is the specific misrepresentation asserted by the plaintiffs. All agree that this too is
        perfectly acceptable.  Now suppose the district court determines that, despite the
11      defendant's study, the plaintiff has carried its burden to prove market efficiency, but that
        the evidence shows no price impact with respect to the specific misrepresentation
12      challenged in the suit. ***The evidence at the certification stage thus shows an efficient
        market, on which the alleged misrepresentation had no price impact.***  And yet under
13      [plaintiff's] view, the plaintiffs' action should be certified and proceed as a class action
        (with all that entails), even though the fraud-on-the-market theory does not apply and
14      common reliance thus cannot be presumed.

15

16   *Id.* at 2415 (emphasis added).  Thus, the Supreme Court recognized that a misrepresentation may

17   be made about a security traded in an efficient market yet does not produce a statistically

18   significant price change and hence not allow a presumption of reliance.  This is what the evidence

19   shows for Mr. Gertel's December 2 statement, which did not cause the stock price to increase in a

20   statistically significant manner.  *See* Section IV(B), *supra*.

21       Courts have inferred price impact from an alleged corrective disclosure in circumstances

22   that do not apply here, where, even though an alleged misrepresentation has no price impact when

23   made, it maintains a stock price that is already inflated.  *Hatamian v. Advanced Micro Devices,*

24   *Inc*., 2016 WL 1042502 (N.D. Cal. Mar. 16, 2016), which the Court cited in *Intuitive Surgical*, is

25   instructive.  In *Hatamian*, Judge Rogers cited two reasons why the lack of a statistically

26   significant price increase at the time an alleged misrepresentation is made "does not necessarily

27   equate to lack of price impact."  One reason is that "a misrepresentation may not cause a

28   statistically significant change in price because misstatements are not made in a vacuum and other

- 15-                                                OPPOSITION TO CLASS CERTIFICATION
                                                    Case No. CV 11-1252 EJD HRL

1    information can offset or confound the effects of a particular misrepresentation." *Id.* at *7.

2    Under this theory, a statement that is falsely positive and that by itself might have been expected

3    to cause the stock price to increase might lose its price-moving effect due to other, negative,

4    price-depressing information in the market at the same time.  But that situation does not exist

5    here.  To the contrary, Plaintiff's expert admits that on the same day as Mr. Gertel spoke

6    (December 2), but before he spoke, other material information—the December 1 press release and

7    conference call—was in the market and had caused Finisar's stock price to <u>increase</u> by $1.35 per

8    share before the trading day even began; and that the December 1 information was in the market

9    on December 2 as the stock price increased further (and before Mr. Gertel spoke).  *See* Sections

10   II(B), II(C), *supra*.  Plaintiff's expert cites to no confounding or negative news on that day that

11   could have depressed Finisar's stock price, but rather points to reports on the positive effect on

12   Finisar's stock price tied to its strong Second Quarter results issued before Mr. Gertel spoke.

13   Hartzmark Report Appendix C, page 2-3.

14          The second reason cited in *Hatamian* as to why a later ("corrective") disclosure impact

15   alone may indicate price impact of the earlier challenged statement is the rationale most often

16   cited by courts:  that the later disclosure demonstrated that the earlier disclosure, when made,

17   served to maintain an artificially high price.  As Judge Rogers explained:  "It is also possible that

18   'a misstatement could serve to maintain the stock price at an artificially inflated level without also

19   causing the price to increase further.'"  2016 WL 1042502 at *7, *citing City of Livonia Emps.'

20   *Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 182 (S.D.N.Y. 2012).  Under this theory, a misrepresentation

21   (or an omission, which was the false or misleading statement at issue in *Wyeth* but is not alleged

22   here) may have had a price impact because it maintained a price that already was inflated before

23   the statement was made.  *See*, *e.g.*, *In re Pfizer Inc. Sec. Litig.*, 936 F. Supp. 2d 252, 264

24   (S.D.N.Y. 2013) (addressing summary judgment, not class certification) (transaction causation

25   could exist where plaintiff's expert alleged stock price was inflated prior to first alleged

26   misrepresentation).  In such circumstances, a corrective disclosure at the end of the Class Period

27   could demonstrate after the fact that the earlier misrepresentation had a price impact by removing

28   the artificial inflation component of the stock price that had existed as of the time of the

- 16-

1   misrepresentation and had been maintained by that misrepresentation.

2          A careful reading of *Hatamian* reveals that Judge Rogers did not endorse the proposition

3   that a price decrease following a corrective disclosure <u>always</u> indicates a price impact for the

4   earlier misrepresentation; as she stated, it is "also ***possible*** that 'a misstatement could serve to

5   maintain the stock price at an artificially inflated level without also causing the price to increase

6   further'." 2016 WL 1042502 at *7 (emphasis added). The defendants in *Hatamanian*, however,

7   did not address the price maintenance theory and hence did not meet their burden under

8   *Halliburton II* to refute price impact. Rather, the defendants admitted that the issuer's stock price

9   had increased by a statistically significant amount on four days on which defendants had made a

10  false or misleading statement. 2016 WL 1042502 at *8. Thus, when the corrective disclosures in

11  *Hatamanian* resulted in statistically significant price declines, those disclosures removed both the

12  price increase caused by the false statements and the pre-existing inflation caused by the market's

13  continuing false understanding of the facts.

14         In the instant case, in contrast, there is no date on which Defendants' alleged

15  misrepresentations caused Finisar's stock price to increase—Mr. Gertel's December 2 statement

16  is the only statement challenged in the case and his statement did not cause the stock price to

17  increase. *See* Section IV(B), *supra*. And Plaintiff ***admits*** that the necessary precondition for a

18  corrective disclosure to reveal that an earlier misrepresentation had a price impact even though

19  the stock price did not increase following the misrepresentation—a pre-existing inflated price—

20  did ***not*** exist. *See* Section II(A), *supra*. To the contrary, Plaintiff alleges that Finisar's stock price

21  was lower than one would expect given Finisar's recent success: it alleges that as of the time Mr.

22  Gertel spoke about telecom customers' inventories, Finisar's stock price did ***not*** reflect the

23  positive impact of the six quarters of strong growth because analysts thought it very well may be

24  the case that the growth had been impacted by inventory build-up. *Id.* There was no inflated

25  price for Mr. Gertel to maintain.

26         Plaintiff's allegations were not accidental. They reflected a deliberate choice by Plaintiff

27  so that it could claim that Mr. Gertel's statement was <u>new</u> information from Defendants that

28  supposedly caused a $3.29 per share increase by dispelling the market's pre-existing assessment

- 17-

1   that inventories may well have been built up.  Having made these admissions, Plaintiff cannot

2   now reverse course and claim that Mr. Gertel's statement maintained a stock price that was

3   inflated by a pre-existing erroneous understanding about Finisar's growth.  As a result of the fact

4   that Mr. Gertel's challenged statement did not maintain an artificially inflated price and itself had

5   no price impact, is simply cannot be presumed that the March 8 disclosures revealed a latent price

6   impact of the December 2 challenged statement.  The challenged statement had no price impact

7   on any basis, including from a supposed corrective disclosure.

8       *IBEW Local 98 Pension Fund v. Best Buy Co*., 818 F.3d 775 (8th Cir. 2016), and its

9   follow-on District Court opinion held that *Basic* did not apply in strikingly similar circumstances.

10  The operative *Best Buy* complaint challenged three statements made in close temporal proximity:

11  a press release containing a quarterly earnings forecast issued at 8 a.m. on September 14, 2010;

12  and two oral statements about the same quarter made on a 10 a.m. conference call the same day.

13  The stock price dropped after the company disclosed on December 14, 2010, that it had not met

14  its forecast, and this was the alleged corrective disclosure in the case.  *Id*. at 777-78.

15      As the Eight Circuit explained, the District Court found the press release issued before

16  market opening on September 14 to be nonactionable, but allowed claims based on the oral

17  statements made on the 10 a.m. conference call.  818 F.3d at 778.  At class certification,

18  plaintiff's expert's event study did not differentiate between the price effects of the nonactionable

19  press release on the one hand and the actionable conference call statements on the other—just as

20  Plaintiff's expert Dr. Hartzmark does not distinguish between the effect on Finisar's stock price

21  on December 2 as between the December 1 press release and Mr. Gertel's statement.  *Id*. at 779.

22  Defendants' expert's event study in *Best Buy* found that the price increase on that day had

23  occurred after the press release was issued but <u>before</u> the call, and that there was not a statistically

24  significant price increase on the rest of the day after the call—just as Dr. Aganin finds for Mr.

25  Gertel's statement on December 2 and Dr. Hartzmark admits as to the day after the statement

26  (December 3).  *Id*.  Plaintiff's expert in *Best Buy* admitted these facts in a revised opinion.  The

27  expert nevertheless argued that the "economic substance" of the press release had been

28  incorporated into the stock price by the time of the call; the conference call statements

- 18-

1  "fraudulently maintained" the stock price; and that the inflation was maintained until the end-of-

2  class period disclosure that the forecast was missed, which was a "corrective disclosure" that

3  showed price impact of the earlier challenged statements. *Id*. at 779-780.

4       Initially, the District Court accepted plaintiffs' argument. "Even though the stock price

5  may have been inflated prior to the earnings phone conference," the court had reasoned, "the

6  alleged misrepresentations could have further inflated the price, prolonged the inflation of the

7  price, or slowed the rate of fall." The court held that "price impact can be shown by a decrease in

8  price following a revelation of the fraud," namely the later missed forecast. 818 F.3d at 780.

9       On appeal, the Eighth Circuit reversed. It reasoned that under *Halliburton II*, defendants

10  can rebut the *Basic* presumption by providing evidence that ***severs the link*** between the alleged

11  misrepresentation and the price paid by plaintiff. The defendants had met this burden by

12  providing "strong evidence" on this issue: "*the opinion of plaintiffs' own expert*," who admitted

13  that the economic substance of the information disclosed in the nonactionable press release and

14  immediately following conference call were the same, yet that the latter disclosure, the

15  conference call, did not have any additional impact on the stock price. 818 F.3d at 782 (emphasis

16  in original). Plaintiffs' argument that the later alleged "corrective" disclosure (the December 14,

17  2010 missed forecast) showed that the challenged conference call statements on September 14

18  had a price impact by maintaining an artificially inflated price was wrong because, as plaintiffs'

19  expert had acknowledged, the price as of the time of the challenged statements had increased due

20  to the earlier non-fraudulent press release, not due to the later conference call statements. Hence,

21  there was no artificially inflated price that the challenged conference call statements could have

22  maintained. *Id*. at 783 ("The allegedly 'inflated price' was established by the non-fraudulent

23  press release.").

24       On remand, plaintiffs moved for leave to file an amended class certification motion in

25  which they sought "to put on evidence that the September 14 conference call had a price impact

26  by artificially maintaining the inflated stock price." *IBEW Local 98 Pension Fund v. Best Buy

27  Co*., 2017 WL 2728399, *2 (D. Minn. June 23, 2017). The District Court reasoned that the

28  Eighth Circuit already had ruled there was no price impact. Even if that was not the case, the

- 19-

1   Eighth Circuit had foreclosed the possibility of plaintiffs putting on evidence of additional impact

2   of price impact on a price maintenance theory because plaintiffs (through their expert) already

3   had admitted there was no price impact.  As the District Court elaborated:

> But Plaintiffs ignore the fact that their own expert said the September 14 conference call
> had no price impact.  Eighth Circuit Order at 783.  The idea that Plaintiffs should be given
> the opportunity to refute their own expert is simply a nonstarter.  Thus, Plaintiffs have
> failed to show that the Eighth Circuit left open the opportunity for Plaintiffs to present
> rebuttable evidence on price impact.

8   *Id*. at *3.  As the District Court further explained:  "While Plaintiffs aver that a new expert will

9   show that the September 14 conference call impacted the stock price by maintaining it at inflated

10  levels, such a presentation is foreclosed by Plaintiffs' earlier expert who concluded that the

11  conference call had no impact."  *Id*.

12       *Best Buy* is strikingly similar to the case at bar.  The equivalents of the (i) September 14

13  press release and the (ii) September 14 conference call statements in *Best Buy* are the (i)

14  December 1 unchallenged disclosures and the (ii) December 2 Credit Suisse conference

15  statement in this case.  In both cases, the statements were close in time and both present in the

16  market on the day of the challenged statement (September 14 in *Best Buy* and December 2 in this

17  case).  In both cases, the earlier non-fraudulent statement (the September 14 press release in *Best*

18  *Buy* and the December 1 disclosures in this case) caused the stock price to increase on the

19  relevant day, while the later-in-time challenged statements (the September 14 conference call

20  statements in *Best Buy* and Mr. Gertel's December 2 statement in this case) did not cause the

21  stock price to increase.  In both cases, plaintiffs tried to obfuscate these facts and tell the courts

22  that the misrepresentations had caused a stock price increase on the day they were made, but were

23  wrong because the price actually had increased after the earlier-in-time non-fraudulent

24  statements, ***not*** after the later-in-time challenged statements.

25       Most importantly, in both cases, plaintiff admitted that the issuer's stock price was ***not***

26  inflated as of the time of the challenged statement.  In *Best Buy*, the admission was indirect:

27  plaintiffs' expert admitted that the substance of the price-moving earlier statement (the press

28  release) and the later alleged misrepresentations (the conference call statements) were the same,

- 20-

1   and because the earlier statement was not fraudulent there was no artificially inflated price to

2   maintain as of the time of the challenged statement.  In the instant case, Plaintiff's admission is

3   direct.  For strategic purposes, Plaintiff alleges that the market did not fully reflect Finisar's

4   strong growth as of the time of Mr. Gertel's statement, and hence that there was no artificially

5   inflated price for that statement to maintain.  *See* Section II(A), *supra*.  Just as the District Court

6   in *Best Buy* ruled that plaintiffs in that case were foreclosed from reneging on their own

7   admissions in order to argue there was price impact via a corrective disclosure that removed

8   artificial inflation plaintiffs admitted did not exist, the Court in this case must foreclose Plaintiff

9   from arguing that the March 8, 2011 press release shows that the December 2, 2010 statement had

10  a price impact via a corrective disclosure that removed artificial inflation, because Plaintiff admits

11  artificial inflation did not exist as of the time of the December 2 statement.

12         Defendants expect that on reply, Plaintiff will argue that the March 8, 2011 press release

13  was a corrective disclose that "must have" revealed that the December 2 statement had a price

14  impact because the stock price declined after the March 8 press release.  But that argument would

15  be incorrect and irrelevant as a matter of law.  If there is no artificial inflation to maintain as

16  Plaintiff admits here, there can be no price impact under a corrective disclosure theory.

17  Moreover, no court has held, and there is no reason to infer, that when a stock price declines

18  following the disclosure of new adverse information, it also ***must be the case*** that some earlier

19  piece of information had inflated the stock price or maintained the stock price at an artificially

20  inflated level.  One would expect a stock price to decline in an efficient market when an issuer

21  announces adverse information, period.  And that is what happened here, even as alleged by

22  Plaintiff:  the SAC alleges that the March 8 press release disclosed Finisar's forecast for the

23  Fourth Quarter 2011, which was lower than what analysts had expected based on their own

24  research; and that the stock price declined after this forecast and the subsequent conference call.

25  SAC ¶¶5, 53.

26

27

28

1    **V.      <u>CONCLUSION</u>**

2           For the reasons set forth above, the Motion should be denied.

3                                          Respectfully submitted,

4    September 27, 2017                    **DLA PIPER LLP (US)**

5                                          By:  */s/ Shirli Fabbri Weiss*

6                                          Shirli Fabbri Weiss
                                           Attorneys for Defendants

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO CLASS CERTIFICATION
Case No. CV 11-1252 EJD HRL