SHIRLI FABBRI WEISS (Bar No. 079225)
shirli.weiss@dlapiper.com
DAVID PRIEBE (Bar No. 148679)
david.priebe@dlapiper.com
**DLA PIPER LLP (US)**
2000 University Avenue
East Palo Alto, CA 94303-2248
Tel: (650) 833-2000
Fax: (650) 833-2001

Attorneys for Defendants FINISAR
CORPORATION, JERRY S. RAWLS, and
EITAN GERTEL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re FINISAR CORPORATION SECURITIES LITIGATION | Case No. CV 11-1252 EJD HRL <br><br> <u>Class Action</u> <br><br> **DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION** <br><br> Date: March 7, 2019 <br> Time: 9:00 a.m. <br> Courtroom: 4 <br> Judge: Hon. Edward J. Davila |

# **TABLE OF CONTENTS**

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.     THE COMPLAINT AND PRIOR CERTIFICATION MOTION ..................................... 4

III.    THERE IS NO BASIS TO REVISIT THE COURT'S PRIOR ORDER .......................... 5

IV.     PLAINTIFF STILL CANNOT USE THE POST-MARCH 8 PRICE DECLINE TO
        SHOW PRICE IMPACT ............................................................................... 6

V.      THE POST-MARCH 8 PRICE DECLINE DOES NOT SHOW PRICE IMPACT .......... 9

        A.      Plaintiff and Hartzmark Mischaracterize The December 2 Statement .................... 9

        B.      The Post-December 2 Analyst Reports Sever The Link ...................................... 12

        C.      Plaintiff's Price Impact Methodology Is Unreliable And Legally Unsound ......... 14

        D.      Plaintiff's Characterization Of The December 2 Statement As Forward-
                Looking Is Integral To Its Motion And Cannot Be The Basis of A Corrective
                Disclosure ................................................................................................ 18

        E.      The Preponderance Of The Evidence Refutes Any Inference That The Stock
                Price Reaction To The March 8 Statements Indicates That The December 2
                Statement Had Price Impact ....................................................................... 20

                1.      The March 8 Statements Did Not Disclose Any Information About
                        Inventory Or Demand As Of The December 2 Statement ...................... 20

                2.      Even Plaintiff's Expert Rejects The Notion That Conditions In
                        February 2011 Must Have Existed In December 2010 ........................... 21

                3.      Hartzmark Ignores The Actual Q411 Forecast Disclosed On March 8,
                        Which Provided New Information About The Timing And Magnitude
                        Of The Emergence Of The Risks Known To Investors ......................... 23

                4.      A Note On Loss Causation ........................................................... 24

VI.     CONCLUSION ........................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Page**

### CASES

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
 568 U.S. 455 (2013) ...................................................................................................10

*Arkansas Teachers Ret. Sys. v. Goldman Sachs Group, Inc.*,
 879 F.3d 474 (2d Cir. 2018) ......................................................................................11

*Baker v. SeaWorld Entertainment, Inc.*,
 No. 14 cv 2129-MMA (AGS), 2017 WL 5885542 (S.D. Cal. Nov. 29, 2017) ..........8

*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988) ........................................................................................... passim

*Berks County Emps.' Ret. Fund v. First Am. Corp.*,
 734 F. Supp. 2d 533 (S.D.N.Y. 2010) .......................................................................20

*Brody v. Transitional Hospitals Corp.*,
 280 F.3d 997 (9th Cir. 2002) .....................................................................................17

*Cooper v. Thoratec Corp.*,
 No. 14-cv-0360 CW, 2018 WL 2117337 (N.D. Cal. May 8, 2018) ............................8

*Daubert v. Merrell Dow Pharmaceuticals*,
 509 U.S. 579 (1993) ...................................................................................................18

*Demarco v. Robertson Stephens, Inc.*,
 318 F. Supp. 2d 110 (S.D.N.Y. 2004) .........................................................................8

*Erica P. John Fund, Inc. v. Halliburton Co.*,
 563 U.S. 804 (2011) ...................................................................................................24

*FindWhat Investor Group v. FindWhat.com*,
 658 F.3d 1282 (11th Cir. 2011) ...................................................................................8

*Glickenhaus & Co. v. Household Int'l, Inc.*,
 787 F.3d 408 (7th Cir. 2015) .................................................................................8, 17

*Halliburton Co. v. Erica P. John Fund, Inc.*,
 134 S.Ct. 2398 (2014) ..............................................................................1, 11, 17, 18, 24

*Hamilton v. State Farm Fire & Cas. Co.*,
 270 F.3d 778 (9th Cir. 2001) .......................................................................................7

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
 818 F.3d 775 (8th Cir. 2016) .......................................................................................7

*In re BP P.L.C. Sec. Litig.*,
   MDL No. 10-md-2185 *etc.*, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) .................................5

*In re Convergent Techs. Sec. Litig.*,
   948 F.2d 507 (9th Cir. 1991) ...............................................................................................19

*In re Federal Home Loan Mtg. Corp. Sec. Litig.*,
   Nos. 09 Civ. 832(MGC) *etc.*, 2012 WL 4435292 (S.D.N.Y. Sept. 26, 2012) ...........................6

*In re Intuitive Surgical Sec. Litig.*,
   No. 5:13-cv-01920-EJD, 2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) ................................20

*In re Moody's Corp. Sec. Litig.*,
   274 F.R.D. 480 (S.D.N.Y. 2011) ..........................................................................................20

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
   571 F. Supp. 2d 1315 (N.D. Ga. 2007) ...................................................................................8

*In re Vivendi, SA Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ............................................................................................7, 8

*Lanovaz v. Twinings North America, Inc.*,
   No. C-12-02646-RMW, 2014 WL 7204757 (N.D. Cal. Dec. 17, 2014) ..............................5, 6

*Li v. Aeterna Zentaris, Inc.*,
   324 F.R.D. 331 (D.N.J. 2018) ................................................................................................8

*Ludlow v. BP, P.L.C.*,
   800 F.3d 674 (5th Cir. 2015) ..................................................................................................8

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2010) ...............................................................................................................17

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) (per curiam) ......................................................................24, 25

*Nathanson v. Polycom, Inc.*,
   87 F. Supp. 3d 966 (N.D. Cal. 2015) ......................................................................................8

*New Hampshire v. Maine*,
   532 U.S. 742 (2010) ...............................................................................................................7

*Ohio Pub. Emps. Ret. Sys. v. Federal Home Loan Mortg. Corp.*,
   No. 4:08 CV 0160, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ....................................11

*Parko v. Shell Oil Co.*,
   739 F.3d 1083 (7th Cir. 2014) ..............................................................................................11

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000) ...................................................................................................8

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
Case No. CV 11-1252 EJD

*Strougo v. Barclays PLC*,
   312 F.R.D. 307 (S.D.N.Y. 2016)..................................................................................8

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017).........................................................................................8

*Willis v. Big Lots, Inc.*,
   239 F. Supp. 3d 634 (S.D. Ohio 2017)......................................................................8

## STATUTES AND RULES

15 U.S.C. §78u-5(c)(1)(B)(i) ....................................................................................18

Fed. R. Civ. P. 23(c)(1)(c)........................................................................................5, 6

Fed. R. Evid. 702(c) .................................................................................................18

Fed. R. Evid. 703 ......................................................................................................14

N.D. Cal. Civil Local Rule 7-9 .................................................................................5

## MISCELLANEOUS

Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure
   Damages in Fraud on the Market Cases," 37 UCLA L. REV. 37 883 (1990) ...........15

# I.  <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

On December 5, 2017, the Court denied Plaintiff's motion for class certification and on January 18, 2018, the Court denied Plaintiff's motion for reconsideration.  ECF #150 ("December 5 Order"), #155.  The Court found that Defendants had rebutted the presumption of reliance of *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), as authorized by *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398 (2014) ("*Halliburton II*").  The preponderance of the evidence showed that the only alleged misrepresentation—a portion of defendant Eitan Gertel's December 2, 2010 response to an analyst's question ("December 2 Statement")—did not have an impact on the price of Finisar stock.  The price did not increase after the statement was made, and analyst reports issued after the statement severed the link between the statement and the price paid by investors.

The Court should deny this renewed Motion For Class Certification ("Motion") at the threshold because it is outside the discretion courts exercise in modifying certification orders.  *See* Section III, *infra*.  The Court also should deny the Motion if it considers its merits.  The Motion relies on a new variant of Plaintiff's previous price impact theory—instant inflation at the moment the challenged statement was made—and relies on the accompanying Expert Report of Michael L. Hartzmark, Ph.D. On Price Impact ("Hartzmark 3") to derive price impact using a "back casting" approach that starts with the stock price decline at the end of the class period.

As a dispositive threshold matter, Plaintiff's new theory of instant inflation is inconsistent with the allegations of the Second Amended Complaint ("SAC"), which Plaintiff cannot disavow.  The SAC alleges that analysts were concerned that telecom customers were stockpiling Finisar products in excess of perceived production needs, until Gertel provided new, material information that changed market perception by supposedly assuring the market this was no concern.  Under these allegations, applying commonly accepted economic principles, if the statement had a price impact, the stock price would have increased after the December 2 Statement, not remain static as it did.  *See* Section IV, *infra*.

Should the Court need proceed further, it should reject Plaintiff's new price impact theory and expert report.  On March 8, 2011, Finisar for the first time made a forecast for its Fourth Quarter 2011 ("Q411"):  $235 million to $250 million, which was lower than analysts'

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
Case No. CV 11-1252 EJD

independent preexisting estimates.  Finisar attributed the forecast in part to its assessment of inventory build-up at telecom customers in 2011.  The Motion posits that the latter statements were "corrective" of the December 2 Statement and if the "truth" had been disclosed on December 2, this would have caused the price to decline on December 2.  As explained in Section V, *infra*, Plaintiff's new theory and expert report should be rejected because:

- At the class certification stage, the Court is not required to accept the SAC's mischaracterization of the December 2 Statement or conclusory assertions that it was corrected by the March 8 Statements.  A review of the December 2 Statement shows that Gertel did not give the assurances characterized by Plaintiff.  Gertel speculated that some telecom customers could be stockpiling and said that it was not visible to Finisar one way or another whether the majority of customers were stockpiling.  He did not assure that past growth would be sustained into Q411 or beyond.  Consistent with these demurrals, analysts did not report after the December 2 Statement that there was no risk of inventory build-up (quite the contrary), nor change their estimates of demand for Q411.  Correlatively, the March 8 Statements did not purport to inform the market about the state of customer inventory, or Q411 demand, as of December 2, 2010.

- There is no reason to upset the Court's finding that analyst reports issued from December 13, 2010 through February 4, 2011 severed the link between the December 2 Statement and the stock price paid by investors.  This evidence, discussed in the Reply Report of Alexander Aganin, Ph.D. ("Aganin 3") (attached as Exhibit 1 to the Declaration of Margaret Austin), is replete with germane post-Statement new information entering the market:  analysts' ongoing independent assessments and competitors' disclosures relating to the market's awareness and timing of the emergence of risks of inventory build-up and slowdown in growth.

- Hartzmark's opinions using the March 9 price decline to attempt to reverse engineer price impact of the December 2 Statement are methodologically unsound and unreliable.  An economist's methodology for analysis of price inflation must first specifically identify the information withheld and then model the effect of that information as if disclosed at the time of the misstatement.  But Hartzmark does not specifically identify the information withheld nor model its price impact as if disclosed on December 2.  Also, he merely assumes that the same

market conditions existed and that all of the information regarding inventory and future demand that was stated on March 8 both existed and was known to Gertel as of the December 2 Statement.  This can neither be assumed nor inferred from the March 8 Statements.

- Alternatively, Hartzmark assumes that the relevant "truth" for price impact purposes is all of the information about inventory and demand known to Gertel at the time of the December 2 Statement, which Hartzmark does not specify but rather leaves for revelation at trial. Thus he bases his opinion on amorphous speculation that the March 8 disclosures corrected unspecified information which Gertel secretly must or may have known on December 2.  He further assumes this unidentified information was required to be disclosed.  This approach also cannot be used to identify price inflation, posits duties to disclose contrary to substantive securities law, and is inconsistent with sound methodological practice.

- The Motion depends on inferring a contradiction between the December 2 Statement and the demand for Finisar's products in a future quarter (Q411) that would not begin until nearly two months later.  Acknowledging this, Hartzmark characterizes the December 2 Statement as forward-looking.  This admission provides a new reason to sever the *Basic* link (and an about-face from the SAC).  Defendants publicly cautioned investors not to extrapolate or predict that far into the future from conditions as they existed on December 2.

- To support Plaintiffs' theory of price impact of the December 2 Statement, the March 8 Statements would have had to have told the market facts showing the earlier statement was false or misleading when made.  But the March 8 Statements did not inform the market about the state of customer inventory, or Q411 demand, as of December 2, 2010.  Instead they disclosed new information:  inventory build-up and a decline in demand that occurred in 2011.  Hartzmark himself admitted at deposition that inventory levels, demand, and production schedules are dynamic rather than static—*i.e.*, a moving target.  The assumption that the facts disclosed on March 8, 2011 both existed and were known by Finisar three months earlier simply cannot be made to support class certification where the March 8 Statement does not say as much and Plaintiff's expert admits that all aspects of that statement refer to matters that change by their nature.  Hartzmark also misses the effect of the Q411 forecast Finisar issued on March 8, which

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
Case No. CV 11-1252 EJD

provided the market with new information about the magnitude and timing of the emergence of the risk of a slowdown in demand.  The Q411 forecast did not correct an earlier Finisar forecast.

## II.       THE COMPLAINT AND PRIOR CERTIFICATION MOTION

On August 14, 2017, Plaintiff moved for class certification and submitted an Expert Report of Michael L. Hartzmark, Ph.D. ("Hartzmark 1").  ECF ##131, 132-1.  Plaintiff alleged that prior to the December 2 Statement, "market analysts repeatedly questioned whether, and to what extent, Finisar's extraordinary growth and increased sales were attributable to an inventory build-up by customers rather than real end-market demand."  ECF #131 at 4:5-7.  "In the face of analyst speculation and questions, Defendants remained silent regarding the possibility of an inventory build-up."  *Id*. at 4:15-16, *citing* SAC ¶38.  "Accordingly, Finisar's stock price remained relatively constant prior to the Class Period, and it did not rise in proportion to the Company's record-setting growth."  *Id*. at 4:17-18, *citing* SAC ¶¶13, 33, 35-36.  The December 2 Statement supposedly assured that "there was no risk of an inventory build-up and that it was not possible for more than 'one or two' customers to build their inventory over six quarters without the inventory build-up being visible to Finisar."  *Id*. ¶ 65.  This denial allegedly removed the uncertainty about the future that had depressed the stock price.  As a result, the price "shot up" by $3.29 per share (the difference between the $19.77 closing price on December 1 and the $23.06 closing price on December 2).  *Id*. ¶¶13, 63; ECF #131 at 5:6-7; Hartzmark 1 ¶¶92-94.

Defendants opposed certification based on the lack of price impact.  ECF #136.  They exposed a crucial error in Plaintiff's timeline:  Gertel had not spoken until the second half of the trading day on December 2, after most of the $3.29 day-over-day increase already had occurred.  Defendants submitted the Expert Report of Alexander Aganin, Ph.D. ("Aganin 1"), which included an event study showing that the stock price did not increase by a statistically significant amount after the December 2 Statement actually had been made.  ECF #136-2.  Defendants also showed that because the SAC did not allege the stock price already was inflated prior to the December 2 Statement, a theory known as "price maintenance" does not apply, which rendered irrelevant the price decline after the March 8 Statements.  *See* Section IV, *infra*.

In its reply brief and accompanying Rebuttal Report of Michael L. Hartzmark, Ph.D.

("Hartzmark 2"), Plaintiff tried to show that Gertel's statement caused the stock price to increase immediately after it was made.  ECF ##140, 141-2.  Plaintiff also opined that six analyst reports issued between December 13, 2010 and February 4, 2011 caused the stock price to increase and inferred this meant the December 2 Statement had price impact weeks after it was made.  Finally, Plaintiff argued that the price decline after the March 8 Statements undermined a lack of price impact.  Defendants filed evidentiary objections, a sur-reply, and Rebuttal Report of Alexander Aganin, Ph.D. ("Aganin 2").  ECF ##144, 148, 148-1.  These submissions showed that the analyst reports cited by Plaintiff constituted evidence of new information which severed the link between the December 2 Statement and any increase in Finisar's stock price.

The Court found for Defendants on all disputed issues.  The December 2 Statement had been made after the stock price already had increased by $3.04 from the previous day's close.  December 5 Order at 9:15-10:1.  Aganin's reports were persuasive, and the December 2 Statement did not cause the stock price to increase when made.  *Id.* at 13:22-15:6.  Defendants were correct that price maintenance theory requires that the stock price was artificially high at the time of the challenged statement and the misstatement maintained that inflated price, which the SAC did not allege.  *Id.* at 12:10-13:21.  The Court further ruled that the evidence Defendants submitted of the contents of the post-December 2 analyst reports showed that they introduced new information into the market about inventory and growth conditions for which Defendants were not responsible, which severed the link.  *Id.* at 11:18-23, 13:18-21.

### III.  THERE IS NO BASIS TO REVISIT THE COURT'S PRIOR ORDER

N.D. Cal. Civil Local Rule 7-9 prohibits reconsideration (which is what the Motion really requests) absent new material facts, a change of law, or a manifest failure by the Court to consider previously submitted facts and law (an argument Plaintiff already made and lost).  Fed. R. Civ. P. Rule 23(c)(1)(c) gives discretion to alter or amend class certification orders, but courts exercise that discretion in moderation.  *See Lanovaz v. Twinings North America, Inc.*, 2014 WL 7204757, **1-2 (N.D. Cal. Dec. 17, 2014) (surveying cases).  Courts allow renewed certification motions to address a change in applicable law.  *See, e.g.*, *In re BP P.L.C. Sec. Litig.*, 2013 WL 6388408, *18 (S.D. Tex. Dec. 6, 2013).  A renewed motion also may be allowed when a court denies a prior

1    motion explicitly without prejudice to its renewal.  *See*, *e.g.*, *Apple iPod iTunes Antitrust Litig.*,

2    2011 WL 5864036, *1 & n.7 (N.D. Cal. Nov. 22, 2011).

3         Neither situation applies here.  Rather, Plaintiff again argues that the price decline after

4    the March 8 Statements shows price impact.  Plaintiff's characterization of its current submission

5    as "affirmative evidence" (*id.* ¶¶60-62, Motion at 2, 3, 6) does not change the fact that all the

6    information underlying the Motion and Hartzmark 3 report existed at the time of the prior

7    briefing.  Plaintiff was obliged to make its best certification argument in its initial motion and in

8    fact addressed Defendants' price impact argument extensively in its reply submission.  The Court

9    should reject Plaintiff's attempt at a repechâge.  *In re Federal Home Loan Mtg. Corp. Sec. Litig.,*

10   2012 WL 4435292, *1 (S.D.N.Y. Sept. 26, 2012) (rejecting new certification motion that

11   attempted "reopening a question that has been exhaustively litigated") ("A plaintiff who wants to

12   lead a class action should be prepared to put his best foot forward on the initial application");

13   *Lanovaz*, 2014 WL 7204757 at *2 (Rule 23(c)(1)(c) does not support "allowing a second motion

14   for class certification on the basis that plaintiff could pursue a 'new' or alternative damages

15   theory not previously proposed.").

16
17   **IV.    PLAINTIFF STILL CANNOT USE THE POST-MARCH 8 PRICE DECLINE TO
         SHOW PRICE IMPACT**

18        Should the Court consider the Motion on the merits, the sole issue is whether Plaintiff has

19   shown through a credible expert analysis or otherwise that the price decline after the March 8

20   Statements provides after-the-fact evidence of the price impact of the December 2 Statement

21   despite the lack of a price increase after that statement was made.  This Section first explains why

22   the SAC itself prohibits the Motion's argument to that effect.

23        Plaintiff claims the Court ignored the possibility that price impact can exist in the absence

24   of a price increase after an alleged misrepresentation.  Motion at 4:13-24, 5:8-22, 6:27-7:4.  In

25   fact, Defendants' prior opposition brief distinguished cases where courts found price impact

26   without a price increase.  ECF #136 at 15:21-17:3.  The Court was aware of this legal argument

27   when it issued the December 5 Order, and declined to reconsider its ruling upon Plaintiff's

28   reconsideration motion (ECF #153).

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
Case No. CV 11-1252 EJD

Plaintiff also claims the Court erred in ruling that the SAC does not rely on a price maintenance theory (which infers price impact from a price decline at the end of a class period). Motion at 7:5-16.  But the Motion does not address the basis for the Court's ruling:  the allegations in the SAC that the stock price was not inflated prior to December 2.  *See* Section II, *supra*.  The doctrine of judicial estoppel prohibits Plaintiff from disavowing these allegations today, especially as they helped Plaintiff defeat the motion to dismiss the SAC.  *New Hampshire v. Maine*, 532 U.S. 742, 749-51 (2010); *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782-83 (9th Cir. 2001) (doctrine "precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position.").

Hartzmark now argues that Defendants' statements on December 1, 2010 created misapprehension about a lack of inventory build-up and hence price inflation, and that Gertel perpetuated the misimpression and consequently the inflation the next day (December 2). Hartzmark 3 ¶14.  But this is an illegitimate change of position.[1]  Plaintiff challenged the December 1 statements in the Consolidated Complaint ("CC"), but dropped them from the First Amended Complaint ("FAC").  *See* December 5 Order at 9 n.2.  While Plaintiff appealed the order and judgment dismissing the FAC, it did not appeal the dismissal of the CC or of the claims based on the December 1 statements.  Plaintiff cannot now attempt to characterize the December 1 statements as misleading.  Thus, if the December 1 statements caused a stock price increase, this was neither <u>artificial</u> inflation nor an increase based on the market's <u>mistaken</u> view of the facts.  It remains the case that there was no preexisting inflation as of the December 2 Statement.

The absence of pre-existing inflation is important because in all price maintenance cases (which depend on a price decline at the end of a class period to show price impact of an earlier statement), the stock price already was inflated as of the time of an alleged misrepresentation. This is true for the appellate cases outside the certification context that established the theory. *See*, *e.g.*, *In re Vivendi, SA Sec. Litig.*, 838 F.3d 223, 255-56, 258 (2d Cir. 2016) (plaintiffs

---

[1] *See also* ECF #140 at 13:27-13:5 (Plaintiff brief distinguishing *IBEW Local 98 Pension Fund v. Best Buy Co*., 818 F.3d 775 (8th Cir. 2016), on grounds that Hartzmark "makes clear that the two statements would be viewed differently by investors, from an economic standpoint.").

calculated inflation "due to the market's misapprehension about [the company's] true liquidity risk" from start of class period; defendant's statement can have price impact as a matter of substantive securities laws if it affirms the preexisting misapprehension and thus "*prevents* preexisting inflation in a stock price from dissipating.").[2]   It is also true for the appellate case that extended the theory to class certification.  *Waggoner v. Barclays PLC*, 875 F.3d 79, 104 (2d Cir. 2017) (applying *Vivendi*'s "already extant"-inflation theory of price impact and affirming *Strougo v. Barclays PLC,* 312 F.R.D. 307 (S.D.N.Y. 2016) on that basis).  It also is true of the district court cases applying the theory.[3]   Plaintiffs' other cases do not address price impact in the absence of a misrepresentation that caused the stock to increase when made.  *See, e.g.*, *Cooper v. Thoratec Corp.*, 2018 WL 2117337, **4-5 (N.D. Cal. May 8, 2018) (defendants reiterated prior misrepresentations that already had caused price increase).[4]

Thus, Plaintiff cites no authority in support of its new theory in this Motion:  that price impact can exist where the market accurately prices a stock up to the nanosecond before a misrepresentation, and then inflation suddenly is introduced even though there is no price movement and the challenged statement is alleged to be new and material.  *See, e.g.*, Motion at 12:3-7 ("propping it up through the introduction of a statistically significant level of artificial inflation"); Hartzmark 3 ¶10 ("price impact from the alleged misrepresentation made by Mr. Gertel at the December 2nd Conference through the rapid introduction of artificial inflation…").

---

[2]  *See also Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 417-18 (7th Cir. 2015) (plaintiff claimed "actual inflation" based on market misunderstanding of facts on first day of class period); *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1313 (11th Cir. 2011) (price "inflated by 26.44 percent before and throughout the Class Period").

[3]  *Willis v. Big Lots, Inc.*, 239 F. Supp. 3d 634, 656-57 (S.D. Ohio 2017) ("already artificially inflated price"); *Baker v. SeaWorld Entertainment, Inc.*, 2017 WL 5885542, *11 (S.D. Cal. Nov. 29, 2017) (misstatements "propped up [the] stock price"); *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1341 (N.D. Ga. 2007) (misstatements affirmed false market expectations).

[4]  *Semerenko v. Cendant Corp.*, 223 F.3d 165, 171 (3d Cir. 2000); *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 984 (N.D. Cal. 2015); and *Demarco v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 110, 124 (S.D.N.Y. 2004) did not address class certification or price impact; the cites are to analyses of loss causation, which is different.  *See* Section V(E)(4), *infra*.  Defendants did not argue price impact in *Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015), and the court did not address it. *Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 345 & n.3 (D.N.J. 2018) distinguished the December 5 Order because the defendants in that case, unlike Defendants here, did not proffer an event study showing that the stock price did not increase after the alleged misrepresentations.

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
Case No. CV 11-1252 EJD

This theory is foreclosed for the same reason the Court did not need to consider traditional price maintenance in the original motion:  the SAC.  The SAC alleges the stock price was depressed, not inflated, due to the market's uncertainty as to whether telecom customers were building up inventories, until Gertel supposedly assured there was no need to worry about inventory build-up.  Given these allegations (which Plaintiff cannot disavow), under accepted economic principles, one would expect the stock price to immediately and significantly increase after the December 2 Statement, which would have removed the uncertainty hampering the price.  *See* Aganin 3 Section VI.  Of course, it did not.

In its December 5 Order, the Court observed:  "Neither the Supreme Court nor the Ninth Circuit, however, has addressed the relative importance of the date of the alleged misstatement as compared to the date of the corrective statement in analyzing price impact and the issue is open to debate."  *Id.* at 12:10-13.  According to the allegations of the SAC, stock price increase on the date of the alleged misstatement in this case would have great importance on price impact, as that was the date Gertel allegedly assured a skeptical market and told it not to worry about inventory build-up.  Even under Plaintiff's new theory of instant inflation, and perhaps especially under that theory, one would expect a significant increase in the price of the stock.  The absence of a significant contemporaneous increase in the stock price has great relative importance and undermines Plaintiff's theory of price impact.

## V.     THE POST-MARCH 8 PRICE DECLINE DOES NOT SHOW PRICE IMPACT

This Section explains why the Motion should be denied even if its new price impact argument was not foreclosed by the SAC.  Plaintiff's argument fails due to a cascade of methodological, legal, and evidentiary errors.

### A.     Plaintiff and Hartzmark Mischaracterize The December 2 Statement

Hartzmark relies on the SAC's characterizations of the December 2 Statement as denying that telecom customers were buying parts to stockpile inventory and thereby assuring a skeptical market that growth would be sustained.  Hartzmark 3 ¶¶1 (SAC alleges Gertel misspoke "by assuring them that Finisar was able to detect customer inventory buildup and that they had not seen any customer inventory build-up."), 14, 38-39.  This characterization of the December 2

1  Statement is integral to the Motion, which contends that the stock price declined when the March

2  8 Statements revealed the growth-sapping inventory build-up Gertel supposedly had denied.

3       At class certification, however, in discharging its obligation of "rigorous" analysis, the

4  Court should not accept the allegations of the SAC as true as they pertain to class certification but

5  rather must evaluate the evidence, which in this case includes the December 2 Statement itself.

6  *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013) (court's analysis

7  "must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying

8  claim'…."). The evidence refutes Plaintiff's characterization. Gertel did not assure investors

9  "that Finisar was able to detect customer inventory buildup and that they had not seen any

10 customer inventory build-up." He nowhere said that it was not possible for more than one or two

11 customers to build their inventory over six quarters without the inventory build-up being visible

12 to Finisar. *Cf*. SAC ¶65. As the evidence below shows, Gertel disavowed knowledge of

13 inventory levels at telecom customers, and he said that Finisar did not know one way or another

14 whether those customers were stockpiling inventory.

15      Hartzmark quotes part of the December 2 Statement: "As far as we know we haven't seen

16 any inventory issues with our product with our customers." Hartzmark 3 ¶13.[5] But Gertel

17 explained his answer, first referring to visibility into inventories on the LAN/SAN side of its

18 business, where Finisar "own[ed] the inventory" and hence knew inventory levels and its

19 customers' use of inventory:

20      Our product—our business is 60/40, basically 40% is the LAN/SAN business, 60% is
        telecom. On the LAN/SAN side, by far the majority of our sales is a vendor-managed
21      inventory. So we have visibility to what people have. There is no reason for them to have
        inventory because we own the inventory. So we're pretty safe with that.
22

23 *See* Aganin 3 ¶16. Gertel then explained Finisar's lack of visibility concerning its telecom

24 customers' inventory levels and their reasons for purchasing parts from Finisar:

25      And on the telecom side, look, there can be one or two guys who try to build their own
        inventory, but by far the majority of the customers expediting product and doesn't look to
26      us, not visible to us at all, all these quarters if they are building any inventory.

27 _____
   [5] Hartzmark also quotes a remark about the "fundamentals for growth," which is nonactionable
28 puffery and which the Ninth Circuit did not include in its account of what stated a claim in the
   December 2 Statement. Hartzmark ignores the rest of Gertel's answer. Aganin 3 Ex. RR.3.

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
Case No. CV 11-1252 EJD

Gertel used the word "if" in this part of his answer to explain that Finisar did not know whether customers were building inventory. He did <u>not</u> say that it was visible that customers were not building up inventories. Nor did he say "it was not possible" for more than one or two customers to build inventory over six quarters without Finisar's knowledge as Plaintiff spins the statement (SAC ¶65); this spin so pushes the envelope that it must be regarded as a fabrication and can be ignored for class certification purposes. Rather, Gertel said Finisar did not know whether ("if") customers were building up inventories, and in fact volunteered that at least some customers could be doing exactly that, outside Finisar's purview. Hartzmark testified that there is a difference between concern and uncertainty about a risk existing on the one hand and certainty that the risk will materialize on the other. Transcript of the Deposition of Michael L. Hartzmark, Ph.D. ("Hartz'k Tr.") at 100:3-13 (attached as Austin Decl. Ex. 2). Thus, when Gertel said it was not visible whether inventory build-up was occurring, he clearly was not speaking with certainty and was not providing assurance against the risk of build-up as alleged.

A "rigorous" analysis cannot ignore the contents of the December 2 Statement and rely instead on the SAC's allegations characterizing the statement. A complaint is not evidence and we are past the pleading stage when courts defer to allegations. When factual disputes bear on matters vital to certification, the court must evaluate the evidence and resolve disputes before certifying the class. *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). Evidence is particularly important when a defendant challenges price impact. "Whether the 'alleged misrepresentation did not actually affect the market price of the stock' is a question of fact, to be judged based on all the evidence." *Ohio Pub. Emps. Ret. Sys. v. Federal Home Loan Mortg. Corp.*, 2018 WL 3861840, *13 (N.D. Ohio Aug. 14, 2018) (citing *Halliburton II*, 134 S. Ct. at 2417); Motion at 9 n.8. "<u>Any</u> showing that severs the link between [an] alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248 (emphasis added); *Halliburton II*, 134 S. Ct. at 2408. Thus, evidence of a lack of price impact must be taken into account even if the evidence also might advance a defense on the merits. *Arkansas Teachers Ret. Sys. v. Goldman Sachs Group, Inc.*, 879 F.3d 474, 485-86 (2d Cir. 2018).

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
Case No. CV 11-1252 EJD

Evidence from analyst reports which could not have been considered at the pleading stage further supports Defendants. The SAC alleges that analysts were deeply concerned about the risk of inventory build-up and its effect on future demand. If Gertel actually had stated that Finisar had visibility into telecom inventory, denied build-up and assured investors not to worry, it would have been major news. But there was no mention of the December 2 Statement in subsequent analyst reports, and analysts continued to recognize and identify as risks inventory build-up and a slowdown in demand, and did not change their forecasts for Q411. Aganin 3 Section VII.

### B.   The Post-December 2 Analyst Reports Sever The Link

By saying that Finisar did not know whether telecom customers were stockpiling inventory, Gertel in effect invited analysts to investigate and come to their own conclusions about whether this risk was emerging and its impact on future demand. A number of analysts did. The Court found that six analyst reports issued after the December 2 Statement (on December 13 and 15, 2010; January 5, 2011; and February 4, 2011) but before the March 8 Statements introduced new information into the market based on the analysts' independent assessments of industry conditions and without reference to the December 2 Statement. As a matter of law, Defendants were not responsible for these reports, which they neither issued nor endorsed. December 5 Order at 11:18-23. Thus, the reports severed the link between the December 2 Statement and any increase in price after that statement. *Id*. at 13:18-20. Plaintiff does not challenge the legal basis of this ruling, nor may Hartzmark disavow his prior opinion that the reports increased the stock price by suppressing the market's recognition of the risk of inventory buildup. Hartzmark 2 ¶52.

Hartzmark again claims the stock price increased by statistically significant amounts well after the December 2 Statement. He purports to control for the effect of the analyst reports by removing the price increases on three dates from the price decline after March 8, leaving a $6.87 to $7.09 residual decline in stock price, which he simply automatically connects to the December 2 Statement with no evidence of the tie. *See* Motion at 3:17-20, 10:12-11:1; Section V(C), *infra*. But he does not address the dates of three analyst reports previously addressed by the Court. These analysts reported that based on their own investigation, they had not found that the risk of inventory build-up had emerged through early January 2011. PiperJaffray reported on December

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
Case No. CV 11-1252 EJD

13:  "We touched base with a variety of contacts in the Optical sector and feel incrementally more confident regarding near-term demand and longer-term growth opportunities.  We believe the favorable bandwidth drivers which consume increasingly more optical components will continue to drive growth for FNSR and others in this space."  The same analyst reported on January 5: "Initial data points from our industry contacts in networking, storage and telco suggest 2010 closed out strong and the pipeline heading into 2011 remains robust."  Aganin 3 Ex. RR-4 at 30, 36.  That same day, the Juda Group wrote that management's tone at recent meetings "validates our recent checks indicating that business trends in the telecom optical component market remain strong with Finisar and JDSU outperforming peers."  *Id.* Ex. RR-4 at 34.

Two dates addressed by Hartzmark (December 15 and February 4) were dates of analyst reports the Court previously considered.  The December 15 Credit Suisse report identified "customers' replenishing component inventory" as a factor in the current growth cycle, thus highlighting that customers had bought parts to re-stock their inventories.  The analyst conducted an analysis which showed that in the past, Finisar had outgrown its customers for longer than the six quarters of growth in the current cycle.  Aganin 3 Ex. RR-4 at 32.  The analyst allowed for the possibility that Finisar would outgrow its customers, but qualified this assessment as follows: "Moreover, <u>if</u> investors believe <u>telecom</u> <u>carriers</u> are on the verge of a major optical upgrade cycle <u>beginning</u> <u>in</u> <u>2011</u>, Finisar outgrowing its customers for the last six quarters should be the beginning of a longer streak…."  *Id.* (emphasis added).  "Telecom carriers" are the customers of Finisar's telecom customers.  Thus, according to this analyst, whether growth would continue depended on third party exogenous demand factors outside of Finisar's direct knowledge that would or would not emerge in 2011, <u>not</u> December 2010.

The two February 4, 2011 analyst reports cited by Hartzmark were based on reactions to competitors' public statements.  Even the title of one report acknowledges this:  "Raising Estimates & TP on Derivative Reads."  "Derivative Reads" means reports from competitors.  Aganin 3 Ex. RR-4 at 51 ("positive derivative reads coming from JDSU, OCLR, OPLK, and OPXT").  Where this analyst believed that "demand appears to be accelerating" and adjusted his Finisar model to "(partly) account for the stronger demand environment" (Hartzmark 3 ¶54), he

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
Case No. CV 11-1252 EJD

mentioned nothing about the December 2 Statement or even Finisar-specific information.

Hartzmark mistakenly asserts that the December 2 Statement affected the stock price by suppressing the market's recognition of the actual risks associated with inventory build-up and resulting slowdown in China business.  The December 2 Statement did not say or do this, but as shown above the analyst reports <u>did</u> report that this risk had not materialized as of early February 2011.  Hartzmark admits the reports affected the stock price, and as a matter of law Defendants were not responsible for the reports.  Thus, the evidence strongly supports the Court's earlier finding that the contents of the price-impacting analyst reports contained new information, unrelated to the December 2 Statement, that severs the link.

The path of Finisar's stock price confirms this.  The closing price on December 2 was $23.06.  The closing price on the trading day before the December 13 analyst report was $25.33, not far off from $23.06.  Hartzmark 1 App'x D at 1.  Even after the March 8 Statements, the closing price was $24.61.  What happened in the meantime?  The analyst reports.  If price impact assumes that what goes up must come down (Motion at 8), the evidence shows that the reason why the price went up prior to March 8 was the analyst reports, not the December 2 Statement.

**C.     Plaintiff's Price Impact Methodology Is Unreliable And Legally Unsound**

Even if Plaintiff had accurately characterized the December 2 Statement (which it did not) and the analyst reports had not severed link between that statement and any stock price increase (which they did), there is still no price impact because Hartzmark's methodology used to arrive at purported "artificial inflation" in Finisar's stock price on December 2, 2010 based on the stock price decline on March 9, 2011 is unscientific and is not the product of reliable principles and methods that are reliably applied to the case, as required under Fed. R. Evid. 703.

The reasons why Hartzmark's methodology is unsound and unreliable are discussed in detail in Section IX of the Aganin 3 report and his discussion is summarized here.  In sum, the first step an economist would undertake to perform an analysis of price inflation requires specifying a hypothetical alternative disclosure in place of the challenged disclosure, a step that Hartzmark inappropriately skips in his calculation of purported "artificial inflation."  Second, an economist would estimate the impact on security prices of the disclosure of that information, and

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
Case No. CV 11-1252 EJD

1   only that information.[6]  Hartzmark does neither.  He makes no attempt to identify the specific

2   information that Finisar allegedly withheld and should have disclosed to the market on December

3   2, 2010 in the hypothetical world.  This step is crucial because it allows the court and the parties

4   to scrutinize the hypothetical disclosure to ascertain if the evidence shows the information existed

5   and was disclosable as of that date.  Moreover, Hartzmark starts his calculation of purported

6   "artificial inflation" as of December 2 with an assumption that the March 8 Statements were

7   corrective.  Hartzmark 3 ¶¶20, 38.  But he skips making a comparison of the alleged corrective

8   disclosure on March 8, which concerned recent developments in orders and specific levels of

9   projected demand for Finisar's products Q411, with the alleged misrepresentation on December

10  2, 2010, which concerned Finisar's knowledge or lack thereof of a build-up of inventory at

11  telecom customers as of that date.  However, March 8, 2011 was the first time that Finisar

12  provided Q411 guidance.  The only quantitative financial guidance Finisar had provided prior to

13  March 8 was the Q311 forecast issued on December 1, which it exceeded.  Hartzmark 3 ¶32.

14      Nor does Hartzmark put the allegedly withheld information in the context of information

15  that was already available to the market; therefore, he does not show if or quantify how the

16  hypothetical alternative disclosure would have affected the value of Finisar's stock as of

17  December 2, 2010, as would be required for the calculation of inflation on this date.  Hartzmark's

18  calculation of purported "artificial inflation" is based entirely on the observed residual changes in

19  Finisar's stock price on future dates, which he attributes to the December 2 Statement without

20  explanation.  Hence, Hartzmark purports to calculate "artificial" inflation but instead

21

22  [6]  Aganin cites an article which explains that to estimate inflation, an economist constructs an
     "equivalent disclosure price…[that] is the price at which the security would have traded if the
23  omitted and misrepresented information—and *only* that information—were accurately disclosed
     at the start of the class period.  To calculate the equivalent disclosure price, one must precisely
24  determine the information that was omitted or misrepresented.  Second, one must estimate the
     impact on security prices of the disclosure of that information, and only that information.  As
25  *Basic* and *Liggett & Myers* illustrate, only in rare circumstances does the second step simply
     involve observing the market price of the security on a date by which all elements of the fraud
26  have been revealed because, by that time, the market price has been affected by more information
     than just the information misrepresented or omitted."  Aganin 3 ¶40 n.50, *citing* Bradford Cornell
27  and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market
     Cases," 37 UCLA L. REV. 37 883, 894-95 (1990) (emphasis in original).  Cornell and Morgan's
28  "equivalent disclosure price" is the "but-for stock price."

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
Case No. CV 11-1252 EJD

1   inappropriately assumes his result.  This is not the application of reliable principles and methods

2   to the evidence in the case.  Finisar's price decline on March 9, 2011 followed the emergence of

3   new information regarding the level and the timing of future demand for Finisar's optical

4   products.  The market learned that the demand for Finisar's optical products in Q411 would be

5   below analyst and investor expectations that these market participants formed throughout the

6   putative Class Period.

7          Hartzmark's calculation of purported "artificial inflation" is fundamentally disconnected

8   from the disclosures that Finisar could conceivably have made in the hypothetical alternative

9   world relevant to the calculation of inflation.  While the alleged misrepresentations concerned

10  Finisar's visibility into customer inventory levels as of December 2, 2010, Hartzmark's

11  calculation of purported "artificial inflation" is based on the stock price decline on March 9, 2011

12  in response to the *realization* of the risk of inventory build-up.  The March 8 Statements nowhere

13  stated that the risk had materialized as of December 2, 2010 and did not "correct" the earlier

14  statement.  Because the stock price decline in response to the realization of a risk cannot be

15  presumed to equate to the stock price reaction to a statement concerning the probability of risk,

16  Hartzmark's "back-casting" exercise is fundamentally incapable of modeling inflation resulting

17  from the alleged "suppressed actual risks" of future declines of demand for Finisar's products.

18         Alternatively, Hartzmark assumes, without any analysis, that securities analysts and

19  investors would have adjusted their estimates of Finisar's financial performance in Q411 and

20  beyond in response to an unspecified hypothetical alternative disclosure on December 2, 2010 in

21  a way that would generate a stock price decline that would somehow happen to be approximately

22  $7 that he calculates using stock price data from weeks and months later.  Hartzmark's approach

23  of assuming his answer in this way is unscientific and cannot form a reliable basis for calculating

24  purported "artificial inflation" on December 2.

25        Plaintiff and Hartzmark eventually admit to their methodological error.  Rather than

26  specifying the hypothetical alternative disclosure so that Hartzmark's assumptions can be tested,

27  Plaintiff and Hartzmark instead define the "truth" that should have been disclosed non-

28  specifically and amorphously as everything Gertel knew but did not disclose about potential

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
Case No. CV 11-1252 EJD

1    inventory build-up and adverse effects on future demand as of that date.  *See* Motion at 6:15-20

2    ("had the truth been disclosed at the December 2nd Conference, instead of the misrepresentation in

3    response to the question presented, the level of the market price of Finisar would have been lower

4    by a statistically significant amount."); Hartz'k Tr. at 78:2-83:10, 90:8-91:10, 150:3-151:19.  This

5    is an attempt to defer price impact analysis to trial, rather than to present (as Hartzmark claims to

6    undertake) a price impact theory whose assumptions regarding what "should have been

7    disclosed" can be tested for price impact purposes as required at this stage under *Halliburton II*.

8         Following Hartzmark's approach would be a severe departure from the securities law.

9    Price impact inferred from a price decline at the end of a class period depends on comparing the

10   statements made earlier with the information disclosed at the time of decline, not with the

11   universe of all information that may have existed earlier.[7]  Moreover, Finisar did not have a duty

12   to disclose all material information as of December 2.  Even if one speaks about a topic such as

13   inventory or demand, there is no duty to disclose all material information about the topic; there is

14   a duty to disclose only what is needed to make the affirmative statement not materially

15   misleading.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2010); *Brody v. Transitional*

16   *Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  Thus, by positing the "all that Gertel knew"

17   standard to assess price impact, Plaintiff invites the Court to disregard substantive securities law.

18        To compound his error, Hartzmark does not specify or model the price effect of the

19   hypothetical alternative disclosure his approach requires Gertel to have made.  To calculate

20   whether a stock price was artificially inflated as of a particular day, one must assess how the price

21   would have reacted in a hypothetical scenario had an alternative disclosure of information been

22   made that was different from what was actually disclosed.  But Hartzmark makes no attempt to

23   model this hypothetical scenario.  Rather, he assumes it will be proven at trial what Gertel knew

24   on December 2 and that this information will be used as the alternative disclosure in assessing the

25

26   [7]  *See*, *e.g.*, *Household Int'l*, 787 F.3d at 416-17 (experts' models, which identified "each major
     disclosure event and then measured the disclosure's effect on the stock price on that specific day"
27   and calculated "the net sum of price declines due to corrective disclosures," "measure the value of
     the truth" "because had the statement been truthful, the stock price would have done what it did
28   do once the truth was revealed").

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
                                                                          Case No. CV 11-1252 EJD

1   "true" price that day.  Hartz'k Tr. at 82:24-83:10, 90:24-91:10.  This essentially would eliminate

2   defendants' right under *Halliburton II* to try to show the lack of price impact at class certification.

3   It is not the reliable application of accepted principles and methods to this case.  *See* Aganin 3

4   ¶¶13, 39; Fed. R. Evid. 702(c); *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

5       Finally, Hartzmark merely assumes that on December 2, the market would have reacted to

6   a disclosure which is not specified in a way that would generate a stock price decline of

7   approximately $7.  He derives this number from stock price data from weeks and months later

8   (the actual decline at the end of the class period minus the purported effect of new information

9   observed in the market on three dates that occurred weeks and months after December 2).  This

10  too is not the application of reliable principles and methods.  *See* Aganin 3 ¶¶47-56.  Hartzmark's

11  approach <u>assumes</u> an answer that must be supported by the evidence, and cannot form a reliable

12  basis for either identifying the existence of, or of calculating, artificial inflation.

13
    **D.    Plaintiff's Characterization Of The December 2 Statement As Forward-Looking Is**
14  **Integral To Its Motion And Cannot Be The Basis of A Corrective Disclosure**

15      Plaintiff asserts that the December 2 Statement was forward-looking, and assumes the

16  information Gertel was required to disclose on December 2 includes whatever information

17  Finisar's management knew at the time about future demand.  Hartz'k Tr. at 78:6-11 (analysis

18  assumes "management knew about an inventory build that <u>was going to take place</u> on December

19  2nd") (emphasis added), 71:10-12 ("The inventory build which would lead to a reduction in

20  demand and a slower growth rate in the future are all tied together."), 102:11-12, 103:7-104:5.

21      Any assertion that Finisar had a duty to project the future is wrong.[8]  Gertel did not have a

22  duty either to disclose all material forward-looking information or to make a Q411 forecast on

23  December 2.  Nor did he represent on that day that past growth would be sustained in Q411.  *See*

24  Sections V(A), (B), *supra*.  Nor can a forecast for Q411 be implied from Finisar's reported results

25

26  _____
    [8]  They also change Plaintiff's position; the SAC denied that any challenged statement was
27  forward-looking.  SAC ¶84.  This makes a major difference to scienter, as the standard for
    forward-looking statements is actual knowledge of falsity.  15 U.S.C. §78u-5(c)(1)(B)(i).  If
    Plaintiff is allowed to reinterpret the December 2 Statement as forward-looking, Defendants
28  should be allowed a motion for judgment on the pleadings to challenge that revisionist view.

1   in prior quarters.  *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512-14 (9th Cir. 1991).

2          For current purposes, however, the key is that Plaintiff's characterization of the December

3   2 Statement as forward-looking is integral to its Motion.  The retrospective information disclosed

4   on March 8 (the results for Q311 ending January 31, 2011) was positive.  Hartzmark 3 ¶¶30-32.

5   Only the forward-looking information also disclosed on March 8—the Q411 forecast, an

6   assessment of demand for a quarter ending April 30, 2011—could have figured in the stock price

7   decline.  It follows that unless Plaintiff construes the December 2 Statement as making a forward-

8   looking projection about Q411, there can be no contradiction between December 2 and March 8

9   and no "corrective disclosure" that Plaintiff's price impact theory requires.  In other words, the

10  Motion depends on a construing the December 2 Statement as a projection for Q411 and beyond

11  when Q411 would not even begin until nearly two months after the statement (February 1, 2011).

12         This provides another reason to deny the Motion.  Defendants' public disclosures

13  precluded investors treating the December 2 Statement as a projection of Q411 demand or results.

14  Rather, Finisar cautioned investors <u>not</u> to extrapolate or predict that far into the future based on

15  conditions as they existed on December 2.  Forms 10-Q filed on September 9 and December 8,

16  2010 warned that quarterly revenues were:  (i) subject to fluctuation due to factors such as

17  "fluctuation in demand for our products," "the timing or cancellation of large customer orders,"

18  and "the evolving and unpredictable nature of the markets for products incorporating our optical

19  components and subsystems"; and (ii) dependent on orders received during the quarter (which

20  generally were cancelable or could be delayed).  The 10-Qs also cautioned that "period-to-period

21  comparisons of our results of operations are not meaningful and should not be relied upon as

22  indications of future performance."  Austin Decl. Ex. 3, 4.  Moreover, Finisar only issued

23  forecasts for the quarter in progress at the time of an earnings release; *e.g.*, on December 1, 2010,

24  Finisar issued a forecast only for its Q311 ending January 31, 2011.  When Finisar issued these

25  short-horizon forecasts, it explicitly disclaimed any duty to update.  *Id.* Ex. 5 at 4 of 10.

26         Where an issuer provides a forecast for a short-horizon, specific time period (*i.e.*, Q311)

27  and cautions investors to treat subsequent quarters (*i.e.*, Q411 and beyond) as *sui generis* time

28  periods that can only be assessed with any certainty at a later point in time, and price impact is

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
Case No. CV 11-1252 EJD

grounded on a purported forecast for a later time period, the *Basic* link is severed.  This is especially true where the conditions affecting future performance are dynamic and complex, not static.  *See* Section V(E)(2), *infra*.

**E.     The Preponderance Of The Evidence Refutes Any Inference That The Stock Price Reaction To The March 8 Statements Indicates That The December 2 Statement Had Price Impact**

Even if the *Basic* link had not been severed as it was, the evidence refutes price impact under Plaintiff's purported corrective disclosure approach.  Such an approach requires a contradiction between an earlier alleged misrepresentation and a later price-moving disclosure.  Without such a contradiction, one cannot draw a reasonable inference that the price decline after the later disclosure reflects how the price would have reacted for price impact purposes had the true information as compared to the alleged misrepresentation been disclosed at the time of the misrepresentation.  Thus, in *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 487-88, 493 (S.D.N.Y. 2011), analysis of defendants' later disclosures showed that they did not correct alleged earlier misrepresentations, so the stock price declines after the disclosures did not show price impact.  In *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, *16 (N.D. Cal. Dec. 22, 2016), the Court found that two adverse disclosures cited by plaintiff did not show price impact where the contents of the statements were not corrective of the alleged misrepresentations.  *See also Berks County Emps.' Ret. Fund v. First Am. Corp.*, 734 F. Supp. 2d 533, 540-41 (S.D.N.Y. 2010) (content-based analysis of price-moving disclosures used to assess price impact).

Here, Plaintiff cannot possibly show how and why the March 8 Statements contradicted the December 2 Statement because it mischaracterizes the December 2 statement as providing assurance against the risks of inventory build-up or a slowdown in growth.  *See* Section V(A), *supra*.  Even apart from this basic error, Plaintiff's argument fails.

**1.     The March 8 Statements Did Not Disclose Any Information About Inventory Or Demand As Of The December 2 Statement**

The Motion relies on the fact that both the December 2 and March 8 Statements referred to inventory.  Thus, Hartzmark testified that the "corrective disclosure" are the factors Finisar disclosed in the March 8 press release and conference call explaining its Q411 forecast issued that

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
Case No. CV 11-1252 EJD

1   day that supposedly had not been anticipated by the market:  inventory build-up for certain

2   products and a general slowdown in China business (factors Hartzmark assumes are related).

3   Hartz'k Tr. at 12:20-13:5, 58:5-13, 70:1-71:12.

4           The evidence shows that the March 8 Statements provided information only about

5   inventory as of February 2011 and only provided information about customer orders as of January

6   2011 ("a couple of months earlier" than March 8).  Defendants did not make any statement on

7   March 8 about the status of telecom customer inventories, or the level of demand from those

8   customers for Q411 or any other future period, as of December 2, 2010.  Aganin 3 App'x A.  And

9   while Hartzmark relies on analyst reports to assess what was revealed on March 8 (Hartzmark 3

10  ¶¶16-20), those reports did not mention inventory or future demand as of December 2010 and

11  Hartzmark admitted he had not seen such disclosure in the record.  Hartz'k Tr. at 106:6-11.

12          Thus, even as Hartzmark assumes in his opinion that "Plaintiff alleges that, in truth,

13  Chinese customers had been acquiring surplus parts – *i.e.,* building surplus inventory – to protect

14  against a supply disruption of products from Finisar" (Hartzmark 3 ¶14), there is no evidence that

15  the market was told this situation was true of the December 2 Statement.  Markets react to the

16  new information actually disclosed to them.  The information that must have been disclosed in

17  order for there to be price impact under the theory of the Motion never was stated.

18
                        **2.      Even Plaintiff's Expert Rejects The Notion That Conditions In**
19                              **February 2011 Must Have Existed In December 2010**

20           Plaintiff may argue that if telecom customers reported excess inventory in February 2011,

21  this must have also been true on December 2, 2010, and hence that the market's reaction to the

22  March 8 Statements actually was a reaction to inventory and demand conditions as of December 2

23  even though those conditions were not disclosed to the market.

24          This argument assumes a simple and static world in which there is a necessary and fixed

25  relationship between telecom customers' inventory levels at a particular point in time and their

26  demand for Finisar's products.  But this assumption cannot be made.  Rather, telecom customers

27  buy parts from Finisar in order to build telecommunications networks for their customers, the

28  telecom carriers.  This means that telecom customers must assess their needs for Finisar parts

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
Case No. CV 11-1252 EJD

based on their assessment of the telecom carriers' needs.  When the telecom carriers' network-building schedules change, so too does the telecom customers' need for the parts sold by Finisar.  Intuitively, it is possible that a telecom customer can have a high inventory level because it is stockpiling parts, or because it needs the parts to satisfy its production schedules, or because it purchased parts to satisfy production schedules but the schedules slipped when telecom carriers delayed or cancelled projects.  Likewise, a telecom customer may have a low inventory level because it does not need parts for its production, or because it has rapidly used the parts it already purchased and desperately needs more.

In other words, the relationship between telecom customers' inventory levels, their perceived demand for parts from Finisar, their purchases from Finisar, and Finisar's perception of demand, is flexible and dynamic.  Hartzmark agrees.  He repeatedly testified to the dynamic nature of production schedules, inventory and demand, and the lack of a fixed relationship between these variables.  Hartz'k Tr at 76:15-25  ("Q:  Inventory build is a function of demand by the end user, if the demand by the end user changes then what you would consider to be inventory build would change; correct?  A:  Yes.  I think I've said this a couple times.").[9]  He even opined:  "It would not be necessary that there was inventory on the shelves of Finisar's customers on December 2nd for my, you know, for my calculation to hold."  Id. at 91:11-21; id. at 78:12-17 (did not assume management knew there was inventory build at Chinese customers on December 2).  This surely seals Plaintiff's fate.  Its Motion requires the information reported on March 8, 2011 (customers reported high inventory levels in February 2011) to have existed on December 2, 2010 in order to contradict the December 2 Statement, yet its expert's methodology allows for price impact even if there had been no inventory on the shelves at all as of December 2.

Given the dynamic nature of the relevant variables, Plaintiff and Hartzmark cannot bootstrap price impact from the March 8 Statements by arguing that they provided the market

---

[9]  He had.  Hartz'k Tr. at 71:13-72:16 (Finisar's customers purchase products, use some of them in production, and maintain whatever is left on their shelves), 73:19-74:1 (response to question "[i]s inventory build a static concept?") ("As I said before, the demand by the Chinese by Finisar's Chinese customers would be derived based on the end customers"), 75:16-18  ("The demand by Finisar's customers would be derived by their end user demand.").

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
Case No. CV 11-1252 EJD

1    with information about conditions as they existed in December 2010.  Indeed, the evidence shows

2    the market understood the opposite proposition:  demand conditions had changed.  Hartzmark

3    quotes a post-March 8 analyst report:  "The soft guide was attributed to push-outs in the Chinese

4    market, which is counter-intuitive given all the favorable news regarding accelerated optical

5    build-outs planned in China this year..."  Hartzmark 3 ¶16 (emphasis added).  This disclosed that

6    underlying end customer factors driving demand had unexpectedly changed in 2011.

7              **3.      Hartzmark Ignores The Actual Q411 Forecast Disclosed On March 8,**
             **Which Provided New Information About The Timing And Magnitude**
8            **Of The Emergence Of The Risks Known To Investors**

9         There is another reason why the March 8 disclosure of inventory build-up in February

10   2011 does not indicate price impact.  This item of information was not disclosed in isolation nor

11   quantified on its own.  Its disclosure was inseparable from Finisar's revenue forecast for Q411:

12   $235 million to $250 million.  Hartzmark refers to this forecast, citing SAC paragraph 78, which

13   alleges the stock price declined because $235-$250 million was far below the preexisting analyst

14   consensus of $268.8 million.  Hartzmark 3 ¶15.  As a matter of law, Defendants were not

15   responsible for the analysts' estimates, which they neither provided nor endorsed.

16        Hartzmark, however, does not model the effect on the stock price had the specific $235-

17   $250 million forecast disclosed on March 8 instead been disclosed on December 2, despite his

18   recognition that "[i]t is a widely-accepted principle within the field of financial economics that

19   the value of a stock is determined by the *discounted value* of the *expected* future cash flow of the

20   company."  Hartzmark 2 ¶55.  This is significant because the forecast provided new information

21   to the market on the timing and magnitude of the emergence of the risks of inventory build-up

22   and a slowdown in future growth as perceived by Finisar as of March 8 (risks Gertel had not

23   disclaimed and which analysts continued to recognize after December 2).  The price decline

24   reflects the incorporation of this new information.  Aganin 3 ¶¶48-50.  Hartzmark's methodology

25   is fundamentally incapable of modeling inflation resulting from the alleged "suppressed actual

26   risks" of future declines of demand for Finisar's products on December 2, 2010 as compared to

27   what was disclosed on March 8.  *Id.* ¶¶57-62.  Also, had Finisar's forecast been closer to the

28   $268 million analyst consensus (for which Defendants are not responsible), the price may not

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
Case No. CV 11-1252 EJD

1    have declined or may have declined by a lesser amount.  It may not have declined by enough to

2    leave any part of the residual $6.87 to $7.09 decline calculated by Hartzmark after supposedly

3    removing the effect of three interim price movement days.  This means that Hartzmark's model

4    depends on the assumption that Gertel should and would have disclosed the same $235-$250

5    million Q411 forecast on December 2 that Finisar later disclosed on March 8.  There is neither

6    evidence in the Motion nor allegation in the SAC that as of December 2, Finisar's Q411 forecast

7    was $235-$250 million—even assuming that, contrary to its policy and without an obligation to

8    do so, Finisar would have given a forecast on December 2 which looked that far into the future.

## 4.    A Note On Loss Causation

10       Plaintiff and Hartzmark repeatedly characterize their approach to price impact as a

11   standard loss causation analysis.  Hartzmark 3 ¶¶2, 12; Motion at 2:21 (Hartzmark report

12   "regarding loss causation and price impact"), 3:5-7, 6:9-10 ("loss causation analysis"), 8:22-9:6

13   ("loss causation analysis"), 10:5-7 ("By demonstrating loss causation....").

14       The Supreme Court ruled that loss causation and price impact are different, so the

15   analyses are not fungible and it is not the case that showing loss causation is a way to show price

16   impact.  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811-13 (2011).  That being

17   said, Plaintiff's having undertaken to show price impact via a loss causation analysis opens the

18   door for Defendants' rebuttal evidence on price impact under *Halliburton II*.  Moreover,

19   Defendants' positions in this Motion do not contradict loss causation law.  This case is not like

20   *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018) (per curiam), where

21   the company issued false financial statements that misrepresented its product defect liabilities, and

22   loss causation could exist because the stock declined after disclosure of the true financials and

23   liabilities.  *Id*. at 752.  There was no later revelation to the market of the adverse facts that had

24   existed at the time of the misrepresentations (*id*. at 754) because the March 8 Statements did not

25   disclose anything about conditions as they existed on December 2.  There was no "earnings miss"

26   on March 8 (*id*.); Finisar achieved its Q311 forecast and had not previously issued a Q411 forecast

27   against which its March 8 numbers could be assessed as a "miss."  The December 2 Statement

28   could not have "foreseeably caused the plaintiff's loss" (*id*.) because Defendants expressly

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
Case No. CV 11-1252 EJD

1   cautioned investors not to extrapolate into the Q411 future from the information disclosed on

2   December 2.  And Defendants do not argue in this opposition that loss causation cannot exist

3   unless the market learns it had been defrauded, *i.e.*, learns that defendants engaged in fraud by

4   providing false information with scienter.  *Id.* at 753.

5                        **VI.    <u>CONCLUSION</u>**

6          The preponderance of the evidence shows that the December 2 Statement did not have a

7   price impact.  The statement affected nothing (the stock price did not increase as one would

8   expect) because it said nothing; it was a demurral.  Later, some analysts did their own research

9   and reported that the risks of inventory build-up and a slowdown in demand had not materialized

10  through the start of February 2011.  When Finisar timely reported its Q311 results, it also

11  voluntarily disclosed its first-ever Q411 forecast, which was lower than what analysts had

12  expected in their own opinions.  Finisar did not disclose, and the market did not learn or

13  conclude, that anything about inventory or demand as of December 2, 2010 was other than as had

14  been represented.  To this day, there is no public information about these facts at that moment in

15  time.  The Motion should be denied.

16                                      Respectfully submitted,

17  November 29, 2018                    **DLA PIPER LLP (US)**

18                                      By: *<u>/s/ Shirli Fabbri Weiss</u>*
                                            Shirli Fabbri Weiss
19                                          Attorneys for Defendants

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
Case No. CV 11-1252 EJD